UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Robert J. Campbell, and
The Campbell Family Investment Trust
*Plaintiffs,*

CIVIL ACTION
NO.05-10620-WGY

V.

Town of Weymouth, and
Paul M. Dillon, Mary Sue Ryan,
Susan Abbott, Paul F. Lynch, individually
and as members of the Weymouth Planning
Board, and James Clarke individually and
as Director of Planning and Community
Development, and Jeffrey R. Coates,
individually and as Director of Municipal
Liens and Licenses, and Mary S. McElroy,
Francis O'Brien, Edward Foley, Martin Joyce,
Stanley Elkerton, individually and as members
of the Weymouth Board of Zoning Appeals, and
Officer Michael Nasuti, individually and as a
member of the Weymouth Police Department,
and Sandra Gildea, and Ruth S. Amos, individually,
and William Ryan, individually and as a member
of the Weymouth Board of Selectmen
*Defendants*

## FIRST AMENDED COMPLAINT

1.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343,
{28 U.S.C. §1441(c)} and 42 U.S.C. §1988(a)

## PARTIES

2.   The Plaintiff Robert J. Campbell is an adult individual currently residing at 50 Squanto

Road, North Weymouth, Norfolk County, Massachusetts 02191 and a citizen of the United

States.

3.   The Plaintiff The Campbell Family Investment Trust is a nominee trust established

dated April 29, 1996, with Francis Campbell and Ruth Campbell as Trustees, recorded

in the Norfolk County Registry of Deeds

Individually, and in his official capacity as Director of Municipal Liens and Licenses

11.    The Defendant Mary S. McElroy, is a current [appointed] member of the Weymouth
       Board of Zoning Appeals and former [elected] member of the Weymouth Planning
       Board, residing at 11 Peter Rd., N. Weymouth, in Norfolk County, MA 02191

12.    The Defendant Francis O'Brien, is a current [appointed] member of the Weymouth
       Board of Zoning Appeals, residing at 17 Erin Way, S. Weymouth, in Norfolk County,
       MA 02190.

13.    The Defendant Edward Foley, is a current [appointed] member of the Weymouth
       Board of Zoning Appeals, residing at 72 Colonels Dr., S. Weymouth, in Norfolk
       County, MA 02190

14.    The Defendant Martin Joyce, is a current [appointed] member of the Weymouth Board
       of Zoning Appeals, residing at 135 Academy Ave., Weymouth, in Norfolk County,
       MA 02188

15.    The Defendant Stanley Elkerton, is a current [appointed] member of the Weymouth
       Board of Zoning Appeals, residing at 15 South Ave., E. Weymouth, in Norfolk
       County, MA 02189

Individually, and in their official capacity as members of the Weymouth Board of Zoning
       Appeals

16.    The Defendant Officer Michael Nasuti, is a Patrolman with the Weymouth Police
       Department, formerly residing at 289 Neck St., N. Weymouth, in Norfolk County, MA
       02191

Individually, and in his official capacity as a member of the Weymouth Police Department,

17.    The Defendant Sandra A. Gildea, is the Founder and current and/or former President
       of the North Weymouth Civic Association, currently or formerly residing at 47 River
       St., N. Weymouth, in Norfolk County, MA 02191

26.  Representing the Plaintiffs, Searles presented the proposed day care and residential
     projects to the Defendant Jeffrey R. Coates, Building Inspector of the Town of
     Weymouth originally on/about February 1996 with applications for Building Permits.

27.  The Building Inspector refused to issue building permits stating that a Special Permit
     was required, since both lots are situated in a residential district R-1, with a floodplain
     overlay district classified by FEMA as a flood hazard zone A4.

28.  Representing the Plaintiffs, Searles applied for a Special Permit for the residential
     construction, to the Weymouth Planning Board on/about March 8, 1996.

29.  Representing the Plaintiffs, Searles applied for a Special Permit for the day care
     center, to the Weymouth Planning Board on/about April 22, 1996.

30.  After public hearings on April 22 and June 17, 1996, the Planning Board approved the
     Special Permit for construction on the residential lot.

31.  The Special Permit application for the day care center contained substantial errors
     made by Searles and Frank Gallagher, a subcontracted Professional Engineer. After a
     contentious public hearing on May 28, 1996, the Planning Board allowed Searles to
     withdraw the application without prejudice.

32.  During the late Summer or early Fall of 1996, the Plaintiffs were approached at their
     (former) residence at 8 Davids Island Road, North Weymouth, MA, by Defendant
     Officer Michael Nasuti, of the Weymouth Police Department, inquiring about plans
     for the daycare.

33.  Officer Nasuti introduced himself and informed Mr. Campbell that he was considering
     purchasing an abutting lot of land, with the intention of building a home for his young
     family. He expressed his concerns about having a daycare center and asked for details
     of the plan, to aid in his decision to purchase the land.

34. The Plaintiff mentioned his enthusiasm for the project and expressed his appreciation for Officer Nasuti's interest, commenting that he was the only town official to approach them informally to discuss the details of the plan.

35. Whereas the proposed location of the daycare was directly across the street from the Plaintiffs' residence at the time, Mr. Campbell and Officer Nasuti walked through the lot for approximately ninety (90) minutes, while the Plaintiff described in great detail the orientation of the building, parking and play areas.

36. Officer Nasuti appeared genuinely interested in the types of programs to be offered, since he had preschool children at the time and his {he} commented that his wife was expecting another. He even mentioned they may consider using the daycare services, as his wife intended to return to work as an EMT, after the baby was delivered.

37. As the meeting concluded, Mr. Campbell thanked Officer Nasuti for his interest in the project and mentioned that he welcomed the opportunity for a discussion with a member of the Police Department, seeing it as an opportunity to make amends for mistakes made years before and expressed a sincere desire to extend an apology to members of the department that were involved in past incidents[1].

38. The Plaintiff did not disclose any details or elaborate on the 1989 incidents and the discussion was terminated shortly thereafter.

39. In October 1996, Officer Nasuti purchased the property located at 289 Neck St, North Weymouth, applied for and received a Special Permit [noted in documents affidavit filed in Land Court Docket #237269] to build a single family residence on the lot abutting locus.

40. In October 1996, the Plaintiffs obtained a commercial financing agreement with the Bank of Braintree (Massachusetts) in the amount of two hundred sixty eight thousand

five hundred dollars ($268,500.00), contingent upon the issuance of permits, and intended for the purchase of locus, building construction and start-up costs.

41.  Through Searles, Plaintiffs submitted a second application for Special Permit, with completely revised plans, on/about November 1, 1996.

42.  Frustrated by the zoning exemption afforded to day care centers by Massachusetts General Law, Chapter 43A {40A}, §3, Defendant Members of the Planning Board initiated a review of specific Bylaws of the Town of Weymouth after the first public hearing in May, 1996.

43.  From May 1996 to January 1997, the Planning Board discussed and proposed changes to various Town Bylaws. Proposals were made to increase the minimum lot size in single-family residential districts, zone "R-1" from 15,000 square feet (s.f.) to 25,000 s.f (Town Bylaw 120, Table 1, Row R-1); increase the minimum lot width (Town Bylaws 120-6, 120-56C, and Table 1); increase minimum parking requirements at all commercial establishments (Town Bylaws 120-74C, D, I, J, K, and M(1)); and, add a minimum parking requirement at day care centers, where hitherto none existed, "…one space for each employee and one space for each 8 students…" (Town Bylaw 120-74 M(2))

44.  The proposed bylaw amendments were published in January 1997, as Articles 40, 41 and 42, in the Warrant for the Annual Town Meeting. Article 41 on minimum parking requirements for day care centers was further amended and substituted prior to Town Meeting in May, 1997 to include an additional caveat in Town Bylaw 120-74 M(2), "plus sufficient off-street space for convenient loading and unloading of clients," and change the terminology from students to clients.

---

[1] The Plaintiff, Robert J. Campbell was arrested in Weymouth twice during the summer of 1989, and charged with numerous offenses on Quincy District Court Docket Nos. 8956CR4773 & 8956CR5313.

45. During Public Hearings held on December 16, 1996, January 13, February 10, and February 24, 1997, Plaintiffs responded to all stated concerns and further modified the proposed plans by increasing the number of proposed parking spaces; including handicapped parking and sufficient space for the safe loading and unloading of clients; adding lighting, refuse and signage details; and providing additional documentation on engineering analyses for stormwater run-off, local traffic impact, student transportation and emergency evacuation procedures.

46. Plaintiffs contend that the Planning Board was unfairly biased toward the project and the Plaintiffs personally, as shown in the minutes of the public hearings and the unethical involvement of Defendants Dillon, McElroy and Officer Nasuti.

47. During the Public Hearings, Chairman Dillon, made reference to a number of issues beyond the purview of the Planning Board, allowed Board Members to engage in irrelevant lines of questioning and personally insinuated that the Campbells had an illegal in-law apartment in their residence.

48. Chairman Dillon also questioned if field trips to the beach during the summer were appropriate, by commenting that he did not want see 53 children walking down the street to the beach [from his front door].

49. Defendant Planning Board Chairman, Paul M. Dillon is an abutter of locus (approximately 200 yards), who was actively engaged in the purchase {of} his primary residence at 378 Neck St., N. Weymouth, during the public hearing process.

50. On the evening of February 4, 1997, the Plaintiffs received a telephone call from a resident of the Salt Water Creek Condominium, located at 275 Neck St, North Weymouth, MA, adjacent to the locus of the proposed daycare.

51. The caller informed them of a conversation that was overheard in the hallway outside the apartment of Ms. Ruth S. Amos, AKA Sandy Amos. The caller identified the

participants in the conversation as a Weymouth Police Officer [in uniform], and Ms. Amos, who were discussing the principals involved in the daycare project and how information could be used to deny the permits [for the day care].

52. The officer mentioned he had knowledge that the Plaintiff, Mr. Campbell, had prior "problems" with the Police, but that he could not check his criminal record legally, unless Mr. Campbell was arrested.

53. The discussion also included the extent of any influence the Plaintiffs' family may have in the town, where Mr. Campbell's mother, Ruth P. Campbell was a former elected Town Meeting Member and retired School Nurse, employed by the Town for over twenty (20) years.

54. The caller mentioned that the officer's police cruiser was outside the building with the engine running during the entire conversation, which was the reason she was alerted to his presence.

55. On February 6, 1997, Plaintiff Trustee Francis Campbell, sent a letter of concern describing the Officer's conversation about the Campbell family and their plans for a day care center to the Attorney General of the Commonwealth, with a copy to Morisi and Associates. No other action was taken on this issue at the time.

56. In the Public Hearings, Defendant Mary S. McElroy[2] was allowed to proceed with commentary and questioning about the details of the intended daycare operations, repeatedly inferring that the Plaintiffs intended to provide substandard care and facilities. Mrs. McElroy specifically mentioned the planned use of cots for toddlers in lieu of cribs; Directors of Health and Administration not being in the facility; teacher

---

[2] Defendant Mary S. McElroy is a current member of the Board of Zoning Appeals, but was an elected member of the Planning Board (and Defendant) during the previous proceedings. Mrs. McElroy's absence from the BZA public hearing that denied the Plaintiffs application for variance is notable to the instant case.

to staff ratios being inappropriate for specific age groups; and questioned the qualifications and involvement of certain individuals in daily operations.

57.  Defendant McElroy went as far as to introduce an unsigned letter that she received at her house and asked that it be read at the hearing. Whereas, Mary S. McElroy was an elected member of the Planning Board, her acknowledgement of receipt and deliberate introduction of that document in public hearing qualifies that document to be a public record, as defined by M. G. L. c. 4, § 7(26).

58.  Plaintiffs contend that the contents of the letter was made known to other Planning Board Members prior to the public hearing and that the subject of that public record had a significant effect on the Board's decision to deny the Special Permit.

59.  Defendant Sandra Gildea, as founder and (former) president of the North Weymouth Civic Association, attended the public hearings to refute the need for day care services in the area, challenge the proposed staff-student ratios, and consult{-ed} with members of the Planning Board before and after the hearings.

60.  Mrs. Gildea is directly associated with and/or related to the owner of the Just Right Child Care, Inc., located at 16 Church Street, Weymouth, MA, approximately two (2) miles from locus, ~~and~~ {which} was the closest privately owned competitor for day care services.

61.  Just Right Child Care, Inc. operates in a retired public school building owned by the Town.

62.  Defendant Mrs. Gildea made repeated verbal threats to the Plaintiff's wife, Tammy A. Campbell, following the public hearings and at casual meetings on the street, promising to continue to harass the family and any future day care operations.

impatience with the permit delays and imposed a thirty (30) day deadline to close the real estate transactions.

72. Without permits, the Bank of Braintree rescinded the financing offer and Plaintiffs were forced to use personal finances to purchase locus to maintain their pursuit of the permit appeal.

73. In April 1997, Plaintiffs purchased locus, using the undeveloped lot and their primary residence at 8 Davids Island Road, N. Weymouth, MA as collateral for a mortgage given by Associates Financial Services of America ("Associates").

74. Locus is currently owned by the Plaintiff The Campbell Family Investment Trust, with Francis Campbell and Ruth Campbell as trustees, by deed dated 4/4/97 and recorded with the Norfolk County Registrar of Deeds on 4/7/97.

75. To maintain their original plans, Plaintiffs were forced to use diminished personal finances to purchase the residential lot in May 1997, with an additional mortgage from Associates and a Seller financed agreement with Turnpike Realty.

76. Searles received an additional one thousand five hundred dollars ($1,500.00) at the closing in May 1997, as agreed in the Purchase and Sale Agreements, to cover Engineering expenses incurred during the permitting process.

77. Plaintiffs entered into Construction Agreements with Searles for the construction of the day care center and a single family residence.

78. The proposed bylaw amendments were adopted by majority vote at the Annual Town Meeting in May 1997, and became effective in August 1997.

79. After the new bylaws took effect, and prior to the end of 1997, the Planning Board proposed additional amendments to the off-street parking requirements, in order to further restrict day care development. The subsequent proposals increased the minimum parking requirements again (under Town Bylaw 120-74 M(2)); and, defined the area for loading/unloading as follows "...shall consist of a minimum of plus one (1) space for each 16 children..."

United States District Court
Docket #05-10620-WGY

80. As in 1997, the proposed bylaw changes were first published as Article 42 in the Warrant for the Annual Town Meeting in January 1998, but was amended and substituted prior to the Town Meeting in May 1998.

81. After being distributed for review and comments, the proposed changes in Article 42 were amended to further increase minimum parking requirements from "…plus one (1) space for each 8 clients…." to read "…plus one (1) space for each 6 clients…." (Town Bylaw 120-74 M(2)); the area for loading/unloading was changed to "… a minimum of plus one (1) space for each 12 clients…" (Town Bylaw 120-74 M(2)); and, imposed further restrictions by mandating "…all required [parking] spaces for non-residential uses shall be located behind the minimum front setback" in single family residential zone R-1 (Town Bylaw 120-70 B(1)). {Emphasis added to identify changes made after Article 42 was published in the Town Meeting warrant}

82. The Defendant Members of the Planning Board and James Clarke, as Director of Planning and Community Development, willfully and wantonly deceived every other department in Town, all Town Meeting Members and the Attorney General of the Commonwealth of Massachusetts, by deliberately falsifying the reason given to review and further amend the parking requirements at day care centers. The deceptive document was distributed for comments and review with the first draft of the proposed bylaw amendments.

83. The cover letter for Article 42 used to describe the first draft of the proposed changes, specifically states "Parking for daycare centers was recently adopted as Article 41 of the 1997 Annual Town Meeting. Since that time, the Planning Board has reviewed new applications for daycare centers, especially in single family districts."

84. Plaintiffs determined in June 2002, through Discovery in current action on Massachusetts Land Court Docket #280041, that no new or any other applications for daycare centers were received or reviewed by the Planning Board during this time.

85. During the Annual Town Meeting held on May 5, 1998, Defendant Susan Abbott, speaking on behalf of the Planning Board, presented the proposal stating "State Law allowing day care centers in any zoning district has created many problems for planning boards."

86. Acting under the color of law and with the sole intent of circumventing the zoning exemption given by MGL Ch. 43A {40A}, §3, the Planning Board's amendments were repugnant to law, through the prohibitive nature of their cumulative application [to day care development] and the manner in which they were implemented.

87. During the litigation on the first appeal, action was taken by the Board of Selectmen of the Town, to revise the application procedure for a Business Certificate, specifically with regard to the requirements for a Criminal Offense Records Investigation (CORI).

88. The application requirements for a Business Certificate were changed to impose the CORI requirement on "applicant *and/or its officers, stockholders and directors.*" (Emphasis added to the identify the modified language).

89. Defendant William Ryan is (former) Chairman of the Board of Selectmen, and the son of Defendant Planning Board Member, Mary Sue Ryan.

90. Plaintiffs contend that the change in CORI requirements was a preemptive move to enable the Town to further deny the day care project in the event that the Plaintiffs prevailed in their appeal.

91. With Plaintiff Mr. Campbell's involvement as an owner/shareholder, the revised CORI requirement could be used as further reason to prevent the operation of the day care [after construction].

92.  With continued delays, the Plaintiffs were faced with increased construction costs and the acquisition of the Bank of Braintree by U.S. Trust Co. prohibited renegotiation of the original financing agreement.

93.  In September 1998, on cross motions for Summary Judgment, Justice M. V. Green issued a decision in favor of the Plaintiffs and remanded the case to the Planning Board.

94.  A special permit was issued at a subsequent public hearing in November 1998.

95.  After the extended litigation, Plaintiffs were overburdened with three (3) mortgage payments for the two (2) undeveloped lots to sustain their original plans and faced continuous arrearages, jeopardizing their primary residence at 8 Davids Island Road.

96.  In November 1998, Plaintiffs made a decision to sell the primary residence and pay down the mortgages on the undeveloped lots.

97.  After the Special Permit was issued on the remand order, "South Shore leaders" urged Massachusetts State Senator Robert Hedlund-(R), Weymouth, to submit a bill to the Massachusetts Legislature, proposing an amendment to MGL Ch. 43A {40A}, §3, to remove the zoning exemption for day care centers and give local authorities control over day care development.

98.  An article published in the New England Section of Wall Street Journal on May 12, 1999, reported that the legislation proposed by Senator Hedlund directly resulted from the Plaintiffs' plans to build the day care center.

99.  Foreclosure action was initiated against Plaintiffs during the Summer of 1999 by the Associates.

100.  Unable to find an affordable home in Weymouth and faced with the uncertainty of being homeless, the Plaintiffs reached an agreement with a mobile home manufacturer

in August 1999, for a single-family home with approved financing, at a cost of
approximately seven hundred and ~~thirty~~ {sixty-five}dollars ($765.00) per month.

101. A second financing agreement for the day care construction and startup costs was
reached in September, 1999 with Horizon Bank, of Braintree, Massachusetts in the
amount of three hundred twenty-five thousand dollars ($325,000.00).

102. Plaintiffs secured private funding to pay the arrears on the mortgages, until the closing
on the primary residence on October 1, 1999.

103. Plaintiffs requested permission from the Defendant Building Inspector in September
1999, to use the undeveloped residential lot to place the temporary mobile home for
emergency shelter, as allowed by Town Bylaw 120-104, until a house could be built.

104. In a written response dated October 1, 1999, the Building Inspector denied the use of
the residential lot for emergency shelter, since the lot is in the "..100 year Special
Flood Hazard Zone A4, and as such will require a Special Permit...".

105. In the same correspondence, Building Inspector granted a 90-day extension to the
Special Permit issued in June 1996 for construction of a single-family residence,
covering the period from October 1, 1999 to December 29, 1999.

106. After a brief period of homelessness during the first two weeks of October 1999,
Plaintiff and his family were forced to commit to a lease for a three-bedroom
townhouse for one year, at a cost of approximately one thousand five hundred dollars
($1,500.00) per month, nearly twice the monthly cost of the proposed mobile home.

107. The extended period required for the sale of the primary residence caused the Plaintiff
Trustees Francis and Ruth Campbell to reduce the selling price of the primary
residence by more than fifty thousand dollars ($50,000.00), to a final selling price of
two hundred fifty seven thousand dollars ($257,000.00).

108. Net proceeds from the sale of the primary residence were inadequate to cover all the outstanding mortgage obligations, early payoff penalties and the cost of financing the arrears to prevent the foreclosure.

109. After the closing on the primary residence on October 1, 1999, Plaintiff Robert J. Campbell and his family were forced to obtain a personal loan for an the amount of six thousand dollars ($6,000.00) to pay for emergency shelter at a local motel, down payment for rent on the townhouse and to pay off other delinquent debts to be eligible for the lease.

110. Plaintiff Trustees Francis and Ruth Campbell, have permanently retired to their residence in New Hampshire, but continue to have significant travel expenses to Weymouth and the Boston area for regular doctors visits and other business. The house at 8 Davids Island Road had an in-law apartment used for frequent and necessary overnight trips.

111. In December 1999, Plaintiffs incurred additional costs for appraisal, legal and application fees in an amount of three thousand six hundred twelve dollars and eighty cents ($3,612.80), related to the commercial loan offer from Horizon Bank.

112. After meeting with officials from Horizon Bank in December 1999, the commercial financing offer was rescinded by the bank, due to the increased construction costs and remaining mortgage obligations on the undeveloped lots.

113. As a result, Plaintiffs sought to renegotiate the construction agreement with Searles but he refused. Plaintiff notified Searles of intent to cancel the construction agreement.

114. In December 1999, Plaintiff Robert J. Campbell was also forced to change careers resulting from injuries incurred in an industrial accident and irreconcilable differences with his employer.

115. To enter a new line of work in March 2000, Mr. Campbell took a thirty three percent (33%) cut in pay on a temporary assignment lasting six months, thereby increasing the financial burden on the family's ability to meet its' increased obligations.

116. In March 2000, Searles submitted an erroneous invoice for cancellation costs totaling twenty-three thousand dollars ($23,000.00), which included charges for Engineering services covered by the original deposits. Searles ignored attempts to negotiate a correct amount on the invoice.

117. Searles also refused to apply the ten thousand dollars ($10,000.00) previously received toward the invoice balance, even though the services listed were paid as previously agreed.

118. Plaintiffs began to investigate alternate methods of construction and solicited bids for modular and stick-built construction from other contractors.

119. Plaintiffs continued to struggle with mortgage payments on two (2) remaining mortgages for the undeveloped lot, with reduced income and without a business to generate additional revenues.

120. In August 2000, the Plaintiffs terminated the Construction Agreement with Searles for causing the grievous errors in the original Special Permit application and for failing to credit payments received.

121. In September 2000, Plaintiffs reapplied for a commercial mortgage with Horizon Bank, but the with outstanding balances on the remaining mortgages, Horizon Bank refused to reconsider a new application.

122. In September 2000, Plaintiffs incurred additional debt for approximately sixteen thousand nine hundred dollars ($16,900.00) for college tuition expenses for their oldest child to attend Suffolk University. The investment in the day care center was

originally planned to help with college expenses, but no return was available when it
was needed.

123. In October 2000, Plaintiffs reluctantly decided to give up their plans to build a house
on the residential lot and sell it undeveloped, to pay off the remaining mortgage
obligations.

124. In November 2000, as the Special Permit for the day care center was due to expire, the
Plaintiffs filed an application for a Building Permit, in order to sustain their plans to
build the day care center.

125. In November 2000, Plaintiffs were able to purchase their existing residence at 50
Squanto Road, North Weymouth, MA with a mortgage given by Household Financial
Services.

126. From December 2000 through April 2001, Town employees of the Building
Department misled prospective buyers by incorrectly telling them that the lot was too
small to build on. The residential lot contained only 15,492 square feet and the Town
had increased the minimum lot size to twenty five thousand square feet (25,000 s.f.)
(Town Bylaw 120, Table 1, Row R-1).

127. Both locus and the adjacent residential lot were exempt from the increase by the
grandfather clause in M.G.L. Chapter 40A, Section 6, for a period of five years after
the bylaw was amended in August 1997.

128. As the local authority, the Defendant Building Inspector and employees in his charge,
have an indisputable obligation to be aware of these issues, to investigate any
questionable lots and to provide accurate responses to an inquiry.

129. As a result of the erroneous information disseminated by Defendants between
December 2000 through April 2001, several prospective buyers backed out of a
potential sale and the plaintiff incurred additional delays in the sale of the property.

130. In January 2001, Plaintiffs received a Notice of Default and Acceleration on the remaining mortgage with the Associates.

131. On May 2, 2001, the Plaintiff Robert J. Campbell visited the Building Department to clarify the issue of lot size and inquire why incorrect information was being provided. When asked if the residential lot was "buildable," Inspector David Nikola informed the Plaintiff that the lot was too small and did not meet the minimum lot size of twenty five thousand square feet (25,000 s.f.).

132. On May 3, 2001, Plaintiffs requested a determination from the Building Inspector on the status of both lots regarding the minimum lot size, Special Permits and Building Permit application. An additional two week delay in responding to the request was caused by the Building Inspector when he denied receipt of the written inquiry by confirmed facsimile transmission.

133. Plaintiffs retained the services of Attorney Patrick Fitzgerald of Weymouth, MA to respond to inquiries on the lot size and provide documentation requested by the Building Inspector.

134. By written response on {in} May 2001, the Building Inspector advised that construction must begin within six months of the date of application for Building Permit, and that both the Building Permit and the Special Permit granted on remand order expired in May 2001.

135. The Building Inspector also advised that locus and the residential lot were exempt from the increase in lot size until August, 2002.

136. The effect of the delays imposed by the town required the Plaintiffs to re-apply for a special permit, subject to all the changes in the [unlawfully amended] zoning bylaws.

137. Unable to sell the residential lot, refinance the mortgage into a construction loan, or otherwise delay the foreclosure, the Plaintiffs were again forced to seek private funding to cover the arrears until the lot was sold.

138. Plaintiffs closed on the sale of the residential lot in September, 2001, paid the two remaining mortgages in full, and approximately eighteen thousand dollars ($18,000.00) in interest on the private financing obtained for the mortgage arrears.

139. Where the Plaintiffs continued to experience financial distress resulting from this ordeal, payments on their primary residence and a vehicle leased from GMAC became delinquent. Since the Plaintiffs were unable to negotiate payment plans with their creditors, GMAC repossessed the vehicle in January 2002 and Household Financial Services began foreclosure proceedings in March 2002.

140. On/about December 28, 2001, Plaintiffs applied to the Board of Zoning Appeals ("BZA"), on BZA Case # 2598, for a Special Permit under Town bylaw 120-38.3, and variance under Town bylaws 120-70.B. and 120-74.M.(2), to build the day care center on locus. Plaintiffs incurred an additional expense of five hundred dollars ($500.00) for the application fee.

141. Since the Plaintiff's submitted the identical plans for the day care center that were previously approved on remand order, where the increased restrictions were now applicable to the project, the variance was required for non-conformances in minimum parking and non-residential use of the required front setback.

142. At a public hearing on February 6, 2002, the Plaintiffs presented a hardship describing the delays imposed by the Town and other events leading to the current application, limitations on gaining additional parking due to the geometry of locus and the unavoidable use of the front setback for a circular driveway [non-residential parking].

143. The Defendant Members of the BZA ignored the hardship imposed by the geometry of the lot, neglected to address the circular driveway in the front setback and insisted that reducing the size of the building would accommodate all of the existing parking requirements.

144. By vote taken on February 6, 2002, the BZA denied the request for variance to the minimum parking requirements, but voted to approve the special permit to build within the floodplain.

145. The Defendants Nasuti and Dillon were also present and spoke at the hearing. As ~~an~~ abutters to locus, the Defendants have a personal financial interest in the outcome of the proceedings.

146. Officer Nasuti appeared at the hearing, to "represent the neighborhood" and offer his professional opinion as a Police Officer of the Town for over twenty years.

147. During the hearing, the Defendant James Clarke read the comments solicited from the Weymouth Police Department on the proposed project, which were limited to concerns about the width of the sidewalk in front of the building, the direction of traffic through the circular driveway and access for emergency vehicles.

148. Officer Nasuti's professional opinion, cited his many years of experience, and related that people who go before the BZA, offer only lip service to the Board's concerns and proceed to act anyway they feel, after receiving permits and/or variances, even if those actions are in direct opposition to the Board's concerns.

149. Defendant Nasuti inferred by his comments that the Plaintiffs intended to disregard safety conditions, allow indiscriminate passenger loading/unloading, unlawful parking on the street and sidewalk, thereby endangering clients of the day care center and passing traffic.

150. The Plaintiffs insist [and Standards of Conduct portend] that it is inappropriate for a municipal employee to represent any group or individual in any matter in which their employer is a party, and further offensive to publicly offer any opinion that significantly varies from that expressed by his employer, especially where the employee has a personal financial interest.

151. Defendant Dillon testified at the public hearing as a Member of the Planning Board, stating that the Board has been opposed to the project from the start, and the only reason a Special Permit had been issued was under Remand Order by the Land Court.

152. Defendant Dillon commented that he never received an Emergency Evacuation Plan during the 1997 proceedings, even though it was required by the Planning Board and revised by the Plaintiffs to include additional details after the Remand Order.

153. There is no statutory or regulatory requirement of any kind for the Emergency Evacuation Plan, and the Plaintiffs willingly prepared and provided a comprehensive plan.

154. Defendant Dillon was the only member of the Planning Board to vote to deny the Special Permit in defiance of the Remand Order.

155. The official decision of the BZA was issued in a notice dated March 14, 2002. On April 3, 2002, Plaintiffs filed an appeal of the BZA decision in the Massachusetts Land Court, Docket # 280041.

156. Whereas the Plaintiffs' attorney Michael V. Morisi is now deceased, Mr. Campbell is proceeding without representation and is diligently engaged in the Discovery of Facts and efforts to sustain all rights and privileges under the law.

157. The Plaintiff has filed subsequent Motions for Leave to Proceed Pro Se and for Continuance of Exemption [to the minimum lot size], which were assented to by Counsel for the Defense.

158. On April 18, 2002, Plaintiff Robert J. Campbell and his wife Tammy filed for personal bankruptcy protection under Chapter 13, in The United States Bankruptcy Court, District of Massachusetts, Case # 02-12823-CJK.

159. Plaintiffs continued to struggle with payments on the mortgage and Chapter 13 plan, with little funds remaining to cover monthly expenses.

160. Mr. Campbell was laid off in March 2003, due to his employer's decision to move operations to the State of Connecticut.

161. In July 2003, Searles filed a civil action against Plaintiffs in Plymouth County District Court, Brockton, Docket #0315CV1397 for Breach of Contract on the Construction Agreement, asking for title to locus and money damages in the amount of seven hundred thousand dollars ($700,000.00).

162. Plaintiffs insist that the full liability to Searles justly belongs to the Defendants in this action, where the delays in proceeding on the agreement were caused entirely by the Defendants' actions.

163. Plaintiff Mr. Campbell became a self-employed contractor and continued to make the required payments until August 2003.

164. The Chapter 13 case # 02-12823-CJK was dismissed on Motion by the Trustee on December 11, 2003, for failure to maintain payments.

165. Household Financial Services began the second foreclosure proceedings in April 2004, with an auction date of May 20, 2004.

166. On April 7, 2004, Mr. Campbell received at {a}contingent offer of employment as an ITS Project Manager for the United States Air Force (USAF) representing the Combat Information Transport System (CITS) Program Office, located at HQ-ESC, Hanscom, AFB.

167.  On May 15, 2004, Plaintiff Robert J. Campbell and his wife Tammy again filed for
      personal bankruptcy protection under Chapter 13, in The United States Bankruptcy
      Court, District of Massachusetts, Case # 04-13888-CJK.

168.  Plaintiff was selected for the position with the USAF CITS Program on May 17, 2004,
      with a start date of May 24, 2004. The position requires a SECRET security clearance
      issued by the United States Department of Defense (DoD).

169.  Plaintiff Mr. Campbell applied to the Defense Security Service (DSS) for an Interim
      Clearance on June 8, 2004, pending a full investigation for the SECRET clearance.

170.  Plaintiff had previously held a SECRET clearance from the DoD for nine years, while
      working at the NATO Seasparrow Surface Missile System (NSSMS) Program
      Manager's Office for Raytheon Co., from 1983 to 1992.

171.  Plaintiff resumed payments on both the mortgage and [second] Chapter 13
      restructuring plan in June 2004.

172.  By written notice received July 28, 2004, DSS denied the Interim Clearance stating six
      reasons; two (2) reasons related to the 1989 convictions resulting from Mr. Campbell
      arrests in Weymouth; and, four (4) reasons related to the distressed financial
      conditions caused entirely or in part by the Defendants in this matter.

173.  The two (2) reasons related to the Plaintiffs convictions in 1989, were fully
      investigated and adjudicated by the DoD in 1991, on Directorate for Industrial
      Security Clearance Review (DISCR) OSD Case No 90-1764, in favor of the Plaintiff
      Mr. Campbell, on all counts. {emphasis added}

174.  Details on the DISCR investigation and documentation included in the DoD case file
      are covered by the Privacy Act of 1974, under 5 USC 552a.

175.  Despite the 1991 DISCR adjudication, the Plaintiff was ineligible for a clearance
      under the Smith Amendment 10 USC 986, as of October 30, 2000. A recent

amendment to 10 USC 986, effective with the FY'05 Defense Appropriations Act, removes the disqualification status as of October, 2004.

176. The Plaintiff and his employer, Odyssey Systems Consulting Group, Inc. attempted to obtain a waiver, which would allow Mr. Campbell to continue in his position at Hanscom AFB. Base Commanders were uncertain that the changes proposed to the Smith Amendment would be approved by the Legislature and, given the four additional reasons for denying the Interim clearance, were unwilling to approve the waiver.

177. On August 19, 2004, a hearing was held before Judge Chamberlain of the Land Court [Docket #280041], on Plaintiff's Motion for Leave to Depose Witnesses with Stipulations. The motion was denied without prejudice.

178. Documents Affidavit in support of Plaintiffs Motion to Depose were admitted at the hearing on August 19, 2004.

179. Since Plaintiffs filed Documents Affidavits in Land Court action, that specifically mentions Officer Nasuti's involvement, he has increased his presence in the Plaintiffs neighborhood, with almost daily appearances in {either} his official capacity and{/or} by cultivating a personal relationship with Plaintiffs neighbors.

180. Plaintiff was discharged from his position at Hanscom AFB on August 20, 2004.

181. Plaintiff contends that the Defendants are responsible in whole or part for the continuing financial distress, and as such, are equally responsible for the recent decisions made by USAF officials.

182. Plaintiff and his wife have been unable to make payments on either the mortgage or Chapter 13 plan, since August, 2004.

183. In November 2004, Household Financial Services motioned for relief from automatic stay under 11 USC 362, but was superceded by a Trustees motion to dismiss Chapter 13 Case #04-13888-CJK.

184. Foreclosure action was again initiated in January 2005, but Plaintiffs filed for Chapter 13 protection a third time on February 4, 2005 on Case #05-10693.

185. Being unemployed and unable to submit a plan, the most recent case was dismissed on February 28, 2005.

## FACTS

186. The Plaintiffs have a protected statutory right given by MGL Chapter 40A, Section 3, to build and operate a day care center on locus.

187. The proposed day care project was fully compliant with all local and state bylaws and regulations when first proposed in 1996.

188. The Planning Board inappropriately denied the Plaintiffs Special Permit application in 1997.

189. The Planning Board exhibited an unfair bias toward the Plaintiffs, and allowed outside influences to affect their decision on the day care application.

190. The "anonymous letter" received by Defendant McElroy was intentionally brought, transported or otherwise conveyed to the Planning Board prior to the public hearing, with the sole intent to distribute the contents of the letter to other members of the Planning Board in order to discredit, humiliate or otherwise harm the Plaintiffs and their project.

191. The "anonymous letter" meets the criteria of a public record as defined by MGL Chapter 4, Section 7, Clause 26.

192. Members of the Planning Board were aware of sensitive information about the Plaintiff and unlawfully discussed and disseminated this information outside of the public hearings, in violation of the Open Meeting statute under MGL Chapter ~~30A, Section 11A ½~~ {39A, §23B}.

193. Defendant Members of the Planning Board conducted an unlawful executive session regarding the information in the "anonymous letter" and that the Plaintiff was denied his rights to representation under MGL Chapter ~~30A, Section 11A ½~~ {39A, §23B} (1)(a) through (1)(c).

194. The Town acted on sensitive information and took deliberate preemptive action to further deny the Plaintiffs project at a later date.

195. The Town failed to maintain proper control over a public record as required by MGL Chapter 66, Sections 7 and 8.

196. The Planning Board initiated changes to zoning bylaws in 1997 and 1998, in a deliberate and willful attempt to circumvent protections given by MGL Chapter 40A, Section 3.

197. The Planning Board exceeded its authority by proposing amendments to bylaws that are repugnant to law and deceptive in violation of MGL Chapter 40, Section 32.

198. The Defendant members of the Planning Board and municipal employees of the Planning Department intentionally and maliciously deceived other Town Departments, Town Meeting Members and the Attorney General of the Commonwealth, by falsifying a public record and knowingly distributing the false document, in violation of MGL Chapter 268, Section 6A.

199. The Town engaged in deliberate indifference to the discriminatory actions by the Planning Board [against day care centers], as to allow the circumvention of statutory protections [of MGL Chapter 40A, Section 3] as a matter of municipal policy.

200. The Town failed to prevent the official misconduct of its employees and allowed the distribution of false information both within the town and to the Attorney General.

201. The Town failed to prevent the official misconduct of its employees and allowed public officials and a municipal employee to willfully and maliciously violate Ethics Statutes under MGL Chapter 268A, Sections 17(c), 19(a), 23(b)(2), 23(b)(3), and 23(c)(2).

202. The Town failed to conduct due diligence in investigating and responding to inquiries on the minimum lot size of Plaintiffs residential lot.

203. The Building Inspector failed to inform or instruct employees in his department to confirm that correct information was provided in response to inquiries.

204. Delays in proceeding with construction on the original permits were the direct result of negligence or official misconduct on the part on Town employees.

205. The Plaintiffs presented a substantial hardship at the BZA public hearing on February 6, 2002.

206. The Defendant Members of the BZA deliberately and intentionally ignored the hardship presented by the Plaintiffs and neglected to address the variance requested under Town Bylaw 120-70.B, for non-residential use of the minimum front setback.

207. The BZA decision to deny the variance violated the uniformity requirements of MGL Chapter 40A, Section 4, where variances to the minimum parking requirements were granted on similar applications.

208. The Plaintiffs have no other recourse or rights to remedy and relief under MGL.

209. The Plaintiffs incurred substantial financial costs, losses and liabilities as a direct result of negligence by the Town and willful and intentional misconduct of certain municipal employees.

210. The Plaintiffs suffered substantial and continuous physical, emotional and
psychological distress as a direct result of the Defendants deliberate acts.


## Counts

211. The Defendants Town of Weymouth, Paul M. Dillon, Mary Sue Ryan, Susan Abbott,
Paul Lynch and Mary S. McElroy, James Clarke and Jeffrey R. Coates have violated
the Plaintiffs rights to due process given by {the Fifth Amendment of} the
Constitution of the United States.

212. The Defendants Town of Weymouth, Paul M. Dillon, Mary Sue Ryan, Susan Abbott,
Paul Lynch and Mary S. McElroy, James Clarke, Officer Nasuti and William Ryan
have violated the Plaintiffs rights to freedom from ~~repression~~ {oppression} given by
the Constitution of the United States.

213. The Defendants Town of Weymouth, Paul M. Dillon, Mary Sue Ryan, Susan Abbott,
Paul Lynch and Mary S. McElroy, James Clarke, Officer Nasuti and William Ryan
have violated the Plaintiffs civil rights under Title 42 U.S.C. §1983.

214. The Defendants Town of Weymouth, Paul M. Dillon, Mary Sue Ryan, Susan Abbott,
Paul Lynch and Mary S. McElroy, James Clarke, Officer Nasuti, William Ryan,
{Ruth} Sandra Amos and Sandra Gildea have conspired to violate the Plaintiffs civil
rights under Title 42 U.S.C. §1985.

215. The Defendants Town of Weymouth, Jeffrey R. Coates, Francis O'Brien, Edward
Foley, Martin Joyce and Stanley Elkerton have failed to prevent a violation of the
Plaintiffs civil rights under Title 42 U.S.C. §1986.

## REQUEST FOR RELIEF

216. Wherefore, the Plaintiffs requests that the Court vacate and remove the amendments to Town Bylaws adopted in 1997 and 1998; Sections 120-70 B(1); 120-74 M.(1) and M.(2); 120-6, 120-56C, and Table 1; and, 120, Table 1, Row R-1.

217. Plaintiffs also request injunctive relief against Defendants Gildea and Nasuti and all members of their professional affiliations in the North Weymouth Civic Association, Just Right Child Care, Inc. and the Weymouth Police Department, from further derogatory action and involvement in any respect.

218. Plaintiffs further request the Court award monetary damages to the Plaintiffs for all costs, losses and liabilities associated with this claim and accumulated over time from the first application for permit in March, 1996 to the present.

219. The Plaintiffs further request additional punitive damages, in an unspecified amount, to be decided by the wisdom of the Court, and any other relief as this Court deems just.

220. In addition, the Plaintiff Robert J. Campbell requests that the Court completely and permanently expunge his criminal record on the basis of fifteen years since the convictions, the results of the DoD investigation and adjudication, continuous personal improvement and over ten years of voluntary community service, in order to prevent the recurrence of similar events in the future.

Humbly submitted, signed and sworn to by:

Robert J. Campbell

Plaintiff, Pro Se
50 Squanto Road
North Weymouth, MA 02191
Telephone (781) 335-4362

Dated May 23, 2005

Page 31 of 32

United States District Court
Docket #05-10620-WGY