UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT J. CAMPBELL,

Plaintiff,

v.

TOWN OF WEYMOUTH, et al.,

Defendants.

C.A. No. 05-10620-WGY

**MEMORANDUM IN SUPPORT OF DEFENDANT SANDRA GILDEA'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Defendant Sandra Gildea submits this memorandum in support of her Motion to Dismiss the Second Amended Complaint for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).

The single count against Gildea, conspiracy to violate Campbell's civil rights (42 U.S.C. § 1985), must be dismissed because (1) it does not adequately plead Gildea's participation in a conspiracy; (2) it fails to satisfy even the "notice pleading" requirements of Rule 8(a) of the Federal Rules of Civil Procedure; and (3) even if a conspiracy is adequately plead, the claim is barred by the statute of limitations. In addition, the Second Amended Complaint must be dismissed in its entirety because Campbell lacks standing to bring this action, has failed to exhaust his state law remedies, and has failed to allege remediable constitutional injury.

Moreover, dismissal should be *with prejudice* because Campbell has already filed three substantively identical complaints, and, despite being afforded fair notice of the deficiencies in

his civil rights claims, has failed entirely to correct them and, instead, has simply asked this Court to afford him special treatment by allowing them to proceed as they are.

## BACKGROUND

This action began with a March 14, 2005 pro se complaint filed by Plaintiff Robert J. Campbell and The Campbell Family Investment Trust alleging improprieties with respect to the issuance of zoning and building permits for the construction of a daycare center on property in Weymouth.  The Complaint alleges that certain of the Defendants violated the Plaintiffs' rights to due process and "freedom from repression," that certain of the Defendants violated the Plaintiffs' civil rights (42 U.S.C. § 1983), that certain of the Defendants conspired to violate the Plaintiffs' civil rights (42 U.S.C. § 1985), and that certain of the Defendants failed to prevent violation of the Plaintiffs' civil rights (42 U.S.C. § 1986).

On May 24, 2005, the Plaintiffs filed a motion for leave to amend the original Complaint. Inexplicably, the Plaintiffs requested leave to, among other things, add Gildea as a defendant when she was already named, and allegations were already made about her, in the original Complaint.  Complaint ¶¶ 17, 59-63.  Also on May 24, 2005, the Plaintiffs filed a First Amended Complaint that contained the same allegations against Gildea as did the original Complaint.

On June 27, 2005, this Court entered a Memorandum and Order addressing, among other things, the Plaintiffs' motion for leave to amend the original Complaint.  Pursuant to 28 U.S.C. § 1915, this Court screened the First Amended Complaint and pointed out a number of deficiencies.  The Court observed that, among other deficiencies, the Plaintiffs' claims may be barred by the applicable three-year statute of limitations.  6/27/05 Mem. & Ord. 16.  In analyzing the issue, this Court stated the following:

> From the Plaintiff's detailed and exhaustive rendition of factual contentions, it appears that he knew or should have known of the alleged conspiracy well before

> March of 2002. The last possible violation that may be construed from the Complaint is the Board of Zoning Appeal's denial of Campbell's request for a variance. This denial occurred on December 28, 2001. Compl. ¶ 144. Therefore, the latest possible time that Campbell could have filed his Section 1983 Complaint was December 29, 2004. However, Campbell did not initiate this suit until March 14, 2005, almost three months after the statute of limitations period expired. Thus Campbell's suit is subject to dismissal as barred by the statute of limitations.

6/27/05 Mem. & Ord. 17-18.

With respect to the Plaintiffs' Section 1985 claim, the only claim asserted against Gildea, the Court concluded that "the claim is subject to dismissal for failure to comply with Rule 8(a) of the Federal Rules of Civil Procedure." 6/27/05 Mem. & Ord. 20. To begin its analysis, the Court determined that the only possible claim the Plaintiffs could be making (since the Plaintiffs did not say) was one under Section 1985(2). Then the Court stated that "[u]nder § 1985(2), Campbell must plead a conspiracy between Town officials to impede, hinder, or obstruct justice, and that the Defendants did so with the intent to deny equal protection to Campbell, or to injure Campbell's person or property in retaliation for Campbell's enforcing his equal protection rights. See 42 U.S.C. § 1985(2)." 6/27/05 Mem. & Ord. 21. Then the Court concluded that the Plaintiffs had failed to plead a Section 1985(2) conspiracy, even under the liberal "notice pleading" standard of Fed.R.Civ.P. 8(a):

> While Campbell alleges a multitude of adverse actions taken against him with respect to his permit applications, he fails to demonstrate how these actions amounted to an intended conspiracy to deprive him of his constitutional rights. The mere conclusory allegation of a conspiracy, without more, is insufficient to state a legally cognizable claim. Therefore, Campbell's § 1985 claim is subject to dismissal.

6/27/05 Mem. & Ord. 21-22.

Ostensibly in an effort to cure the deficiencies described in this Court's June 27, 2005 Memorandum and Order, on August 1, 2005, the Plaintiffs filed a Second Amended Complaint and a response to the Court's June 27, 2005 Memorandum and Order. On the statute of

3

limitations issue, the Plaintiffs noted that the Board of Zoning Appeals actually denied his request for a variance on February 6, 2002, then asserted that the statute of limitations period should run from March 14, 2002, the date of the Town Clerk's official letter notice of the denial. 8/1/05 Resp. 10-11.  The Plaintiffs also asserted that the statute of limitations ought to have begun running even later because "although [Campbell] was aware of the multitude of amendments to the Town's Zoning Bylaws, as they occurred, it was not readily apparent on the surface that Defendant members of the Planning Board and the Director of Planning and Community Development had deliberately engaged in deceit and chicanery to effect the changes to the Bylaws in order to circumvent the exemptions provided by M.G.L. Ch 40A, Sec.3" and that he figured all of this out while conducting discovery in the second Land Court case.  8/1/05 Resp. 11.  The Plaintiffs made no substantive response concerning the adequacy of their civil rights allegations in their Response to Show Cause Order, but, instead, "pray[ed] the Court allow the federal questions be allowed to continue pending resolution of the land use questions." 8/1/05 Resp. 13.

Especially relevant with respect to the conspiracy claim alleged against Gildea, the substantive allegations in the Second Amended Complaint *are exactly the same as those in the First Amended Complaint*.  Indeed, the only apparent difference between the two documents is deletion of the request that Campbell's criminal record be expunged.  The substantive allegations of the First Amended Complaint are, in turn, exactly the same as those contained in the Complaint.  Thus, the Plaintiffs made no substantive modification to the First Amended Complaint to address the concerns raised in this Court's June 27, 2005 Memorandum and Order.

On August 19, 2005, this Court entered a second Memorandum and Order to address the Plaintiffs' August 1, 2005 Response to Show Cause Order and Second Amended Complaint.  In

4

that Memorandum and Order, the Court stated that "[b]ecause Campbell has provided a sufficient show cause response to the June 24th Memorandum and Order to raise factual issues, this Court will permit summonses to issue for service of process of the Second Amended Complaint (#12) by Campbell, provided he pays the $125 fee." 8/19/05 Mem. & Ord. 4.

The Court also stated in its August 19, 2005 Memorandum and Order its intention to dismiss Plaintiff Campbell Family Investment Trust within thirty-five days unless a Notice of Appearance was filed by a duly licensed attorney representing the Trust. Id. at 7. When no Notice of Appearance was filed, this Court dismissed the Trust as a plaintiff in its October 14, 2005 Further Memorandum and Order.

## FACTUAL ALLEGATIONS

Solely for purposes of her Motion to Dismiss, Gildea presents here the relevant factual allegations, which, in assessing the motion, the Court assumes to be true. All references here are to the Second Amended Complaint, though the substantive allegations contained in the Second Amended Complaint are exactly the same as those contained in both prior versions.

In October 1995, Campbell entered into purchase and sale agreements with Searles Builders, Inc. for two adjacent lots in Weymouth, 311 Neck Street and 9 Davids Island Road. ¶¶ 22-24. Campbell intended to build a daycare center at 311 Neck Street (the "daycare lot") and a residence at 9 Davids Island Road (the "residence lot"). ¶¶ 22, 24. Campbell did not actually purchase the daycare lot until April 1997, however, and did not actually purchase the residence lot until May 1997. ¶¶ 73, 75. The Campbell Family Investment Trust, the Plaintiff dismissed from this action on October 14, 2005, currently owns the daycare lot. ¶ 74.

On or about February 1996, Campbell submitted building permit applications to the Town of Weymouth Building Inspector with respect to the daycare lot and the residential lot.

¶ 26.  The Building Inspector denied the Building Permits because both lots are located in a residential district and in a flood hazard zone, and informed Campbell that he needed to apply for Special Permits.  ¶¶ 27.

On or about March 8, 1996, Campbell applied for a Special Permit for the residential lot. ¶ 28.  After public hearings on April 22 and June 17, 1996, the Weymouth Planning Board approved the Special Permit.  ¶ 30.

On or about April 22, 1996, Searles Builders, on Campbell's behalf, applied for a Special Permit for the daycare lot.  ¶ 29.  Campbell then withdrew the application, purportedly because it contained "substantial errors," and the Planning Board, after a public hearing on May 28, 1996, allowed the withdrawal without prejudice.  ¶ 31.

On or about November 1, 1996, Campbell applied again for a Special Permit for the daycare lot.  ¶ 41.  While that application was pending, the Planning Board proposed changes to lot size and dimensions requirements and to parking requirements in the Town Bylaws.  ¶ 43. The proposed changes, which implemented minimum parking requirements for daycare facilities, were approved at the Weymouth Town Meeting in May 1997 and became effective in August 1997.  ¶¶ 43-44, 78.  Campbell changed his proposed plans to comport with the new requirements and "responded to all stated concerns" during public hearings on December 16, 1996 and January 13, February 10, and February 24, 1997.  ¶ 45.

On February 24, 1997, the Planning Board denied Campbell's application for a Special Permit.  ¶ 67.  Campbell appealed the denial to the Massachusetts Land Court (Docket #237269). ¶ 68.  In September 1998, the Land Court granted Summary Judgment to Campbell and remanded the case back to the Weymouth Planning Board.  ¶ 93.  In November 1998, the Planning Board granted Campbell's Special Permit.  ¶ 94.

Due to financial and contractual problems, Campbell was unable to build the daycare before his Special Permit expired in November 2000.  ¶ 124.  Accordingly, he applied for a Building Permit at that time.  Id.  Campbell was still unable to begin construction prior to May 2001, when his Building Permit expired.  ¶ 134.

On or about December 28, 2001, Campbell applied to the Board of Zoning Appeals for a new Special Permit and for a variance, the variance being necessary, apparently, for non-conformance to minimum parking requirements that Campbell implies, but does not specifically allege, were adopted at the 1998 Weymouth Town Meeting.  ¶¶ 79-81, 14-41.

On February 6, 2002, the Board of Zoning Appeals approved the Special Permit but denied the variance.  ¶ 144.  The written notice of that decision is dated March 14, 2002.  ¶ 155.  Campbell appealed the Board's denial to the Massachusetts Land Court (Docket #280041).  Id.  That matter is currently in the discovery stage.  ¶ 156.

In addition to describing the adverse decisions of the Town of Weymouth, Campbell makes conclusory allegations of improper conduct by a number of persons acting in various capacities.  One of those persons is Defendant Gildea.  The allegations naming Gildea, however, are contained in just five paragraphs:

17.   The Defendant Sandra A. Gildea, is the Founder and current and/or former President of the North Weymouth Civic Association, currently or formerly residing at 47 River St., N. Weymouth, in Norfolk County, MA 02191.

\* \* \*

59.   Defendant Sandra Gildea, as founder and (former) president of the North Weymouth Civic Association, attended the public hearings to refute the need for day care services in the area, challenge the proposed staff-student ratios, and consult{ -ed} with members of the Planning Board before and after the hearings.

60.   Mrs. Gildea is directly associated with and/or related to the owner of the Just Right Child Care, Inc., located at 16 Church Street, Weymouth, MA,

7

>      approximately two (2) miles from locus, and {which} was the closest
>      privately-held competitor for day care services.
>
> 61.  Just Right Child Care, Inc. operates in a retired public school building
>      owned by the Town.
>
> 62.  Defendant Mrs. Gildea made repeated verbal threats to the Plaintiff's wife,
>      Tammy A. Campbell, following the public hearings and at casual meetings
>      on the street, promising to continue to harass the family and any future day
>      care operations.

¶¶ 17, 59-62. Accepting the allegations as true—which they are not (most notably ¶ 61; public records show this is not the case)—they do nothing to support Campbell's claim that Gildea participated in any conspiracy.

## ARGUMENT

**I. THE CONSPIRACY CLAIM AGAINST GILDEA MUST BE DISMISSED**

### A. The Second Amended Complaint fails to plead Gildea's participation in a civil rights conspiracy.

The Second Amended Complaint must be dismissed with respect to Gildea, first, because it fails to adequately allege that Gildea participated in a civil rights conspiracy, the single count asserted against her. This Court must dismiss a plaintiff's complaint if the allegations contained therein show that the plaintiff would not be entitled to any relief under any state of facts that it could prove to support it. See, e.g., Conley v. Gibson, 355 U.S. 41, 45-46 (1957). This Court must accept all facts pleaded as true, view them in the light most favorable to the plaintiff, and draw any reasonable inference from them in the plaintiff's favor. See, e.g., Garita Hotel Limited Partnership v. Ponce Federal Bank, 958 F.2d 15, 17 (1st Cir. 1992). This Court may not, however, rely on "bald assertions, insupportable conclusions, and opprobrious epithets." Chongris v. Board of Appeals, 811 F.2d 36, 37 (1st Cir. 1987)(internal quotation marks and citation omitted).

In his only count naming Gildea, Campbell claims that "[t]he Defendants Town of Weymouth, Paul M. Dillon, Mary Sue Ryan, Susan Abbott, Paul Lynch and Mary S. McElroy, James Clarke, Officer Nasuti, William Ryan, {Ruth} Sandra Amos and Sandra Gildea have conspired to violate the Plaintiffs civil rights under Title 42 U.S.C. § 1985." ¶ 214.  As this Court stated in its June 27, 2005 Memorandum and Order, "[u]nder § 1985(2), Campbell must plead a conspiracy between [Gildea and] Town officials to impede, hinder, or obstruct justice, and that the Defendants did so with the intent to deny equal protection to Campbell, or to injure Campbell's person or property in retaliation for Campbell's enforcing his equal protection rights. See 42 U.S.C. § 1985(2)." 6/27/05 Mem. & Ord. 21.

The factual allegations concerning Gildea, ¶¶ 17, 59-62, do nothing to support a conclusion that Gildea conspired with anyone to do anything.  The only contact Campbell alleges between Gildea and Town officials is her *public* comments at *public* hearings on Campbell's proposed project and her alleged "consult[ation] with members of the Planning Board before and after the hearings." ¶ 59 (emphasis added).  The Second Amended Complaint provides no additional allegations concerning the circumstances of these alleged consultations, such as how many there were, where they took place, who besides Gildea was involved, who else was in the vicinity, or whether Campbell's daycare project was even discussed.  Thus, even if Campbell can prove that Gildea made public comments against Campbell's project and consulted with Town officials before and after public hearings, those facts do nothing to support a conclusion that Gildea participated in an intended conspiracy of any sort, let alone an intended conspiracy to deprive Campbell of his constitutional rights.

Campbell's other allegations—that Gildea is related to the owner of Just Right Child Care, Inc., ¶ 60; that Just Right Child Care operates in a public building owned by the Town,

9

¶ 61; and even that Gildea threatened Campbell's wife that she would "continue to harass the family and any future day care operations," ¶ 62—do nothing to support the conclusion that a conspiracy existed. These allegations, even if proven, describe, at most, individual motivations and individual actions. Absent further allegations of specific contact, communication, or collusion, Campbell's claim of conspiracy must fail.

Immediately after his allegations concerning Gildea, Campbell makes two further allegations that appear to imply some nefarious intent or action by Gildea even though she is not named in those paragraphs. First, Campbell alleges that "[c]oincidentally, Tammy Campbell was the subject of an investigation of a complaint made to the Office for Child Care Services (OCCS), on February 14, 1997, which resulted in a finding of no non-compliance on OCCS Complaint # 12753." ¶ 63. Campbell apparently hopes the Court will infer from this that it was Gildea who filed the complaint with the Office of Child Care Services. But this would be pure speculation, not a reasonable inference to be drawn from the facts alleged. And even if Campbell could prove that Gildea indeed filed the complaint, he would be proving only an individual act. It does nothing to show that Gildea intentionally conspired with Town officials to deprive Campbell of his constitutional rights.

Second, Campbell alleges that "Defendant members of the Planning Board, Paul M. Dillon (Chairman) and Mary S. McElroy are currently and/or formerly active members of the North Weymouth Civic Association." ¶ 64. Here, Campbell apparently hopes that the Court will infer that Defendants Dillon and McElroy communicated with Gildea about Campbell's project and conspired with her to deprive him of his constitutional rights. But even the inference, based on common membership in the North Weymouth Civic Association, that Gildea discussed the project with Dillon and McElroy is unreasonable speculation, particularly where Campbell

10

cannot even conclusively allege that Dillon and McElroy were members of the North Weymouth Civic Association during the relevant time period. To go from speculative communication to an intended conspiracy to deprive Campbell of his constitutional rights is just too far a stretch.

In short, Campbell cannot rely on speculation, implication, and innuendo to allege a conspiracy. He must allege facts. He has not done so here, and his complaint against Gildea must be dismissed.

### B. The Second Amended Complaint fails even to comply with the "notice pleading" requirements of Fed.R.Civ.P. 8(a).

In addition to failing to plead Gildea's participation in a civil rights conspiracy, the Second Amended Complaint must be dismissed with respect to Gildea because it fails to comply with the "notice pleading" requirements of Fed.R.Civ.P. 8(a), which requires Campbell to include in his Second Amended Complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." The statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests," Rivera v. Rhode Island, 402 F.3d 27, 33 (1st Cir. 2005) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)), such that the defendant is afforded a "meaningful opportunity to mount a defense," Diaz-Rivera v. Rivera-Rodriguez, 377 F.3d 119, 123 (1st Cir. 2004) (quoting Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1172 (1st Cir. 1995)). "In a civil rights action . . . , the complaint should at least set forth minimal facts as to who did what to whom, when, where, and why . . . ." Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 68 (1st Cir. 2004). Although "the requirements of Rule 8(a)(2) are minimal . . . minimal requirements are not tantamount to nonexistent requirements." Id. (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st Cir. 1988)).

As discussed in detail above, the Second Amended Complaint does nothing more with respect to Gildea than (1) expressly allege that Gildea made public statements at public hearings

11

and consulted with Planning Board members before and after such hearings; (2) imply that Gildea opposed Campbell's project to protect a family member's day care business; (3) imply that Gildea reported Tammy Campbell to the Office of Child Care Services; and (4) imply that Gildea communicated with Planning Board Members about Campbell's project. ¶¶ 59-64. None of the facts that Campbell expressly alleges or implies supports the conclusion that Gildea participated in an intended conspiracy to deprive Campbell of his constitutional rights. The Second Amended Complaint provides no illumination, and hence no notice to Gildea, on crucial questions concerning the alleged conspiracy. When did it come into existence? How was it formed? How was it organized? How and when did its members communicate? How did it achieve its ends? How did Gildea learn about it? How did she become involved? How did she participate? The answers to all of these questions are left to speculation. That is not enough to satisfy even Rule 8(a)'s liberal pleading requirements.

      **C.**    **The conspiracy claim is barred by the statute of limitations.**

Even if this Court concludes that Campbell has adequately alleged Gildea's participation in a conspiracy to violate his constitutional rights, his claim against Gildea must nevertheless be dismissed as barred by the statute of limitations. The limitations period for civil rights cases is three years. See, e.g., Govan v. Trustees of Boston Univ., 66 F. Supp. 2d 74, 80 (D. Mass. 1999). A civil rights cause of action accrues when the plaintiff knows or has reason to know of the injury that is the basis of the action. See, e.g., Carreras-Rosa v. Alves-Cruz, 127 F.3d 172, 174 (1st Cir. 1997). Here, Campbell knew or had reason to know of the conspiracy he alleges by the time the Board of Zoning Appeals denied Campbell's request for a variance at a public hearing on February 6, 2002, more than three years before Campbell filed his Complaint on March 14, 2005. His civil rights claim against Gildea is therefore untimely.

Campbell suggests in his August 1, 2005 Response to Show Cause Order that March 14, 2002 is the date on which his cause of action accrued because that is the date of the Town Clerk's letter officially notifying Campbell of the denial of his request for a variance. 8/1/05 Resp. 10-11. This analysis, he argues, would make his original Complaint timely. Id. Campbell presents no authority, however, for the proposition that the date of official notice, March 14, is more appropriate than the date of the actual vote, February 6, to establish when the Zoning Board of Appeals' denied his request for a variance. In any event, Campbell knew on February 6, *because he attended that hearing*, that his request was denied. The inquiry for this Court is when Campbell knew or had reason to know of his constitutional injury, not when "official" notice of the same occurred. The "know or reason to know" moment came on February 6, the day of the vote.

Further, Campbell knew or had reason to know of the civil rights conspiracy he alleges well before February 6, 2002. Even assuming Campbell's allegations are sufficient to state a civil rights conspiracy claim (and they are not), most of those allegations concern events that occurred well before February 6, 2002 and that Campbell knew about *as they happened*.

First, as Campbell acknowledges in his August 1, 2005 Response to Show Cause Order, "he was aware of the multitude of amendments to the Town's Zoning Bylaws, as they occurred." 8/1/05 Resp. 11.

Second, Campbell alleges a large number of facts and events that occurred or were revealed during public hearings on his request for a Special Permit on December 16, 1996 and on January 13, February 10, and February 24, 1997:

- Campbell alleges that, during the public hearings, Defendant Paul Dillon, Chairman of the Planning Board, "made reference to a number of issues beyond the purview of the Planning Board, allowed Board Members to engage

13

- in irrelevant lines of questioning, and personally insinuated that the Campbells had an illegal in-law apartment in their residence." ¶ 47.

- Campbell alleges that Dillon "also questioned if field trips to the beach during the summer were appropriate, by commenting that he did not want to see 53 children walking down the street to the beach [from his front door]." ¶ 48 (brackets in original).

- Campbell alleges that Dillon is "an abutter of locus (approximately 200 yards), who was actively engaged in the purchase {of} his primary residence at 378 Neck St., N. Weymouth, during the public hearing process." ¶ 49.

- Campbell alleges that, during the public hearings, "Defendant Mary S. McElroy was allowed to proceed with commentary and questioning about the details of the intended daycare operations, repeatedly inferring that the Plaintiffs intended to provide substandard care and facilities. Mrs. McElroy specifically mentioned the planned use of cots for toddlers in lieu of cribs; Directors of Health and Administration not being in the facility; teacher to staff ratios being inappropriate for specific age groups; and questioned the qualifications and involvement of certain individuals in daily operations." ¶ 56 (footnote omitted).

- Campbell alleges that "Defendant McElroy went so far as to introduce an unsigned letter that she received at her house and asked that it be read at the hearing." ¶ 57.

Campbell knew all of these alleged facts at the time of the public hearings on December 16, 1996 and on January 13, February 10, and February 24, 1997 because all of these alleged facts occurred or were revealed at those public hearings and Campbell, by his own admission, *attended those public hearings*. ¶ 45.

Third, Campbell alleges that "[o]n the evening of February 4, 1997, the Plaintiffs received a telephone call from a resident of the Salt Water Creek Condominium, located at 275 Neck St., North Weymouth, MA, adjacent to the locus of the proposed daycare." ¶ 50. According to the Second Amended Complaint, the unidentified caller reported to Campbell a conversation between Defendant Ruth Amos and Defendant Officer Nasuti, who was in uniform and had his marked cruiser running outside, wherein they allegedly discussed ways to stop

14

Campbell's daycare project. ¶¶ 51-55. Obviously, Campbell was aware of these alleged facts back in February 1997, when they allegedly occurred.

Fourth, Campbell alleges that "[a]fter the Special Permit was entered on the remand order, 'South Shore Leaders' urged Massachusetts State Senator Robert Hedlund (R), Weymouth, to submit a bill to the Massachusetts Legislature, proposing an amendment to MGL Ch. ~~43A~~ {40A}, § 3, to remove the zoning exemption for day care centers and give local authorities control over day care development." ¶ 97. Campbell further alleges that "[a]n article published in the New England Section of Wall Street Journal on May 12, 1999, reported that the legislation proposed by Senator Hedlund directly resulted from the Plaintiff's plans to build the day care center." ¶ 98. Obviously, these events became known to Campbell in May 1999, the time of the Wall Street Journal article.

Fifth, Campbell alleges that the Weymouth Building Department improperly represented during 2000 and 2001 that his lots were too small to build on when, in reality, they were exempt from a new minimum lot size through a grandfather clause. ¶¶ 126-36. Among other things, Campbell alleges that an additional two-week delay in responding to his May 3, 2001 request for a determination of the lots' status "was caused by the Building Inspector when he denied receipt of the written inquiry by confirmed facsimile transmission" ¶ 132. These events, of course, became known to Campbell at the time that they occurred because he was involved in them.

The five examples above do not even exhaust the facts and events that occurred before February 6, 2002 and that Campbell knew about as they occurred. Campbell knew most of the allegations that underlie his conspiracy claim well before the Board of Zoning Appeals denied his request for a variance on February 6, 2002. Accordingly, he knew or had reason to know of the conspiracy he alleges well before that time, and the statute of limitations bars his claims.

In his August 1, 2005 Response to Show Cause Order, Campbell suggests that his cause of action did not accrue until some point after March 14, 2002. He argues that "although he was aware of the multitude of amendments to the Town's Zoning Bylaws, as they occurred, it was not readily apparent on the surface that Defendant members of the Planning Board and the Director of Planning and Community Development had deliberately engaged in deceit and chicanery to effect the changes to the Bylaws in order to circumvent the exemptions provided by M.G.L. Ch 40A, Sec.3." 8/1/05 Resp. 11. Because he learned these facts during the most recent Land Court case in the summer of 2002, he argues, his complaint in this case was timely. Id. Campbell's reference to "deceit and chicanery" appears to be to an alleged misrepresentation by the Planning Board and the Director of Planning and Community Development that the Planning Board had recently reviewed new applications for daycare centers when it had not. ¶ 83. Even if true, the alleged single misrepresentation is a very small piece of the very large collection of allegations in the Second Amended Complaint. The lion's share of the facts that Campbell alleges in support his civil rights claims, including (1) the allegedly inappropriate actions of the Planning Board, (2) the allegedly inappropriate actions of Officer Nasuti, (3) the repeated changes to the Town ByLaws, (4) the legislation proposed by Senator Hedlund, and (5) the allegedly improper conduct of the Building Department concerning application of new size requirements to Campbell's two lots, were known to Campbell well before February 6, 2002. Given all that he knew before February 6, 2002, again, assuming he has sufficiently plead a conspiracy, Campbell knew or had reason to know about it well before that date, and his claim is too late.

16

## II. THE ENTIRE COMPLAINT MUST BE DISMISSED

### A. <u>Campbell lacks standing.</u>

As this Court observed in its June 27, 2005 Memorandum and Order, Campbell does not own the daycare lot at issue in this case. 6/27/05 Mem. & Ord. 12. Rather, the lot is owned by The Campbell Family Investment Trust, with Francis Campbell and Ruth Campbell as trustees. ¶ 74. The First Amended Complaint, which the Court analyzed in its June 27, 2005 Memorandum and Order, alleges neither ownership rights in the lot by Plaintiff Robert Campbell nor authorized representation by Plaintiff Robert Campbell of The Campbell Family Investment Trust. The Second Amended Complaint is exactly the same as the First Amended Complaint. The Court rejected Attorney Edward Clancy's contingent notice of appearance on the trust's behalf, 8/19/05 Mem. & Ord. 7, then later dismissed The Campbell Family Investment Trust as a party for failure to pay the filing fee and file an appearance of counsel, 10/14/05 Further Mem. & Ord. 1-2. Thus, to the extent Campbell, now the only plaintiff, alleges violation of property rights, he has failed to correct his standing problem, and the Second Amended Complaint should be dismissed.

### B. <u>Campbell has not exhausted his state law remedies.</u>

As this Court also observed in its June 27, 2005 Memorandum and Order, to the extent that Campbell's claim is interpreted as a procedural due process claim, it is barred in this Court by the availability of state law remedies. 6/27/05 Mem. & Ord. 13. First, Campbell appealed the February 6, 2002 denial of a variance to the Massachusetts Land Court (Docket # 280041). In addition, a Section 1983 takings claim is not ripe until the plaintiff has sought remedy under state inverse condemnation law. <u>See, e.g.</u>, <u>Ochoa Realty Corp. v. Faria</u>, 815 F.2d 812, 816-17 (1st Cir. 1987). Massachusetts has an inverse condemnation statute, G.L. c. 79, § 10. It appeared to the Court from its review of the First Amended Complaint that Campbell has not sought remedy

17

under that statute. 6/27/05 Mem. & Ord. 15. Campbell's civil rights claims, then, are not ripe for review by this Court.

### C. Campbell's allegations do not support a substantive due process claim.

As this Court also observed in its June 27, 2005 Memorandum and Order, "[e]ven if this Court were to construe Campbell's assertions as a substantive due process claim, his allegations are not sufficient to warrant redress." 6/27/05 Mem. & Ord. 18. A substantive due process claim is based on "the idea that the government's conduct, regardless of procedural swaddling, was in itself permissible," and a plaintiff must show that the "state action . . . *in and of itself* [is] egregiously unacceptable, outrageous, or conscience-shocking." Amsden v. Moran, 904 F.2d 748, 753-54 (D.N.H. 1990). As observed by this Court, failures to grant a Special Permit and to properly characterize a lot as buildable or not do not, in and of themselves, amount to substantive due process violations. 6/27/05 Mem. & Ord. 19. As such, even if improperly motivated, they are not remediable in this Court.

## III. DISMISSAL SHOULD BE WITH PREJUDICE

Dismissal of the Second Amended Complaint should be with prejudice, as it appears that Campbell would be unable to cure its defects. Campbell filed a Complaint, an Amended Complaint, and a Second Amended Complaint. The last of the three was filed purportedly to address the deficiencies described in this Court's June 27, 2005 Memorandum and Order, including the First Amended Complaint's failure to allege a conspiracy, yet the substantive allegations in *all three* complaints are exactly the same.

In its August 19, 2005 Memorandum and Order, the Court made it very clear that the Second Amended Complaint was Campbell's last chance:

> Although Plaintiff has not sought leave to file the Second Amended Complaint, given that Plaintiff has indicated the Second Amended Complaint attempts to comport with the June 24th Memorandum and Order, the Court will permit the

> filing of the Second Amended Complaint (#12). However, at some point the
> Plaintiff must be held to the choices he makes with respect to pleadings in this
> case, and that time has come.

8/19/05 Mem. & Ord. 5. Since Campbell had fair notice of the deficiencies in his complaint, in the form of this Court's June 27, 2005 Memorandum and Order, and did not amend his complaint accordingly, but submitted the same complaint under a different title, he should not be given yet another chance to avoid dismissal.

Moreover, despite being given the opportunity, Campbell did not even try to explain in his August 1, 2005 Response to Show Cause Order why the allegations with respect to his civil rights conspiracy claim are sufficient to survive dismissal. Instead, he requested, with no basis whatsoever, that "the Court allow the federal questions be allowed to continue pending resolution of the land use questions." 8/1/05 Resp. 13. He also stated that "Plaintiff defers discussion on these issues pending resolution of the state civil rights claims, but seeks to retain the right to introduce a more detailed allegation at a later date." Id. at 12. It is not entirely clear exactly what Campbell is requesting, but what is clear is that he is unable to support his conspiracy claim with proper factual allegations, despite having had three chances to do so. Dismissal should be with prejudice.

## CONCLUSION

For the reasons discussed above, this Court should dismiss so much of the Second Amended Complaint as pertains to Defendant Sandra Gildea with prejudice.

<div style="margin-left: 40%;">

Respectfully submitted,

SANDRA GILDEA

By her attorney,

/s/ *Stephen C. Warneck*
Stephen C. Warneck, BBO # 640871
WARNECK LAW OFFICES
350 Lincoln St., Suite 2400
Hingham, MA 02043
781-740-1115

</div>

Dated: February 27, 2006

## CERTIFICATE OF SERVICE

    I, Stephen C. Warneck, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 27, 2006.

<div style="margin-left: 50%;">

/s/ *Stephen C. Warneck*
Stephen C. Warneck

</div>