UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Robert J. Campbell,
                    *Plaintiff,*

CIVIL ACTION
NO.05-10620-WGY

V.

Town of Weymouth, et al
                    *Defendants*

### DOCUMENTS AFFIDAVIT IN SUPPORT OF PLAINTIFFS MOTION TO AMEND COMPLAINT

The plaintiff Robert J. Campbell, ["Campbell"] humbly submits the attached Documents

Affidavit in support of his Motion To Amend Complaint To Conform To The Evidence in

accordance with Federal Rules of Civil Procedure ("FRCP"), Rule 15(b). The Plaintiff seeks to

consolidate federal and state claims as if the aforementioned Land Court Action was removed

from the Land Court to This Honorable Court.

The evidence contained in this Documents Affidavit will show that specific actions by the

Defendants Members of the Planning Board to change local zoning ordinances were deliberately

designed to prevent or limit the development of daycare centers in the town. During the

Discovery process and through a review of documents previously filed on the Plaintiffs' original

suit in Land Court[1], prima facie evidence was found that indicates the Planning Board had

promulgated a false reason to review and amend the zoning regulations governing minimum

parking requirements at daycare centers, and that the changes are arbitrary and capricious in

nature. The documentation shown in Exhibits "A" through "E" provides conclusive evidence that

---

[1]Massachusetts Land Court Docket No. 237269

the need for the zoning change was fabricated; that the deception was intentional and willfully disseminated across the town and to the Attorney General.

Exhibit "A" is the Town of Weymouth 1998 Annual Town Report, which includes Article 42, as it appeared in the Warrant for the Annual Town Meeting[2], dated January 26, 1998, shown in the Annual Report on page 165. Article 42, proposed an amendment to Town of Weymouth Zoning Bylaws[3], which was sponsored and created by the Planning Board, and sought to modify the bylaw to read:

> Section 120-74.M
>
> (2) Day care centers: one (1) space for each employee, plus one (1) space for each 8 children of the licensed capacity, *plus sufficient off-street space for safe and convenient loading and unloading clients. Off-street space for loading and unloading shall consist of a minimum of plus one (1) space for each 16 children of the licensed capacity.*

(Emphasis added to indicate the proposed change)

The warrant for the Town Meeting published in January, 1998 recommends: "No Action (A substitute article will be proposed)," indicating the Planning Board's intention to modify the Article after it was distributed to each department within the town for review and comments. The language of Article 42 was discussed at a public hearing held by the Planning Board in March, 1998, the minutes of which are included forthwith as Exhibit "B". The extent of the modifications incorporates the previous language with additional restrictions on the minimum parking requirements, such that the substituted motion reads:

---

[2] Weymouth Town Meeting was the governing body for approval of Zoning Amendments at the time the subject change was adopted in May, 1998.

[3] Town of Weymouth Zoning Bylaw, 120 of the Code of the Town of Weymouth, Article XVII Off Street Parking, Section 120-74.M.(2)

Section 120-74.M

(2) Day care centers: one (1) space for each employee, plus one (1) space for each 8 *6* ~~children~~ *clients* of the licensed capacity, *not including any shared parking spaces, plus sufficient off-street space for safe and convenient loading and unloading clients. Off-street space for loading and unloading shall consist of a minimum of* ~~plus~~ *one (1) space for each* ~~16~~ *12 children of the licensed capacity.*

(Emphasis added to indicate the proposed change)

The discussion by the members of the Planning Board amounts to an arbitrary and capricious change in the language of Article, based solely on the whim of two Board Members, which resulted in further restrictions on the minimum parking requirements. Whereas subsection (2) of this bylaw first imposed specific parking requirements at day care centers, and had only been recently added by vote at Town Meeting in May 1997, the Plaintiffs contend that the original 1997 version was never implemented, tested or otherwise proven to be inadequate, thereby precluding any immediate need to increase the minimum requirements.

Additionally, the membership of the Planning Board that requested that subsection (2) of the bylaw be added the previous year was unchanged from those promoting Article 42. It is unlikely that their initial efforts to impose parking restrictions were so flawed or indiscriminate, that they would require such inordinate attention to make additional changes and restrictions within a four month period [from the Attorney General's approval in 1997 to the 1998 Town Meeting Warrant in January]. The Plaintiffs could also conclude that both bylaw changes are arbitrary and seek only to circumvent M.G.L. Ch 40A by preventing or limiting day care development under the guise of reasonable regulation.

With no stated opposition, the substitute motion for Article 42, shown in Exhibit "C", was then sent to the Town Meeting with a recommendation for favorable action. After approval by majority vote at Town Meeting, held from May 5th through May 7th, 1998, the change was forwarded to the Attorney General for concurrence. This document was also included in the First Supplemental Documents Affidavit provided in the Plaintiffs' first appeal of the Special Permit denial on Land Court Docket # 237269, and is currently present in the Land Court files. An excerpt from the Minutes of the Town Meeting, specifically related to the discussion on Article 42, is provided in Exhibit "D"[4], which illustrates the attitude of the Planning Board with respect to the zoning exemption for daycare centers [provided by M.G.L. Ch.40A §3].

To address the previously mentioned charges of deception, the Plaintiffs wish to direct the Court's attention to Article 42, most notably, the second sentence of <u>Section 3. Background</u>, which states, as reason for the amendment, "Since that time the Planning Board has reviewed new applications for daycare centers, especially in single family districts." In Discovery, the Plaintiffs requested a listing of all Special Permit Applications reviewed by the Planning Board from 1997 to 1999. The inquiry and the response are provided as Exhibit "E". In addition, the Plaintiffs presented the Defendant James Clarke, Director of Planning and Community Development, with a Request for Admission, included herewith as Exhibit "F", in an attempt to confirm that the list of applications provided for the years 1997, 1998 and 1999, are all inclusive and that no other applications were reviewed during that period.

In that, the Defendant refused to sign or dispute the facts in the Request for Admission, the lists are admitted to be complete. The Plaintiffs wish to point out that there are no new applications for daycare centers in 1997 and 1998, and furthermore, the only daycare issue addressed by the

---

[4] Exhibit "D" was incorrect in the original filing of this document, where a page was duplicated, the correct page of the minutes was inadvertently omitted. The error has been corrected in this submission.

Planning Board in that period was the Plaintiffs' case on remand order from the previous Land Court decision, which occurred after the Bylaw was changed. Upon review, the conclusions are incontrovertible and the motivation is the only remaining issue.

The Plaintiffs' charges of outside influence and misuse of authority can best be illustrated by describing specific relationships and noting the disregard for the standards of conduct, which were exhibited by members of the Planning Board, municipal employees and other civic leaders. These influences began with the original application for Special Permit before the Planning Board and extended to the later application for variance before the Board of Zoning Appeals.

The Plaintiffs originally filed an application for Special Permit, through their General Contractor, Searles Builders, Inc., on April 12, 1996. The original application for Special Permit was rife with errors created by Searles and his Engineering subcontractor, Mr. Frank J. Gallagher, P.E., Civil Registration #33959. Both Searles and Gallagher ignored the Plaintiffs' original specifications for the proposed day care center and presented an erroneous application, Permit Assessment and drawings for a single family home. After a contentious Public Hearing before the Planning Board on May 28, 1996, the applicant, Searles, was allowed to withdraw the application without prejudice.

Exhibit "G" includes the erroneous application filed by Searles, a Site Plan of Land prepared by Mr. Gallagher, the Decision of the Planning Board on Case #96-3-4/22, dated June 3, 1996 and the minutes of the public hearing conducted by the Planning Board. As a result of the General Contractor's initial errors, the tone for future hearings was set and the "without prejudice" attitude did not extend to the second application for Special Permit, filed on November 1, 1996. The second application was denied by the Planning Board on February 24, 1997 and appealed on Land Court Docket #237269. Searles was named as the original Plaintiff in the appeal before the

Land Court and has since initiated civil action against the Plaintiffs in Brockton District Court on Docket No.0315CV1397, for Breach of Contract [to build the day care center]. Searles' complaint in the said action is included for reference as Exhibit "H".

Evidence of the Board's bias toward the application is displayed in the minutes of the proceedings before the Planning Board, included herewith as Exhibit "I", where the Chairman, Paul M. Dillon, made reference to a number of issues beyond the purview of the Board, allowed Board Members to engage in irrelevant lines of questioning and personally insinuated that the Campbells had an illegal in-law apartment in their residence. Chairman Dillon also questioned if field trips to the beach during the summer were appropriate, by commenting that he did not want see 53 children walking down the street to the beach. The fact that his residence is approximately two hundred yards from the proposed location of the daycare center indicates a personal revulsion to the potential sight from his front door, rather than an objective concern for the health and well-being of the children. He purchased his current residence at 378 Neck St, North Weymouth approximately sixty (60) days after the Board denied the Special Permit, but was obviously fully engaged in relocating to the neighborhood during the proceedings.

Mr. Dillon also testified at the latest public hearing before the Board of Zoning Appeals, that the Planning Board has been opposed to the project from the start, and the only reason a Special Permit had been issued was under this Court's Remand Order. Mr. Dillon commented that he never received an Emergency Evacuation Plan from the Plaintiffs during the previous proceedings, even though it was requested by the Planning Board and revised to include details requested after the Remand Order. There is no statutory or regulatory requirement of any kind for this document, and the Plaintiffs willingly prepared and provided a detailed plan. Interestingly, Mr. Dillon was the only member of the Planning Board to vote to deny the Special Permit in direct violation of this Court's Order.

On numerous occasions, Defendant Mary S. McElroy[5] was allowed to proceed with commentary
and questioning about the details of the intended daycare operations and repeatedly inferred that
the Plaintiffs intended to provide substandard care or facilities, specifically mentioning cots for
toddlers in lieu of cribs; Directors of Health and Administration not being in the facility; teacher
to staff ratios being inappropriate for specific age groups; and questioning the qualifications and
involvement of certain individuals in daily operations. Mrs. McElroy went as far as to introduce
an unsigned letter that she received at her house and asked that it be read at the hearing.

Whereas, Mary S. McElroy was an elected member of the Planning Board, her acknowledgement
of receipt and deliberate introduction of that document in public hearing qualifies that document
to be a public record, as defined by M. G. L. c. 4, § 7(26). The Plaintiffs' attempted through
Discovery to obtain a copy of the letter by written and numerous verbal requests, included
herewith as Exhibit "J", but Defendants have been unwilling or unable to produce the document.
Furthermore, the Plaintiffs contend that the contents of the letter were made known to other
Planning Board Members prior to the public hearing and that the subject of that public record had
a significant effect on the Board's decision to deny the Special Permit. Plaintiff's demand for the
document was unanswered by Counsel for the Defense.

Furthermore, the Plaintiffs wish to direct the Court's attention to the involvement of the North
Weymouth Civic Association (NWCA), by noting the consistent and deliberate attempts of that
organization to influence the Planning Board's decision on the project. Many members of the
group were present at public hearings, in an obvious, concerted effort to oppose the project.
Throughout the testimony provided in the minutes of the hearings, Sandy Gildea, AKA Sandra A.

Goldea, AKA Jan Sandra Gildea of 47 River St., North Weymouth, MA, 02191, continuously made contradictory and derogatory comments on the need for the day care service, types of services to be offered, teacher to student ratios, transportation requirements of the proposed center, location of the building and the qualifications of the principals involved.

Records obtained from the Secretary of the Commonwealth, included as Exhibit "K", indicate that Mrs. Gildea is the Founder and President of the NWCA. Plaintiffs intend to obtain copies of the NWCA's membership records, which will show that Planning Board Members Mary S. McElroy and Paul M. Dillon are currently or have been active members of the group, including the period of time when the application for Special Permit was under review by the Board. Curiously, but worthy of considerable mention is the fact that Mrs. Gildea's primary income is derived from her ownership of the Just Right Child Care, Inc., located at 16 Church St, E. Weymouth, MA, 02189, approximately two miles from the Plaintiffs' proposed building, and one of the prime competitors for daycare services in the area. Secretary of the Commonwealth records of incorporation for Just Right Child Care, Inc. are also included in Exhibit "K".

Moreover, the Plaintiffs respectfully request a permanent injunction and restraining order prohibiting Mrs. Gildea, the NWCA and its' entire membership from any future actions, contact, communications or other involvement by any means, due to Mrs. Gildea's repeated verbal threats to the Plaintiff, Tammy A. Campbell, following the public hearings and at casual meetings on the street. Coincidently, Tammy Campbell was the subject of an investigation of a complaint made to the Office for Child Care Services (OCCS), on February 14, 1997, which resulted in a finding of no non-compliances on OCCS Complaint # 12753, enclosed as Exhibit "L". The Court may note

---

[5] Defendant Mary S. McElroy is a current member of the Board of Zoning Appeals, but was an elected member of the Planning Board (and Defendant) during the previous proceedings. Mrs. McElroy's absence from the public hearing that denied the Plaintiffs application for variance is notable to the instant case.

that regulations prohibit OCCS from releasing the name of the complainant, unless multiple complaints are received from the same individual.

The Plaintiffs also wish to address an issue of momentous consideration that has permeated these proceedings, but has never been spoken of publicly, or documented in any form to date. During the summer of 1996, in the period between the first application that was withdrawn and the second application denied by the Planning Board, the Plaintiff, Robert J. Campbell was approached by Officer Michael Nasuti of the Weymouth Police Department, who came to the Campbells' residence at 8 Davids Island Rd, North Weymouth, inquiring about plans for the daycare. Officer Nasuti introduced himself and informed Mr. Campbell that he was considering purchasing an abutting lot of land, with the intention of building a home for his young family. He expressed his concerns about having a daycare center and asked for details of the plan, to aid in his decision to purchase the land.

The Plaintiff mentioned his enthusiasm for the project and expressed his appreciation for Officer Nasuti's interest, commenting that he was the only town official to approach them informally to discuss the details of the plan. Whereas the proposed location of the daycare was directly across the street from the Plaintiffs' residence at the time, Mr. Campbell and Officer Nasuti walked through the lot for approximately ninety (90) minutes, while the Plaintiff described in great detail the orientation of the building, parking and play areas. Officer Nasuti appeared genuinely interested in the types of programs to be offered, since he had preschool children at the time and his commented that his wife was expecting another. He even mentioned they may consider using the daycare services, as his wife intended to return to work as an EMT, after the baby was delivered.

As the meeting concluded, Mr. Campbell thanked Officer Nasuti for his interest in the project and mentioned that he welcomed the opportunity for a discussion with a member of the Police Department, seeing it as an opportunity to make amends for mistakes made years before and expressed a sincere desire to extend an apology to members of the department that were involved in past incidents[6]. No details on the incidents were offered by the Plaintiff and the discussion was terminated shortly thereafter.

Officer Nasuti eventually purchased the property located at 297 Neck St, North Weymouth, applied for and received a Special Permit [noted in documents affidavit filed with this Court in the previous action] and built a beautiful waterfront home with boat access to the Back River. Officer Nasuti appeared at the latest hearing of the Board of Zoning Appeals, to "represent the neighborhood" and offer his professional opinion as an officer in town for over twenty years. During the hearing, the Defendant James Clarke read the comments solicited from the Weymouth Police Department on the proposed project, which were limited to concerns about the width of the sidewalk in front of the building, the direction of traffic through the circular driveway and access for emergency vehicles.

Officer Nasuti's professional opinion, cited his many years of experience, and related that people who go before the Board of Zoning Appeals offer only lip service to the Board's concerns and proceed to act anyway they feel, after receiving permits and/or variances, even if those actions are in direct opposition to the Board's concerns. The Plaintiffs insist [and Standards of Conduct portend] that it is inappropriate for a municipal employee to represent any group or individual in any matter in which their employer is a party, and further offensive to publicly offer any opinion that significantly varies from that expressed by his employer. Minutes of the hearing are included

---

[6] The Plaintiff, Robert J. Campbell was arrested in Weymouth twice during the summer of 1989, and charged with numerous offenses on Quincy District Court Docket Nos. 8956CR4773 & 8956CR5313.

as Exhibit "M", but do not provide sufficient detail to suggest the exact language used by the Officer. A videotape of the entire proceedings is being copied for filing at a later date.

On the evening of February 4, 1997, the Plaintiffs received a telephone call from a resident of the Salt Water Creek Condominium, located at 267 Neck St, North Weymouth, MA, adjacent to the proposed daycare, which informed them of a conversation that was overheard in the hallway outside the apartment of Ms. Ruth S. Amos, AKA Sandy Amos. The caller identified the participants in the conversation as a Weymouth Police Officer [in uniform], and Ms. Amos, who were discussing the principals involved in the daycare project and how information could be used to deny the permits. The officer mentioned he had knowledge that the Plaintiff, Mr. Campbell, had prior "problems" with the Police, but that he could not check his criminal record legally, unless Mr. Campbell was arrested. The discussion also included the extent of any influence the Plaintiffs' family may have in the town, where Mr. Campbell's mother, Ruth P. Campbell was a former elected Town Meeting Member and retired School Nurse, employed by the town for over twenty (20) years. The caller mentioned that the officer's police cruiser was outside the building with the engine running during the entire conversation, which was the reason she was alerted to his presence.

As a result of this incident, a letter of concern dated February 6, 1997, included herewith as Exhibit "N", was sent to the Attorney General's office, noting the incident and the caller's identity and the concern of the Plaintiffs' family that Mr. Campbell may be arrested without justification. The Plaintiffs have requested and received various Police Department records through Discovery, which identify all officers on duty the night of February 4, 1997, but attempts to obtain Dispatch communication records have been refuted despite written and multiple verbal requests to the Department. A request for determination and demand for access to public records

has been forwarded to Counsel for the Defense and is included with the correspondence in Exhibit "O".

The Court should note through minutes of the hearings that Ms. Amos was an avid proponent of the project who boasted publicly about taking a leave of absence from her job to pursue her fight against the daycare. She was also adamant about espousing the [exaggerated] negative impact that the project would have on the neighborhood, having acted as representative spokesperson for the NWCA, created and distributed flyers throughout the condominium complex, organizing opposition meetings and sending multiple letters of opposition to the Planning Board, Board of Selectmen and [State] Senator Robert Hedlund. A representative sample of her efforts is also included in Exhibit "P".

Subsequently, Senator Hedlund introduced a bill in 1998, which proposed a change to the language of M.G.L. Ch. 40A, that, if enacted, would completely or partially remove the zoning exemptions afforded to daycare centers and transfer the decision authority to local boards. An article published in the New England section of the Wall Street Journal on May 12, 1999, included herewith as Exhibit "Q", confirms that the daycare proposed in the instant case was the catalyst for the bill proposed by Senator Hedlund. Fortunately, the bill was tied up in committee and left to rot on the vine, but the essence of the change will be incorporated into the Land Use Reform Act (LURA) currently being discussed by the legislature. In publish reports, the 1998 bill was introduced at the urging of South Shore Leaders.

Coincidently during the same time frame, the Weymouth Board of Selectman, which included a Mr. William E. Ryan[7], initiated a change to the town's application requirements for issuing a

---

[7] William E. Ryan is the son of former Planning Board Member Mary Sue Ryan, Defendant in the Plaintiffs original case.

Business Certificate. The Criminal Offense Records Investigation (CORI) requirement and authorization form were modified to impose the CORI requirement on "applicant *and/or its officers, stockholders and directors.*" (Emphasis added to the identify the modified language) The Plaintiffs contend that sensitive information on Mr. Campbell's background was inappropriately obtained and made known to the town officials providing the impetus for the CORI change, and significantly affecting the decisions of the Planning Board and Zoning Appeals, leading to the eventual permit and variance denials. A copy of the revised CORI Authorization Form is included as Exhibit "R".

For the reasons previously stated and considering the overwhelming amount of evidence against the Defendants, the plaintiffs respectfully request that This Court grant the Motion To Amend Complaint.

Signed and sworn to under the pains and penalties of perjury.

Respectfully Submitted,

Robert J. Campbell
Plaintiff, Pro Se
50 Squanto Road
North Weymouth, MA 02191

Dated February 24, 2006

Pc: William P. Breen, Jr., Esq.
    Murphy, Hesse, Toomey & Lehane, LLP
    300 Crown Colony Dr., Ste 410
    Quincy, MA 02169

    George E. Lane, Jr., Esq.
    87 Broad St.
    Weymouth, MA 02188

Gregory F. Galvin, Esq.
775 Pleasant St., Unit 16
E. Weymouth, MA 02189

Stephen C. Warneck, Esq.
350 Lincoln St., Ste 2400
Hingham, MA 02043

## CERTIFICATE OF SERVICE

I hereby certify on this day that a true copy of the enclosed document was served upon the defendant(s) by U.S. Mail/Fax/Hand Delivery.

Date: 2/24/06

Robert J. Campbell,
Plaintiff, Pro Se
50 Squanto Road
North Weymouth, MA 02191
PH(781)335-4362

# Exhibit "A"

2006 FEB 24 P 5:03

# 1998

# ANNUAL TOWN REPORT



**Weymouth Teen Center**

# TOWN OF WEYMOUTH

## ANNUAL TOWN MEETING



## COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS

TO THE TOWN MEETING MEMBERS OF THE TOWN OF WEYMOUTH, IN SAID COUNTY, GREETING:

IN THE NAME OF THE COMMONWEALTH OF MASSACHUSETTS, YOU ARE HEREBY NOTIFIED TO MEET IN THE GEORGE L. BARNES AUDITORIUM OF THE ABIGAIL ADAMS INTERMEDIATE SCHOOL, 89 MIDDLE STREET, EAST WEYMOUTH, ON

### MONDAY, THE FOURTH DAY OF MAY, 1998

AT SEVEN O'CLOCK AND THIRTY MINUTES IN THE EVENING, THEN AND THERE TO ACT UPON FIFTY ARTICLES (A COPY OF WHICH IS ENCLOSED).

GIVEN UNDER MY HAND AT WEYMOUTH, THE TWENTY SEVENTH DAY OF JANUARY IN THE YEAR OF OUR LORD NINETEEN HUNDRED AND NINETY-EIGHT.

TOWN CLERK OF WEYMOUTH

127

**RECOMMENDATION: FAVORABLE ACTION**

**ARTICLE 42:** (By request of the Planning Board): To see if the Town will vote to amend the Town of Weymouth Zoning Bylaw, 120 of the Code of the Town of Weymouth, Article XVII Off-Street Parking, Section 120-74.M.(2) as follows:

(2). Day care centers: one (1) space for each employee, plus one (1) space for each 8 children of the licensed capacity, plus sufficient off-street space for safe and convenient loading and unloading of clients. Off-street space for loading and unloading shall consist of a minimum of plus one (1) space for each 16 children of the licensed capacity.

or take any other action in relation thereto.

**RECOMMENDATION: NO ACTION** (A SUBSTITUTE ARTICLE WILL BE PROPOSED.)

**ARTICLE 43:** (By request of the Planning Board): To see if the Town will vote to amend the Town of Weymouth Zoning Bylaw, 120 of the Code of the Town of Weymouth, regulating the minimum amount of upland on a lot required. Article XV Dimensional Requirements, Section 120-53.1 as follows:

Part 1. By adding the following definition to § 120-6:

(Definitions are to be inserted alphabetically within the current list of definitions in § 120-6.)

UPLAND A Land not considered a wetland as defined in M.G.L. Ch. 131, Sec 40, the Wetlands Protection Act, including but not limited to oceans, ponds, streams, bogs, wet meadows, and swamps.

Part 2. By amending Article XV Dimensional Requirements, Section 120-53.1 as follows:

Any lot created after May 5, 1986 shall have a minimum upland area, as defined in § 120-6 of seventy-five percent (75%) of the minimum required lot area.

Part 3. Amend Table 1, Schedule of district regulations.

Cell located in row "R-1", column "Minimum lot Size(square feet)" add (See § 120-53.1).

or take any other action in relation thereto.

**RECOMMENDATION: FAVORABLE ACTION.**

44

(Continued on next page)

You are hereby directed to service this warrant by posting a copy thereof, attested by you in writing in each of two public places in each voting precinct of said Town, seven (7) days at least before the date of holding the first meeting called for in this Warrant.

Hereof fail not to make due return of this Warrant with your doings thereon to the Town Clerk of said Town on or before the Twenty-seventh day of April in the year of Our Lord, One Thousand, Nine Hundred and Ninety-Eight.

Individuals requesting interpreter services for the hearing impaired or needing other specialized services must notify the Selectmen's Office (617) 335-2000, or TTY (617) 331-5124 as soon as possible. Please note it often takes two weeks prior notice to secure a hearing interpreter.

Given under our hands this 26th of January, 1998.

TOWN OF WEYMOUTH
BOARD OF SELECTMEN

_Susan M. Kay_
Susan M. Kay, Chairman

_David W. Chandler_
David W. Chandler, Vice Chairman

_William E. Ryan_
William E. Ryan, Jr., Clerk

_Gregory P. Hargadon_
Gregory P. Hargadon

_Peg Goudy_
Peg Goudy

171

# Exhibit "B"

Planning Board Minutes - March 17, 1997 - Page 9

    e.  Roadways do not contain any turn around provision.

3.  Comments raised by staff review.
    a.  Drainage review should be expanded to include the area of ponding on Sanderson Rd. west of Shubert Rd.
    b.  Isolated areas of upland of Lot 2 should be calculated separately.
    c.  Consider regrading of Sanderson Rd. between Pleasant St. and Shubert Ave.

6.  Annual Town Meeting - vote on zoning articles

Article 40 -

Mr. Clarke stated that Article 40 is the proposed change from 15,000 square foot minimum lot size to 25,000 square foot minimum lot requirement.

Upon motion made by Mrs. Ryan and seconded by Mrs. Abbott, it was:

UNANIMOUSLY VOTED: to recommend favorable action for Article 40.

Article 41

Mr. Clarke stated that Article 41 is the proposed changes to parking requirements.

Mr. Fuqua stated that the staff has reviewed the report from the Zoning Bylaw Committee. The only item was they did submit a substitute motion for review for the one on day care which added the phrase "provide sufficient off street parking for loading and unloading", and they changed the word students to clients.

Mr. Clarke stated that the staff is supportive of this change.

Upon motion made by Mr. Hurley and seconded by Mrs. McElroy, it was:

UNANIMOUSLY VOTED: to recommend favorable action on the substitute motion for Article 41.

Article 42

Mr. Clarke stated that Article 42 is the pork chop lot article. There was discussion at the public hearing and we had a proposed substitute motion through the Zoning Bylaw Committee from the Inspector of Buildings.

Planning Board Minutes - March 17, 1997 - Page 10

Mr. Fuqua stated that the substitute motion would retain the provision for two lots or less to have 40' of frontage, but would eliminate the neck downs on both the 40' and 72'.

Upon motion made by Mrs. Ryan and seconded by Mrs. McElroy, it was:

UNANIMOUSLY VOTED: to recommend favorable action on the substitute motion for Article 42.

Article 43

Mr. Clarke stated that Article 43 is the change on site plan review and is just a housekeeping item.

Upon motion made by Mrs. McElroy and seconded by Mrs. Abbott, it was:

UNANIMOUSLY VOTED: to recommend favorable action on Article 43.

Article 44

Mr. Clarke stated that Article 44 is for a proposed zoning change in the Woodside Path area from POP to R-1.

Upon motion made by Mrs. McElroy and seconded by Mr. Lynch, it was:

UNANIMOUSLY VOTED: to recommend favorable action on Article 44.

Article 45

Mr. Fuqua stated that on Article 45 a substitute motion was submitted by Greg Galvin at the last meeting that defines the article. As a general comment, Article 45 in its current format, is nothing that can be supported since it does not really define the area. If the Board is inclined to look on favorable action, then it should be favorable action on the substitute motion as presented by Mr. Galvin.

Mrs. Abbott stated that her concern is the abutters really being aware of what the substitute motion is really about.

Mrs. McElroy stated that none of the abutters were present at the hearing.

Mrs. Abbott asked if the abutters were aware of the hearing for the article. Mr. Clarke replied that we are not required to notify abutters of proposed zoning changes.

Planning Board Minutes - March 17, 1997 - Page 11

Mr. Clarke stated that Rod will speak to Greg Galvin to make sure he speaks to the abutters. If the Board feels this is an issue, this article can be tabled at this time.

Mr. Hurley stated that he does not see a problem going ahead with this article. Dunkin Donuts will still have to come before the Board with for a site plan review.

Upon motion made by Mr. Lynch and seconded by Mrs. McElroy, it was:

VOTED: 4-1 (Mrs. Abbott opposed) to recommend favorable action on the substitute motion as presented by Mr. Galvin for Article 45.

7. Subdivision Performance Guarantee

a. Northern Avenue - set bond

Upon motion made by Mr. Hurley and seconded by Mrs. McElroy, it was:

UNANIMOUSLY VOTED: to set a bond amount of $8,150 for Northern Avenue and to release the lot pending posting of a suitable bond.

b. Sears Road - set bond

Upon motion made by Mrs. Ryan and seconded by Mrs. McElroy, it was:

UNANIMOUSLY VOTED: to set the bond at $59,800 for Sears Road.

8. Other Business

a. Town Hall Hours

Mr. Clarke stated that as the Board knows Town Hall has been open, on an experimental basis once a month. The Board of Selectmen are still pursuing staying open on Wednesday evenings and they are looking at closing a half day on Friday.

Mr. Clarke stated that the issue has been raised with regards to having Planning Board meetings on the same night as the Board of Selectmen. It was suggested that the Planning Board meet on Wednesday nights.

Mrs. McElroy stated that Wednesday is not good for her.

Mr. Dillon stated that Wednesday is a good idea so that we can have our meetings on a different date from the Board of Selectmen's meetings.

# Exhibit "C"





**TOWN OF WEYMOUTH**

**PLANNING BOARD**

**ARTICLE 42**

1. **Description:**
   Article 42 proposes to revise the off-street parking requirements for daycare centers.

2. **Sponsor:**
   Weymouth Planning Board.

3. **Background:**
   Parking for daycare centers was recently adopted as Article 41 of the 1997 Annual Town Meeting. Since that time the Planning Board has reviewed new applications for daycare centers, especially in single family districts. Daycare centers are exempt uses under state law, meaning they may be located on any parcel. The Planning Board feels a need for increased parking requirements to make sure there is adequate parking especially where a daycare may be located on a side street or narrow street. The increased parking, just above the average criteria based on a national survey yet below the highest ranges, is within a range that the Board feels is a reasonable requirement and will provide for the safety and convenience of those using daycare centers as well as neighboring property owners.

   A second part of the proposal requires parking for non residential uses in R-1 (single family districts) to be located behind the minimum front yard setback. The Board is concerned about the impact of a daycare center locating in a single family neighborhood and insuring the entire front yard is not converted into a parking lot.

4. **Recommendation of the Planning Board:**

   **Favorable Action on the following substitute motion for Article 42:**

   **ARTICLE 42:** (By request of the Planning Board): To see if the Town will vote to amend the Town of Weymouth Zoning Bylaw, 120 of the Code of the Town of Weymouth as follows:

   **PART A.:** Article XVII Off-Street Parking, Section 120-74.M.(2) by striking the current section and replacing the section to read:

   "(2). Day care centers: one (1) space for each employee, plus one (1) space for each 8 6 children clients of the licensed capacity, not including any shared parking spaces, plus sufficient off-street space for safe and convenient loading and unloading of clients. Off-street space for loading and unloading shall

4



## TOWN OF WEYMOUTH

## PLANNING BOARD

consist of ~~a~~ an additional minimum of ~~plus~~ one (1) space for each ~~16~~ 12 ~~children~~ clients of the licensed capacity."

PART B.: Article XVII Off-Street Parking. Section 120-70. B. (1) by striking the current section and replacing the section to read:

"(1). Residences Districts R-1, R-2, R-3 and R-4, all required spaces for nonresidential uses shall be located behind the minimum required front setback."

# Exhibit "D"

WEYMOUTH TOWN MEETING

VOLUME 4

ABIGAIL ADAMS INTERMEDIATE SCHOOL

89 MIDDLE STREET

EAST WEYMOUTH, MASSACHUSETTS

THURSDAY, MAY 7, 1998

7:45 p.m.



TOWN CLERK

TRUE COPY
EST:

4-99

1    Article 41.

2                THE MODERATOR:  Thank you.  You timed

3    that just right.  The ten minutes for debate has

4    now expired.  We're gonna put the motion to you.

5    The motion on Article 41 is favorable action.  We

6    ask the tellers to come forward.  This takes a two

7    thirds vote.

8                All those in favor please indicate by

9    raising your right hand.  All those opposed.

10               A TELLER:  Mr. Moderator, in the

11   affirmative, 93.  In the negative 53.

12               THE MODERATOR:  Voting in the

13   affirmative 93.  Voting in the negative, 53.  The

14   motion fails for lack of a two thirds majority.

15   (Applause.) We'll take a ten-minute break.

16   (Whereupon at 9:35 p.m. the hearing recessed and

17   reconvened at 9:45 p.m.)

18               THE MODERATOR:  I call the meeting

19   back to order.  For the planning board, Article 42,

20   Mrs. Abbott.

21               MRS. ABBOTT:  Article 42.  State law

22   allowing day care centers in any zoning district

23   has created many problems for planning boards.  The

4-100

1  planning board has made several adjustments to our

2  conventional standards to protect abutters.

3          These changes increase the parking

4  required at the center and allow safe access to the

5  site without impacting the roadway.  Planning board

6  recommends favorable action on substitute motion.

7          THE MODERATOR:  All right.  For the

8  appropriation committee, Mr. Wilson.

9          MR. WILSON:  On the substitute motion

10  the appropriation committee recommends favorable

11  action.

12          THE MODERATOR:  Anyone wishing to

13  speak against the motion for favorable action on

14  the substitute motion?  Anyone else in favor?  Then

15  the motion before you on Article 42 is for

16  favorable action on the substitute motion.  All

17  those in favor please indicate by saying aye.

18  Opposed, no.  So voted unanimously.  Article 43.

19          MRS. ABBOTT:  Article 43 increases the

20  amount of upland required for any newly created

21  lot.  The intent is to ensure a usable lot for the

22  homeowner and greater protection of our valuable

23  wetland area.  The planning board recommends

# Exhibit "E"

50 Squanto Road
North Weymouth, MA 02191

June 5, 2002

Town of Weymouth,
Department of Planning &
Community Development
Town Hall
75 Middle St.
Weymouth, MA 02189

Attn: Mr. James Clarke, Director of Planning & Community Development

VIA CMRR

Re: Request for Listing of Special Permit & Zoning Variance Applications

Dear Mr. Clarke,

Please provide a complete listing of all Special Permit and Zoning Variance applications received by the Town of Weymouth between February 24, 1997 and May 31, 1999. Information is required for all applications received and should not be limited to daycare centers or commercial operations. A summary document may be prepared, but should include the following information:

1)  Receipt date of the application
2)  Name of the applicant(s)
3)  Address of the applicant(s)
4)  Town assigned Case number
5)  Location of the proposed project
6)  A summary description of the proposed project
7)  Applicable section of zoning bylaw
8)  Date(s) of public hearing(s)
9)  Dates of decision & filing
10) The nature of the decision

Copies of the original applications, attachments, minutes of the public hearing, the Town's written decision, or any other related documents may be required at a later date, but will be requested individually, under separate correspondence.

Thank you in advance for your cooperation.

Very Truly Yours,

Robert J. Campbell

pc: Atty. George Lane, Jr.
    Town Solicitor via CMRR

Department of Planning and
Community Development

*Town of Weymouth*
*Massachusetts*

David M. Madden
Mayor

James F. Clarke, Jr.
Director of Planning and
Community Development
:mail: jclarke@weymouth.ma.us



75 Middle Street
Weymouth, MA 02189

(781) 340-5015
(781) 335-3283 fax
(781) 331-5125 TTY

June 20, 2002

Robert J. Campbell
50 Squanto road
Weymouth, MA 02191

RE:    Request for Listing of Notices of Intent, Variances, Special Permits

Dear Mr. Campbell,

I have reviewed your letter of 6/5/02, regarding the request for listings of all Notices of
Intent received by the Conservation Commission between 2/24/97 and 5/31/99 and
variances and special permits by the Planning Board and Board of Zoning Appeals for the
same dates.

This office does not keep a list of everything you have requested. We keep our
conservation records by file number but not by date. We do have a list of activity that
begins on January 4, 1999, until the present that includes Notices of Intent, Request for
Determination, Extensions and Certificates of Compliance, etc. I am enclosing a copy of
this list for your review. The information requested by you will require considerable
research on the part of this office since we do not have a similar listing for activity prior
to 1999. The list of special permits is also enclosed.

In compliance with the public records law, all of our records are accessible for your
review. This office will supply you with any copies you may request at a price of $.20
per page in addition to a fee of $15.43 per hour to cover the cost research necessary to
comply with your request. Any information requested from the Conservation Office or
Planning and Community Development Department must be specific in nature.

If I can be of any further assistance, you may contact me at 781 340-5015.

Regards,

*James F. Clarke.*

James F. Clarke, Jr.
Director
Planning and Community Development

**SPECIAL PERMITS – 1997**
**Book 1 of 2**

| CASE # | ADDRESS | SHEET-BLOCK-LOT |
|---|---|---|
| 97-2-4/4 | Neck Street | 5-13-61 |
| 97-3-4/18 | 1121 Main Street | 53-554-10 |
| 97-4-5/20 | 768 Main Street | 45-521-3 |
| 97-5-7/21 | 15 Pearl Street | 10-123-7 |
| 97-6-7/10 | 280 Libbey Parkway | 38-444-25 |
| 97-7-7/9 | 151 Main Street | 29-372, 374-33, 28,18 |

**SPECIAL PERMITS – 1997**
**Book 2 of 2**

| CASE # | ADDRESS | SHEET-BLOCK-LOT |
|---|---|---|
| 97-7-7/22 | 749-755 Main Street | 41,45-488-12, 14, 30 |
| 97-8-9/12 | 1540 Commercial Street (In Litigation) | 19-253-25 |
| 97-9-9/17 | 298 Broad Street, off | 17, 21-220-2 |
| 97-10-10/28 | 20 Wolcott Street | 2-8-5 |
| 97-11-12/16 | Neck Street | 5-13-60 |

## SPECIAL PERMITS – 1998

| CASE # | ADDRESS | SHEET-BLOCK-LOT |
|---|---|---|
| 98-1-2/9 | Liberty Street off - Weathervane | 51-535, 576, 608 |
| 98-2-3/26 | Massasoit Road 47 | 4-24-7 |
| 98-3-6/23 | Main Street 768 – Marylou's | 45 |
| 98-4-8/25 | Wolcott Street 20 | 2-8-5 |
| 98-5-REMAND | Neck Street – Day Care | 5-13-24 |

**SPECIAL PERMITS – 1999**
**Book 1 of 2**

| CASE # | ADDRESS | SHEET-BLOCK-LOT |
|---|---|---|
| 99-1-3/12 | Broad and Middle Streets | 22/241/14-17, 21, 29, 32 |
| 99-2-7/6 | 280 River Street | 3/1/18 |
| 99-3-7/21 | Lots 3A and 4A. School House Road | 21/220/10, 11 |
| 99-4-8/11 | 55 Fogg Road | 45/515/2; 45/518/11, 14; 45/519/1, 3, 5; 45/520/1, 2, 8, 9, 10, 11, 12, 14 |
| 99-5-8/17 | 29-141 Libbey Park & 3-25 Performance Dr. | 33, 34/431/2; 34/433/15 |
|  |  |  |
|  |  |  |
|  |  |  |

**SPECIAL PERMITS – 1999**
**Book 2 of 2**

| 99-6-8/16 | 437 Washington Street | 24/325/39 |
|---|---|---|
| 99-7-9/13 | 1680 Main Street | 61, 64/641/17 |
| 99-8-10/6 | 55 Fogg Road | 45/515/2; 45/518/11, 14; 45/519/1, 3, 5; 45/520/1, 2, 8, 9, 10, 11, 12, 14 |
| 99-9-10/8 | 96 Main Street | 29/329/22 |
| 99-10-10/15 | 861 & 879 Main Street | 45/516/17, 18 |
| 99-11-11/22 | 470-510 Washington Street | 25/328/13 |

## 1999 YEAR TO DATE ACTIVITY CONSERVATION

| Project | Date Rec'd | Request | DEP# | Date Agenda | Date of Determ. | Date Orders | Cert of Compl | Date Extend |
|---|---|---|---|---|---|---|---|---|
| Weymouth Club | 1/4/99 | NOI | 81-770 | 3/24/99 | | 5/26/99 | | |
| 25 Mathewson Drive | 1/6/99 | RFD | | 2/10/99 | 2/10/99 | | | |
| 31 Orleans Road | 1/6/99 | Cof Compl | 81-762 | 1/13/99 | | | INCOMPLETE | |
| Tayla Drive Lot 7 | 1/6/99 | Cof Compl | 81-759 | 1/13/99 | | | 1/27/99 | |
| Tayla Drive Lot 6 | 1/6/99 | Cof Compl | 81-758 | 1/13/99 | | | INCOMPLETE | |
| 1121 Main Street | | Cof Compl | 81-734 | 1/13/99 | | | 1/27/99 | |
| Lot 1 Lucas Circle | 12/30/98 | Cof Compl | 81-744 | 1/13/99 | | | 1/27/99 | |
| Lucas Cir/Roadway/Utilities | 12/30/98 | Cof Compl | 81-689 | 1/13/99 | | | INCOMPLETE | |
| Lot 8 Bantry Drive | 9/17/98 | NOI | 81-772 | 2/10/99 | | 2/12/99 | | |
| Lot 27 Libbey Parkway | 12/9/98 | RAD | 81-777 | 2/10/99 | | | | |
| 528 Columbian Street | | Cof Compl | 81-456 | 2/10/99 | 2/10/99 | | | |
| Michelle Dr - Lot 7 | 2/12/99 | Cof Compl | 81-765 | | | | | |
| Chelsea Way Lot E-5 | 2/12/99 | Cof Compl | 81-766 | | | | | |
| 55 Meetinghouse Lane | 2/10/99 | Cof Compl | 81-175 | 2/24/99 | | | 2/10/99 | |
| 67 Regatta Road | | Cof Compl | 81-601 | 2/24/99 | | | INCOMPLETE | |
| 17 Sunny Plain Circle | 2/16/99 | RFD | | 3/10/99 | 3/10/99 | | WITHDREW | |
| 267 Middle St./Ryder | 2/22/99 | NOI | 81-778 | 3/10/99 | | | 3/10/99 | |
| Burkhall St.-Condo Project | 2/26/99 | RAD | 81-779 | 3/10/99 | | 6/2/99 | 3/10/99 | |
| 190 River Street | 1/15/99 | RFD | | 3/10/99 | | 4/28/99 | | |
| Wharf Street/Landfill Cap | 3/4/99 | NOI | 81-780 | 3/24/99 | 3/10/99 | 4/28/99 | | |
| Wessagusset Yacht Club | 3/11/99 | NOI | 81-789 | 3/24/99 | | 4/28/99 | | |
| 35-45 Mathewson Dr./Varasso | 3/10/99 | Enforcem | | | | 4/20/99 | | |
| S&E Auto 1255 Washington | 4/7/99 | NOI | 81-781 | 4/28/99 | | 5/26/99 | | |
| 42 Ocean Ave | 4/13/99 | RFD | | 4/28/99 | 4/28/99 | | | |
| Lot 7 Libbey Parkway | 4/16/99 | RAD | 81-782 | 5/12/99 | | 6/10/99 | | |

| Project | Date Rec'd | Request | DEP# | Date Agenda | Date of Determ. | Date Orders | Cert of Compl | Date Extend |
|---|---|---|---|---|---|---|---|---|
| Diana Drive | 4/16/99 | C of Compl | 81-594 | 5/12/99 | | | 5/12/99 | |
| 280 River Street | 4/16/99 | NOI | 81-783 | 4/28/99 | | | | |
| 65 River Street | 4/22/99 | RFD | | 5/12/99 | 5/26/99 | | | |
| Edgar Station Demolition | 5/12/99 | NOI | 81-785 | 5/26/99 | | | | |
| Lot 2, 15 Libbey Parkway | 5/7/99 | RAD | 81-784 | 5/26/99 | | 6/9/99 | | |
| 317 Pleasant Street | 5/7/99 | C of Compl | 81-599 | 5/26/99 | | | 5/26/99 | |
| 81 King Cove Beach Road | 5/17/99 | C of Compl | 81-694 | 5/26/99 | 5/26/99 | | 5/26/99 | |
| Ashley Circle/Jordan Homes | 5/25/99 | NOI | 81-786 | 6/9/99 | | | | |
| 16 Concannon Circle | 5/3/99 | C of Compl | 81-688 | 5/12/99 | | 6/23/99 | 5/12/99 | |
| 25-27 Pond Street/Kravetz | 6/1/99 | NOI | 81-787 | 6/9/99 | | | | |
| 442 Union Street | 5/24/99 | RFD | | 6/9/99 | | 12/8/99 | | |
| Concannon Circle Lot 7 | 6/9/99 | EXT | | 6/9/99 | Withdrawn | | | |
| Cranberry Road Lot 1 | 6/10/99 | RFD | 81-753 | 6/23/99 | | | | |
| Off Summer Street-14 Lots | 6/18/99 | NOI | 81-788 | 6/23/99 | 6/23/99 | | | 6/23/99 |
| 293 Randolph Street | 6/18/99 | C of Compl | 81-714 | 6/23/99 | | | 6/23/99 | |
| Weathervane Golf Club | | EXT/RAD | 81-756 | 7/28/99 | | 8/11/99 | | |
| 31 Orleans Road | 6/18/99 | C of Compl | 81-762 | 7/28/99 | | | | Not Needed |
| 619 Randolph Street | 5/26/99 | C of Compl | 81-749 | 7/28/99 | | | INCOMPLETE | |
| Thicket Street - Lot 1 | 7/12/99 | NOI | 81-789 | 7/28/99 | | | 7/28/99 | |
| 1256 Washington St. | 7/12/99 | RFD | | 7/28/99 | 7/28/99 | 8/11/99 | | |
| 261 Sheri Lane | 7/27/99 | RFD | | 8/11/99 | 8/11/99 | | | |
| MWRA/Boring Program | | EXT | | 7/28/99 | | | | |
| 39 Weyfair Path | 7/29/99 | RFD | 81-666 | 8/11/99 | 8/11/99 | | | 7/28/99 |
| Wey. Woods-Libbey Pkwy | 8/23/99 | RFD | | 9/22/99 | | 8/11/99 | | |
| Town of Wey Pump Stations | 8/10/99 | NOI | 81-792 | 9/8/99 | | 11/10/99 | | |
| 88 Sheri Lane | 8/20/99 | RFD | | 9/8/99 | | | | |
| 102 Rustic Drive | 9/3/99 | Enforcem | | 7/28/99 | 9/8/99 | | | |
| Libbey Pkwy/Harvest Minist. | 9/16/99 | NOI | 81-791 | 9/22/99 | 10/13/99 | 12/8/99 | | |
| 74 Randolph St | 9/8/99 | C of Compl | 81-704 | 9/22/99 | | | 10/13/99 | |
| 16 Lucas Circle | 9/3/99 | Bond Rel | 81-744 | 9/22/99 | | | | |
| Lucas Circle Subdivision | 9/3/99 | C of Compl | 81-689 | 9/22/99 | | | 10/27/99 | |

| Project | Date Rec'd | Request | DEP# | Date Agenda | Date of Determ. | Date Orders | Cert of Compl | Date Extend |
|---|---|---|---|---|---|---|---|---|
| Galway Road Subdivision | 9/28/99 | NOI | 81-793 | 10/13/99 | | 12/8/99 | | |
| Lot B Sheri Lane/Albanese | 10/6/99 | NOI | 81-794 | 10/13/99 | | 11/10/99 | | |
| Michelle Drive / Lot 7 | 10/18/99 | NOI | 81-765 | 10/27/99 | | | 10/27/99 | |
| Vernon Street-Subdivision | 10/28/99 | C of Compl | 81-796 | 11/10/99 | | | | |
| 46 Beach Road | 10/29/99 | NOI | 81-797 | 11/10/99 | | 12/8/99 | | |
| Lot 8B Moore Rd/Mulcahy | 11/1/99 | RAD | 81-795 | 11/10/99 | | 12/8/99 | | |
| 52 Jordan Drive | 11/1/99 | RFD | | 11/10/99 | | 1/12/00 | | |
| Rt 18/Supreme Enterprises | 11/10/99 | RFD | | 12/8/99 | 11/10/99 Withdrawn | | | |
| Lot 1 Cranberry Rd/Gosselin | 11/18/99 | NOI | 81-798 | 12/8/99 | | 1/12/00 | | |
| 500 Washington Street | 11/22/99 | NOI | 81-799 | 12/2/00 | | 1/26/00 | | |
| Lot 7A Bantry Drive | 11/22/99 | NOI | 81-773 | 12/8/99 | | | | |
| Lot E4 Chelsea Way | 12/2/99 | C of Compl | 81-769 | 12/8/99 | | | 12/8/99 | |
| Sithe Power Plant Constr. | 12/5/99 | C of Compl | 81-800 | 12/14/99 | | | INCOMPLETE | |
| 267 Libbey Ind. Parkway | 12/21/99 | NOI | 81-801 | 1/12/00 | | 1/26/00 | | |
| Hanifan Lane Subdivision | 12/23/99 | RAD | 81-804 | 1/12/00 | | 1/26/00 | | |
| Vernon Street Lot 1 | 12/30/99 | NOI | 81-802 | 1/26/00 | | 2/2/00 | | |
| Vernon Street Lot 2 | 12/30/99 | NOI | 81-803 | 1/26/00 | | 2/2/00 | | |

**The following is a Request for Production of Documents related to Massachusetts Land Court Docket #280041**

**Form 24. Request for Production of Documents, etc., Under Rule 34**

Plaintiff Robert J. Campbell requests defendant Town of Weymouth, to respond within 10 days to the following requests:

(1) That defendant Town of Weymouth produce and permit plaintiff to inspect and to copy each of the following documents:

1. All opinion letters, written comments from various Town Departments, petitions and any other documentation related to Special Permit Application 96-3-4/22; and,
2. All opinion letters, written comments from various Town Departments, petitions and any other documentation related to Special Permit Application 96-8-11/1; and,
3. All opinion letters, written comments from various Town Departments, petitions and any other documentation related to Board of Zoning Appeals Application for Variance #2598; and,

That the Defendant shall make known to the Plaintiff when the documentation is available for inspection and copying at the office of the Town Clerk at the Weymouth Town Hall 75 Middle Street, Weymouth, MA 02189.

(2) That defendant produce and permit plaintiff to inspect and to copy, test, or sample each of the following objects:
Not Applicable

(3) That defendant permit plaintiff to enter the office of the Town Clerk of the Town of Weymouth, located at the Weymouth Town Hall, at the address shown above, and to inspect and to photograph, test or sample:
Not Applicable

Signed: _____    Date: ___6/11/04___

Robert J. Campbell
*Plaintiff*
*Pro Se.*
Dated: 11 June 2004
Address: 50 Squanto Road
         N. Weymouth, MA 02191
(As amended Mar. 30, 1970, eff. July 1, 1970.)

# Exhibit "F"

**The following is a Request for Admission of Facts related to Massachusetts Land Court Docket #280041**

**Form 25. Request for Admission Under Rule 36**

Plaintiff Robert J. Campbell requests defendant James Clarke, as Director of Planning and Community Development for the Town of Weymouth, within 14 days after service of this request to make the following admissions for the purpose of this action only and subject to all pertinent objections to admissibility which may be interposed at the trial:

1. That each of the following documents, exhibited with this request, is genuine.

   a) Town of Weymouth records of the Planning Board, logging all applications for Special Permit received during the years 1997 through 1999.

2. That each of the following statements is true.

"The Planning Board did not receive any new or additional applications for Special Permits, other than those shown on the attached logs, during the period from January 1, 1997 through December 31, 1999."


Signed:
Robert J. Campbell
*Plaintiff.*
*Pro Se*
Address: 50 Squanto Road.
          N. Weymouth, MA 02191
(As amended Dec. 27, 1946, eff. Mar. 19, 1948.)

# Exhibit "G"

TOWN OF WEYMOUTH, MASSACHUSETTS

PLANNING BOARD

APPLICATION FOR A SPECIAL PERMIT FROM THE PLANNING BOARD

Date _APRIL 12, 1996_

To the Planning Board of the Town of Weymouth:

The undersigned hereby applies for a Special Permit Use under Section _120-38.4_

of the Zoning By-Laws of the Town of Weymouth, namely to construct __A__

_SINGLE FAMILY HOUSE & DAYCARE CENTER_ located at _NECK STREET_

_____ shown on Weymouth Town Atlas

Sheets(s) ___5___  Block(s) _13_  Lots(s) _24_

Applicant's Name _SEARLES BUILDERS INC._

    Address _3660 BELMONT ST._

        _BROCKTON, MA. 02401_

   Telephone _508-941-5887_

Applicant's Interest _PROSPECTIVE PURCHASER_

        (owner, tenant, licensee, prospective purchaser, agent
        for owner, etc.)

The owner's title to the land is derived under deed from _DEED_
dated _DEC. 18_, 19_85_ and recorded in Norfolk Registry of Deeds,
Book _6903_, Page _222_ or Land Court Certificate of Title No._____
_____, registered in_____ District Book_____.
Page_____.

Received by Town Clerk:

Date _____

Time _____

Signature _____

Applicant's Signature: _____

Owner's signature and address if
not the applicant:

_Paul 'D.M_

_P.O. Box 98, 285 RIVER ST._
_WEYMOUTH, MA. 02191_

Form SP-1

# Frank J. Gallagher, P.E.

## CIVIL ENGINEERING • STRUCTURAL ENGINEERING • LAND SURVEYING

4 Windsor Drive
Foxboro, MA 02035
508-543-9894

April 17, 1996

Weymouth Planning Board
Town Hall
Weymouth, Ma. 02191

Re: Special Permit Assessment
    Lot 3, Neck Street

Dear Board Members,

On behalf of my client, Searles Builders Inc., I am submitting this Special Permit Assessment for the above referenced lot.

This lot was created in 1983 as part of a 5 lot subdivision at the corner of Neck Street and Davids Island Road. Presently four of the lots remain unbuilt upon. The entire lot is in the flood plain as are the other lots in the area. The surrounding area is thickly settled and residential.

The applicant, Searles Builders Inc., is seeking to construct a single family house. The house that is proposed is a large contemporary style house that will be an asset to the surrounding neighborhood.

The house will be located to meet all zoning requirements for the R-1 zone. Construction will be in accordance with all local, state, and federal regulations for construction in flood plain areas. Specifically, no habitable living space is to be located in that portion of the house below flood plain elevation. The area below flood plain elevation will be used for storage and parking of vehicles only. Also, the top of foundation elevation is above flood plain elevation. The foundation will be provided with "breakaway openings" to allow flood waters to flow through the foundation if that situation is to ever occur.



TOWN OF WEYMOUTH

(SEAL)

PLANNING BOARD

Notice is hereby given of a public hearing of the Planning Board of the Town of Weymouth under MGL Ch. 40A, Sec. 9, as amended and the Town of Weymouth Zoning Bylaw Article XXV to be held at:

7:45 P.M.

TUESDAY, MAY 28, 1996

TOWN HALL

75 MIDDLE STREET

on the application of Searles Builders, Inc. for property at Neck Street, also shown on the Weymouth Town Atlas Sheet 5, Block 13, Lot 24 seeking permission for a single family dwelling and daycare center located within a 100 year Special Flood Hazard Zone A4 as required by Section 120-38.4 of the Zoning Bylaws.   Plan and application is on file at the Office of Planning and Community Development, Town Hall, 75 Middle Street, Weymouth, MA, and may be inspected between 8:30 A.M. and 4:30 P.M., Monday through Friday.

for the Weymouth Planing Board
Paul M. Dillon, Chairman
Mary S. McElroy, Vice-Chairman
Paul F. Lynch, Sr., Clerk

**TOWN OF WEYMOUTH**
**PLANNING BOARD**
**MINUTES**



There was a Planning Board meeting held on Tuesday, May 28, 1996 at 7:30 P.M.
at the Town Hall.

Members present:     Paul M. Dillon, Chairman
                     Paul F. Lynch, Sr., Vice Chairman
                     Paul Hurley, Clerk
                     Susan Abbott
                     Robert S. Lang
                     Mary S. McElroy
                     Mary Sue Ryan

Staff present:       James Clarke, Director of Planning & Community Development
                     Roderick M. Fuqua, Principal Planner
                     Michael R. Milanoski, Economic Development Planner

The meeting was called to order at 7:30 P.M. by Chairman Dillon.

1.   Reorganization

     Mr. Dillon stated that the Chair will step down and turn the meeting over to
     the Clerk.

     Mr. Lynch asked for nominations for Chairman.

     Mr. Lang stated that he would like to recommend Paul Dillon for Chairman and
     make a comment.  Mrs. Ryan may not know it but they try to move through the
     Board so each member has a chance to move through all of the offices and to
     become Chairman.   It is unusual that he would nominate Paul Dillon to
     succeed himself, but he does so because Mary as Vice Chairman should either
     move up or move out.  She doesn't want to move up, so she should move out
     thereby freeing up the Vice Chairman position for Paul Lynch.  So with that in
     mind, he will nominate Paul Dillon for Chairman.

     Mr. Lang moved that nominations be closed for Chairman.

     Mrs. Abbott asked if there could be other nominations for Chairman.  Mrs.
     McElroy replied that there could be but Mr. Lang made a motion to close
     nominations, and the Board must vote on Mr. Lang's motion.

     Mr. Lynch polled the members for their vote on closing the nominations for
     Chairman.

Mary Sue Ryan - nay

<u>Planning Board Minutes - May 28, 1996 - Page 2</u>

Susan Abbott - nay
Paul Hurley - aye
Robert S. Lang - aye
Mary S. McElroy - aye
Paul F. Lynch, Sr. - nay
Paul M. Dillon - aye

With four members voting in the affirmative and three opposed, nominations for Chairman were closed.

Mr. Lynch polled the members for the vote on Paul Dillon for Chairman.

Mary S. McElroy - aye
Robert S. Lang - aye
Paul Hurley - aye
Susan Abbott - nay
Mary Sue Ryan - nay
Paul F. Lynch, Sr. - aye

With four members voting in the affirmative and two opposed, Paul Dillon was elected as Chairman.

Mr. Dillon asked for nominations for Vice Chairman.

Mr. Hurley nominated Paul Lynch for Vice Chairman.

Mr. Lang moved that nominations be closed for Vice Chairman.

On the nomination of Paul Lynch for Vice Chairman, it was unanimously voted.

Mr. Dillon asked for nominations for Clerk.

Mrs. McElroy nominated Paul Hurley for Clerk.

Mr. Lynch nominated Susan Abbott for Clerk.

Mr. Lang stated that he thinks that Paul Hurley should be Clerk because it is his time - Mr. Hurley has not been in office for some time. Normally Susan Abbott would be in line for an office but she has declined for two years. He feels that if a member declines an office, that member should go to the bottom of the line.

Mrs. Ryan seconded the nomination of Susan Abbott for Clerk.

Mr. Dillon stated that first the Board would vote on the nomination of Paul Hurley for Clerk.

Planning Board Minutes - May 28, 1996 - Page 3

Mr. Dillon polled the members for Paul Hurley for Clerk.

Mary Sue Ryan - nay
Susan Abbott - nay
Paul Hurley - aye
Mary S. McElroy - aye
Robert S. Lang - aye
Paul F. Lynch, Sr. - nay
Paul M. Dillon - aye

With four votes in the affirmative and three opposing, Paul Hurley was elected as Clerk.

Mr. Dillon stated that there are vacancies on the School Reuse Committee and Zoning Bylaw Committee. He asked Mrs. Ryan if she would be interested in serving on those committees. Mrs. Ryan replied in the affirmative.

2.  Minutes - 7/18/94, 12/11/95, 1/22/96, 3/13/96 and 4/29/96

Upon motion made by Mrs. McElroy and seconded by Mr. Lang, it was:

UNANIMOUSLY VOTED: to approve the Minutes of July 18, 1994, December 11, 1995, January 22, 1996, March 13, 1996 and April 29, 1996.

3.  Other Business

a.  South Farm Estates/Holly Estates

Mr. Fuqua read a letter from Ed Jordan regarding paving at Holly Estates. Mr. Buzz Couillard has submitted a request for a bond reduction for South Farm Estates and he has received an inspection report from DPW.

Discussion of the bond reduction was tabled until after the public hearing.

4.  Public Hearing - 7:45 P.M.
    Petr:    Searles Builders, Inc.
    Locus:   Neck Street
             Sheet 5, Block 13, Lot 24
    Zoning:  R-1

Request for special permit for single family dwelling and day care center within 100 year floodplain

Upon motion made by Mr. Lang and seconded by Mr. Lynch, it was:
UNANIMOULSY VOTED: to open the public hearing at 7:55 P.M.

Upon motion made by Mr. Lang and seconded by Mr. Lynch, it was:

UNANIMOUSLY VOTED: to waive the reading of the public hearing notice.

Sonny Searles and his engineer, Frank Gallagher were present.

Mr. Gallagher presented the plan for construction of a single family home which will also serve as a day care center. The topography is shown on the plan, and the floodplain is at elevation 17.83'. The first floor of the home will be at least 1' above the floodplain. The plan conforms to all set back requirements and will conform to all floodplain criteria.   Mr. Gallagher stated that anything below 17.83' cannot be used for basement or living space, but it can be used for storing vehicles.

Mr. Gallagher stated that this is a proposal for a single family residence and day care which is a permitted use in R-1.

Mr. Lynch stated that when they came before the Board before there was no suggestion of a day care. He asked if they are providing parking for people dropping off children. Mr. Gallagher replied that they have proposed four spaces with a double wide driveway. Mr. Searles stated that they will either have a double driveway or provide a circular drive.

Mr. Gallagher stated that they were here previously for the other lot.

Mr. Lynch stated that a circular drive is not shown on the plan. He has talked to Sgt. Newell who is against parents dropping off children on Neck Street. Mr. Searles replied that is why they came up with the idea of a circular drive.

Mrs. McElroy stated that she would like to know specifically how many children there will be. She's also concerned about dropping off children.

Mr. Lang stated that he's concerned about the safety of the children. He feels there should be one way in and out.

Mrs. Abbott asked about the heating system. Mr. Searles replied that everything will be above the floodplain elevation on the first floor.

Mrs. Abbott stated that she has a handbook for floodplain regulations and it says that the applicant shall have all necessary permits.

Mr. Gallagher stated that they have not filed with the Conservation Commission. They expect to file within the next couple of days.   He stated that he does not believe they need to file with the Board of Health. Mr. Searles stated that in order to file for a building permit, they must go through this process.

Mrs. Abbott stated that with regards to a day care aren't there any rules

regarding fuel on the first floor. Mr. Searles replied that once they go through this process, they will meet with the Building Department and determine what is needed.

Mrs. Ryan stated that she would be concerned with a circular drive and how it would be done. She is also concerned with storing of fuel on the floor with the living area.

Mrs. Ryan stated that she would think that they would go to the Conservation Commission before coming to this Board.

Mr. Dillon stated that there is a gas line going down Neck Street. He asked if it was possible to have natural gas instead of fuel in the house. Mr. Searles replied that he has not approached the Gas Co.

Mr. Dillon asked what type of house is proposed. Mr. Searles replied that he is proposing a Cape style house.

Mr. Hurley stated that the floodplain elevation is at 17.83'. Everything must be 1' above or at elevation 18.83'. Mr. Searles replied in the affirmative.

Mr. Hurley stated that since this will be a business, he would recommend that they participate in DPW's I/I program.

Mr. Hurley asked if the property must be handicapped accessible and have a fire alarm system. Mr. Searles replied that he's not sure about a fire alarm, but it must be handicapped accessible.

Mr. Dillon opened the floor for comments/questions from the public.

Mr. Chris Cazeault, 19 Davids Island Road, stated that he has a question on soil tests and why there weren't tests taken. Mr. Gallagher replied that they did soil tests on all five lots at a time when they had not decided on lot lines.

Mr. Cazeault asked if there was any peat found in the hole. Mr. Gallagher replied that there was no peat found; it was gravel.

Mr. Cazeault stated that he lives at the next house over and he believes there is peat there and it should be removed.

Mr. Searles stated that before they pour any footings, the Building Inspector will come down to the site and look at it. They took test shots - they dug five holes.

Mrs. McElroy asked how many children there will be. Ms. Tammy Campbell, 8 Davids Island Road, replied that there will be 35 children at one time at the center. She stated that she will live next door. She has 8 staff and the day care

will meet OFC standards.

Mr. Dillon stated that this is not a single family dwelling. He asked the staff for their comments.

Mr. Clarke stated that they have not received comments from the Inspector of Buildings yet, but he would like to ask the question of whether there will be anyone living in this building.

Ms. Campbell stated that there will not be anyone living in the building.

Mr. Dillon asked how they can call it a single family dwelling. Ms. Campbell replied that it is a house. She stated that the Office for Children would not let anyone open a building if all requirements were not met.

Ms. Janet Sullivan, Neck Street, stated that she has been there a lot of years. The town has allowed hundreds of condos on Neck Street. This is a residential area, and they want to put in a day care center with 35 children plus staff. It seems like the Board has the power to shut this down. A circular drive will not do it. It is about time residents of Neck Street caught a break.

Ms. Mary Mundy, 267 Neck Street, stated that she is concerned about Neck Street and the children's safety. There are flood problems there.

A resident of Neck Street stated that everyone on her side of the street have a sump pump because the road floods out. When the road floods you cannot get through.

A resident of 275 Neck Street stated that her main concern this is not a residence; it is a business. It entails a lot of children and a lot of staff. She does not think this is the proper location.

Ms. Sheila Shea, 267 Neck Street, stated that 35 children are proposed now. Would there be a maximum number of children, and what will be the ages of the children. Ms. Campbell replied that there will not be any infants or toddlers. It's an after school program from K-3, 5 years to 9 or 10.

Ms. Sandy Gildea, River Street, stated that she has no problem with a residential home with 6 children maximum, but this is a business, and there is quite a bit more to a business. There is traffic constantly on Neck Street. A business is another thing and Neck Street can't take it. She does not think that the neighborhood can take it and she thinks that the Board should really look into this as a business.

Mr. Clarke stated that the Board has gotten information that was not presented in the application. The application says this request is for a four bedroom home. State law prohibits restricting day care centers, but this submittal is

incorrect. He would recommend that the applicant withdraw and resubmit the application with the correct information.

Mr. Dillon stated that he thinks it would be advisable for the applicant to withdraw without prejudice.

Mrs. Abbott asked if it was correct that there is nothing in the bylaw regarding day care centers. Mr. Clarke replied that State law does not allow towns to restrict day care center.

Mr. Searles stated that he will request that he be allowed to withdraw without prejudice.

Upon motion made by Mrs. McElroy and seconded by Mr. Lynch, it was:

VOTED:  5-1 (Mrs. Abbott opposed) to allow the applicant to withdraw the special permit request for a single family dwelling an day care center within the 100 year floodplain without prejudice.

5.  Public Hearing - 8:30 P.M.
    Petr:     Brian Zeppenfeld
    Locus:   431 Pine Street
             Sheet 47, Block 538, Lot 5
    Zoning:  R-1 (Watershed Protection District)

Request for three (3) lot definitive subdivision plan.

Upon motion made by Mrs. McElroy and seconded by Mr. Lynch, it was:

UNANIMOUSLY VOTED:  to open the public hearing at 8:30 P.M.

Upon motion made by Mrs. McElroy and seconded by Mr. Lynch, it was:

UNANIMOUSLY VOTED:  to waive the reading of the public hearing notice.

Mr. Scott Arnold from Arnold Associates stated that he is representing the applicant for a three lot definitive plan for 431 Pine Street which was approved by the Board in preliminary form in January, 1996. Included in the application is a list of waivers. The definitive plan complies with all conditions of the preliminary plan approval. The site is approximately 4.6 acres and is located within the Watershed Protection District. The site currently has five structures on it.. There are three residences which he pointed on the plan. There is a substantial garage structure and a storage building. They are proposing to remove two dwellings and subdivide the parcel into three lots. Today there is about 15,000 square feet of pavement on the site.   They are proposing to construct a road approximately 190' long to provide access for two dwellings. The road would culminate in a turn around with a landscaped island in the

## Frank J. Gallagher, P.E.

### CIVIL ENGINEERING • STRUCTURAL ENGINEERING • LAND SURVEYING

4 Windsor Drive
Foxboro, MA 02035
508-543-9894

May 29, 1996

Weymouth Planning Board
Town Hall
75 Middle Street
E. Weymouth, Ma. 02189

Re: Lot 3 Neck Street
    Special Permit

Dear Planning Board Members,

As discussed at last nights public hearing, the applicant, Searles Builders Inc. has directed me to formally request that the above referenced special permit request be withdraw without prejudice.

If you have any questions please contact me.

Sincerely,

Frank J. Gallagher, P.E.

RECEIVED
May 30  8 51 AM '96
OFFICE OF ... CLERK
WEYMOUTH, MASS.

**TOWN OF WEYMOUTH, MASSACHUSETTS**
**PLANNING BOARD**
**NOTICE OF DECISION ON SPECIAL PERMIT**
**307-315 NECK STREET**

(To be mailed forthwith to the owner and applicant, if not the owner.)

Owner:      Turnpike Realty Co., Inc.              Date:      June 3, 1996
Address:    P.O. Box 98                            Case No.:  96-3-4/22
            285 River St.                          Town Atlas:
            Weymouth, MA 02191                     Sheet 5, Block 13, Lot 24

Applicant:  Searles Builder's Inc.
            860 Belmont St.
            Brockton, MA 02401

Special permit application filed on April 22, 1996.

Referring to the above application for a permit for a single family house and day
care center located within a 100 year Special Flood Hazard Zone A4.

After a public hearing on May 28, 1996, the Planning Board at its meeting on May
28, 1996:

VOTED TO ALLOW THE APPLICANT TO WITHDRAW WITHOUT PREJUDICE.

The decision of the Board, together with detailed record of its proceedings stating
the reasons for the decision, shall be filed within 14 days after decision in the office
of the Town Clerk. Decision filed with the Town Clerk on  June 5, 1996          .

IMPORTANT: Any appeal from the decision of the Planning Board can be made
only to the Court and must be made pursuant to Section 17, Chapter 40A (GL) as
amended, and must be filed within twenty (20) days after the date of filing of the
decision with the Town Clerk.

                    WEYMOUTH PLANNING BOARD

                    _Paul M. Dillon_
                    Paul M. Dillon, Chairman

FORM: SP-6

OFFICE OF TOWN CLERK
WEYMOUTH, MASS.

JUN 5  2 34 PH '96

RECEIVED

# Exhibit "H"

2006 Feb 24 P 5: 03

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.                                    DISTRICT COURT
                                                BROCKTON DIVISION
                                                C.A.NO:

*****************************

COPPERWOOD, INC, f/k/a
SEARLES BUILDERS, INC.
        Plaintiff,

                                                **COMPLAINT AND**
                                                ~~JURY TRIAL CLAIM~~
        v.

ROBERT & TAMMY CAMPBELL,
        Defendants, .

*****************************

## PARTIES

1.    The Plaintiff, Copperwood, Inc. f/k/a Searles Builders, Inc., is a company duly organized
      and existing under the laws of the Commonwealth of Massachusetts with a usual place of
      business at 721A Belmont Street, Brockton, Plymouth County, Massachusetts.

2.    The Defendants, Robert & Tammy Campbell, are individuals with a post office address and
      mailing address of 50 Squanto Road, Weymouth, Norfolk County, Massachusetts.

## COUNT I
### *(Copperwood, Inc. f/k/a Searles Builders, Inc. v. Robert &*
### *Tammy Campbell/Breach of Contract)*

3.    The plaintiff, hereby restates, realleges and incorporates fully by reference paragraphs one
      and two contained herein as though fully set forth in this Count I.

4.    On or about June 24, 1996, the plaintiff entered into a contract whereby the plaintiff
      agreed to sell and the defendants agreed to purchase the real estate located at Lot X, on
      Davids Island Road, Weymouth, Massachusetts, for a discounted price of $100.000.00.

5.    The defendants agreed to purchase this property contingent on the contract with the
      plaintiff to build a single-family home.

6.  On or about May 2, 1997, the plaintiffs entered into a contract whereby the defendants agreed to pay and the plaintiff agreed to furnish all materials and labor for the construction and completion of a single-family home with the property address of Lot X, on Davids Island Road, Weymouth, Massachusetts.

7.  The plaintiff has been ready, willing and able to comply with the requirements of the agreement and has repeatedly demanded that the defendants comply with the agreement.

8.  On or about June 24, 1996, the plaintiff entered into a contract whereby the plaintiff agreed to sell and the defendants agreed to purchase the real estate located at Lot Y, on Neck Street, Weymouth, Massachusetts, for a discounted price of $100.000.00.

9.  ~~The defendants agreed to purchase this property contingent on the contract with the plaintiff to build a day-care facility.~~

10. On or about November 12, 1998, the plaintiffs entered into a contract whereby the defendants agreed to pay and the plaintiff agreed to furnish all materials and labor for the construction and completion of a dwelling for a day-care facility with the property address of Lot Y, on Neck Street, Weymouth, Massachusetts.

11. The plaintiff has been ready, willing and able to comply with the requirements of the agreement and has repeatedly demanded that the defendants comply with the agreement.

12. The defendants have refused to so comply and still refuse to comply with the requirements of said agreement.

13. Thereafter, despite the plaintiff's demand, the defendants failed to proceed in accordance with the terms of the contract.

WHEREFORE, the plaintiff demands:

1.  That the defendants be restrained from transferring, assigning, encumbering or in any way attempting to pass outside of his/her control the premises located at Lot Y on Neck Street, located in Weymouth, Norfolk County, Massachusetts.

2.  That the defendants be ordered to convey to the plaintiff by a good and sufficient quitclaim deed, free from all encumbrances, the premises as described in the agreement.

## COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

DISTRICT COURT
BROCKTON DIVISION
C.A.NO:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COPPERWOOD, INC, f/k/a
SEARLES BUILDERS, INC.
Plaintiff,

v.

ROBERT & TAMMY CAMPBELL,
Defendants,

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## STATEMENT OF DAMAGES

_x_ Plaintiff _____ Defendant _____ Other  in the above-captioned action, hereby asserts that

the money damages sought by means of the _x_ complaint _____ crossclaim _____ counterclaim

to which this statement of damages is attached, amount to $700,000.00.

Respectfully Submitted,
The Plaintiff,
By his attorney,

Angela K. Troccoli, Esq.
Sims & Sims, LLP
53 Arlington Street
Brockton, MA 02301
(508) 588-6900
BBO #651593

Dated: June 26, 2003

# Commonwealth of Massachusetts

## TRIAL COURT OF MASSACHUSETTS
### DISTRICT COURT DEPARTMENT
### BROCKTON DIVISION

Plymouth, ss

Civil Action No. __0315CV1397__

### SUMMONS
(Rule 4)

To defendant ____Robert Campbell____ of ____50 Squanto Road, Weymouth, MA____
                (NAME)                             (ADDRESS)

You are hereby summoned and required to serve upon ____Angela K. Troccoli – Sims & Sims, LLP____ , plaintiff(s)

attorney, whose address is ____53 Arlington Street, Brockton, MA____ , a copy of your answer to the complaint which is herewith served upon you, within 20 days after service of this summons, exclusive of the day of service. You are also required to file your answer to the complaint in the office of the Clerk of this court either before service upon plaintiff('s attorney), or within 5 days thereafter. If you fail to meet the above requirements, judgment by default may be rendered against you for the relief demanded in the complaint. You need not appear personally in court to answer the complaint.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you wiill be barred from making such claim in any other action.

WITNESS, David G. Nagle, First Justice, on _____ .
                                         (Date)

SEAL LS

_Kevin P. Ruedor_
_____
Clerk/Magistrate

Note: (1) When more than one defendant is involved, the name of all defendants should appear in the action. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

(2) The number assigned to the complaint by the Clerk at commencement of the action should be affixed to this summons before it is served.

## RETURN OF SERVICE

On_____ , I served a copy of the within summons, together with a copy of the complaint in this action, upon the
    (Date of Service)

within name defendant, in the following manner (see Rule 4 (d) (1-5):

A TRUE COPY, ATTEST:

DEPUTY SHERIFF

DATE __8-14-03__

_____
(Signature)

_____
(Name and Title)

_____
(Address)

Note: (1) The person serving the process shall make proof of service thereof in the court and to the party or his attorney. As the case may be, who has requested such service. Proof of service shall be made promptly and in any event within the same time during which the person served must respond to the process. Rule 4(f).

(2) Please place date you make service on defendant in the box on the copy served on the defendant, on the original returned to the court and on the copy returned to the person requesting service or his attorney.

(3) If service is made at the last and usual place of abode, the officer shall forthwith mail first class a copy of the summons to such last and usual place of abode, and shall set forth in the return the date of mailing and the address to which the summons was sent (G.L.c223, sec. 31).

This form prescibed by the Chief Justice of the District Court

# Exhibit "I"

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

(Copies of this Record of Proceedings with all attachments must be filed within 14 days of a decision by the Board with the Town Clerk and kept on file by the Board.)

I, Paul M. Dillon, Chairman of the Planning Board hereby certify that the following is a detailed record of all its proceedings relative to the application of Searles Builders Inc., 860 Belmont Street, Brockton, MA 02401, for a Special Permit under Section 120-38.3 of the Zoning Bylaws for premises located on Neck Street, shown on the Weymouth Town Atlas Sheet 5, Block 13, Lot 24, owned by Turnpike Realty Co., Inc., P. O. Box 98, 285 River Street, Weymouth, MA 02191. to construct a single family home.

1. On November 1, 1996, an application of which a true copy marked "A" is made a part of this record, was presented to the Planning Board, including all supplemental material presented.

2. Thereupon, an advertisement was published in the Quincy Patriot Ledger, a newspaper published in Quincy, MA on December 2, 1996 and December 9, 1996.

3. Notices of the hearing, a copy of which marked "B" is made a part of this record, were mailed postpaid to the petitioner, abutter, and abutter to abutters of land within 300 feet of the property line, being the same persons named in the Assessors certificate which was a part of the petition heretofore referred to and marked "A", and to the Board of Selectmen, Inspector of Buildings and the planning boards of every abutting municipality.

4. Copies of the site plan were referred to the Conservation Commission, Board of Health, Department of Public Works, Police Department, Fire Department and Building Department, School Department and Tax Collector for comments and recommendations. A copy of comments and recommendations received from Town Officials and all Planning Board correspondence is marked "C" and made a part of this record.

5. Material submitted by the public is marked "D" and made a part of this record.

6. On December 16, 1996, a hearing was held at the Weymouth Town Hall, 75 Middle Street, Weymouth, MA 02189, at which opportunity was given to all those interested to be heard in favor or opposition to said petition, application or appeal at which hearing:

The Clerk read the public hearing notice.

Upon motion made by Mrs. McElroy and seconded by Mr. Lynch, it was:

**PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS**
**RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT**
**NECK STREET - SP-7**

UNANIMOUSLY VOTED: to open the public hearing at 7:45 P.M.

Present were Sonny Searles, applicant; Walter Watson, engineer from Genesis Engineering, Inc.; and Robert Campbell, future owner of the property.

Mr. Campbell stated that he will be co-owner of the property. This is a family project - there are nine people involved.

Mr. Watson stated that on behalf of the applicant, Searles Builders Inc., he is submitting this special permit assessment for Lot 3A on Neck Street. It is a 15,000 square foot lot. They are proposing an approximate 30 by 50 square foot building to be placed upon this lot. He pointed out the lot on Davids Island Road and Neck Street. There are ten parking spaces proposed. The building is being built in a floodplain, and that is the reason they are here this evening. This lot was originally created in 1983 as part of a five lot Approval Not Required Plan. Since that time a house has been built on Lot 5 which is one lot away from this lot, and the area has been further subdivided to add one more lot. There is also another lot that is under construction. The surrounding area is primarily residential and is densely populated where the majority of the dwellings are constructed on lots between 7,500 to 10,000 square feet. The applicant, Searles Builders Inc. seeks to construct a day care center that will be designed to look like a cape style house and its appearance will fit into the overall neighborhood.

Mr. Watson stated that the structure will be located to meet all zoning setback requirements of the R-1 zone in which it is located. The construction of the building will conform to all local, state and federal regulations for floodplain areas. There will be no habitable, and/or storage areas within the building envelope below the floodplain elevation. The first floor is designed to be a slab on grade, and the area between the foundation walls and below the floor slab shall be compacted clean fill material. The top of the foundation is designed to be one foot above the floodplain elevation. A test pit was performed within the location of the building envelope on October 24, 1996 and the results of the test pit were provided to the Board. There was five feet of loamy, sandy fill and the test went down eleven feet. They have also provided information on the amount of fill which will be placed within the floodplain area. The entire lot is within the floodplain. Approximately 268 cubic yards of fill will be placed within the floodplain area. The grading as shown on the plan, has most of the water flowing the same as it always has. Most of the water flows towards the back of the site. A small amount of water does go out towards the street.

Mr. Dillon asked for comments from the staff.

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

Mr. Fuqua stated that the plan was sent out for referrals. He reviewed the comments received from DPW, Water and Sewer, and Engineering; Fire Department; Conservation Commission; and the Tax Office.

Mr. Fuqua stated that for the Board's information this is a day care center. A day care center is a protected use and is exempt from zoning under Ch. 40A, Sec. 3. Any questions regarding this being a day care center are not within the jurisdiction of the Board to address.

Mrs. Abbott asked if there is anything that says that the day care must be owner occupied. Mr. Fuqua replied that there is nothing that says the day care must be owned occupied. The only criteria is that it must conform to a day care program as defined in Section 9 of Chapter 28A. A day care use is exempt and State law does not address ownership or occupancy.

Mr. Dillon asked Mrs. Abbott for an update on where this stands with the Conservation Commission.

Mr. Searles stated that the public hearing before Conservation is scheduled for this Wednesday evening.

Mr. Hurley asked if it was correct that this will not be a place that could be lived in i.e. no showers or cooking facilities.

Mr. Campbell stated that there will be some cooking facilities, but they will not be cooking hot meals on a daily basis.

Mr. Hurley stated that he has some concerns over the parking spaces - the number and backing out onto Neck Street. Mr. Watson replied that he can take a look at the parking.

Mr. Lynch asked if they had their curb cut permit for Neck Street yet. Mr. Searles replied that he was not aware that he needed a curb cut permit. Mr. Fuqua stated that a street opening permit for the utilities is required from the town, but Neck Street is a town street and a State curb cut permit is not required.

Mr. Lynch asked if the circular drive is one way in and out. Mr. Searles replied in the affirmative.

Mr. Lynch asked how many cars there would be in the morning to the day care center. Mr. Campbell replied that they expect six to eight cars per hour between 7 A.M. and 9 A.M.

## PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
## RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
## NECK STREET - SP-7

Mr. Lynch asked if the cars would be backing out onto Neck Street. Mr. Campbell replied that they think there is sufficient room for a car to park and another car to go around and exit onto Neck Street.

Mr. Hurley stated that the applicant would probably be required to participate in the I/I program. Mr. Fuqua replied in the affirmative.

Mrs. McElroy stated that ten parking spaces are proposed. She asked how many employees there would be. Mr. Campbell replied that there is a specific staff ratio set by the Office for Children. They expect to have seven or eight employees.

Mrs. McElroy stated that with eight employees there will only be two spaces left for people parking to drop off their children. Mr. Campbell replied that they expect that two or three cars in the driveway would be the maximum.

Mrs. McElroy asked if it was correct that they would not be cooking meals for the children. Mr. Campbell replied that they expect the children to bring a lunch and they will provide snacks.

Mrs. McElroy asked about infants. Mr. Campbell replied that there would be no infants; the youngest child would be two years, nine months.

Mrs. McElroy asked if they will have cribs. Mr. Campbell replied that they will have cots. He noted that they will meet all requirements set by the Office for Children. Mrs. McElroy stated that a child age two years, nine months is very young to be on a cot.

Mrs. McElroy asked if this day care center will be lived in or is it strictly a business in this residential neighborhood. Mr. Campbell replied that the day care center is a business.

Mrs. McElroy asked if there will only be one structure on this lot, or more than one. Mr. Campbell replied in the affirmative; there will be the house and dumpster.

Mrs. McElroy asked if it was correct that the employees will be parking in the front - there is no other place for them to park. Mr. Campbell replied in the affirmative; the only other place would be on the street.

Mrs. McElroy asked what the hours would be for the day care center. Mr. Campbell replied that the day care center would be open from seven in the morning to six-thirty or seven at night.

Page 4 of 34

## PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
### RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
### NECK STREET - SP-7

Mrs. McElroy asked if they expected cars to be coming and going all hours, all day on this busy street. Mr. Campbell replied that they expect to have most cars at peak times of drop off and pickup.

Mrs. McElroy asked how many bathrooms there would be. Mr. Campbell replied that there will be one handicapped bathroom on the first floor, and two and a half baths on the second floor.

Mrs. McElroy asked where the dumpster will be, how often will it be emptied and is it shown on the plan. Mr. Campbell replied that the dumpster is not shown on the plan. They have discussed several options. Ideally it would be on one side because the dumpster will require access to be emptied. They expect the dumpster will be adjacent to the building probably on the right side.

Mrs. McElroy asked if there will be any delivery trucks bringing milk or juice, etc. Mr. Campbell replied that they don't expect they will have any delivery service.

Mrs. McElroy asked if their business for any reason closes down would the same type of business go in or could it be converted to a home. Mr. Campbell replied that the day care center could be converted to a home, but a similar business could go in.

Mrs. McElroy asked if this day care center will be setting a precedent. Mr. Campbell replied that he believes the precedent already exists at the former elementary school on Green Street. He does not believe that if they succeed, other homes in the area will go for the same thing. There is an increased need in the area for day care. He does not know about the need in other areas. They think they can provide a need in the North Weymouth area and at a reasonable rate.

Mrs. McElroy asked Mr. Campbell if he was comparing this proposed day care center to the day care center at McCulloch. McCulloch is set back, off the street, and not as heavily traveled as Neck Street. Mr. Campbell replied that it was not his intent to compare their service to Country Academy Children's Center.

Mr. Lang asked who determines parking. Mr. Fuqua replied that parking will be determined by the Inspector of Buildings. One space for every employee is required and whatever else the Inspector of Buildings deems necessary. They must also provide for a drop off space.

Mr. Lang asked if it was correct that earlier it was mentioned there would be thirty children. Mr. Campbell replied that he believes their preliminary license will be for twelve children for six months and after that time, they may increase their capacity through the Office for Children provided they meet all of the criteria. They will meet the Office for Children guidelines.

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

Mrs. Abbott stated that if twenty children came at the same time, some may be dropped off at Neck Street. Mr. Campbell replied that the center will not allow any child to be dropped of at Neck Street.

Mrs. Abbott asked about medical services. Mr. Campbell replied that the Office for Children does not require medical personnel on site.

Mrs. Abbott stated it must take more than two or three minutes to drop off a child. She does not see how there will be sufficient parking. Mr. Campbell replied that they have considered all options. They believe this is the best plan they could come up with. There is sufficient room for cars to stop off Neck Street so as not to block traffic on Neck Street.

Mrs. Abbott read from the floodplain criteria. She asked how much of the lot is in the floodplain. Mr. Watson replied that the lot is in the floodplain.

Mrs. Abbott stated that all state and federal permits should be in place. Also, she read recently that all businesses/homes must have flood insurance. She asked if the staff had any information on that. Mr. Fuqua replied that whether someone must have flood insurance, is up to whoever holds the mortgage. Mrs. Abbott asked Mr. Fuqua to find out about flood insurance.

Mrs. Ryan stated that she didn't see any drainage calculations so she does not know whether their drainage is adequate. They are turning a lot of pervious area into pavement. Regarding state/federal permits, they should be obtained prior to this special permit. A day care center will certainly impact this area. She can't imagine that the Office for Children would be more concerned with play equipment than children. Mrs. Ryan stated that in our zoning, it states that with regards to the floodplain districts all permits must be obtained. She would question how the Office for Children could permit a day care center in the floodplain.

Mr. Campbell stated that the lot is not in a tidal zone. They do not experience water in/out of the property on a daily basis. Flooding would only occur during flooding conditions.

Mrs. Ryan stated that it clearly states in the bylaw that all permits must be obtained. Cars will be parking in the floodplain area. There is a question of safety with just the parking itself. There will be a lot of children at this day care, and she feels there is a safety concern.

Mr. Campbell stated that the Office for Children allows fifteen children in anyone's home provided they meet all requirements for a family day care. He's sure the

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

Office for Children does everything they can to protect the children. He noted that they are looking to provide a need.

Mrs. Ryan stated that it is not a question of need. The applicant is before this Board for a special permit in the floodplain. A day care center is not our jurisdiction, but the floodplain is. She wants to know how many children there will be, and if the parking is adequate.

Mr. Campbell stated that he is not familiar with the Board's bylaw. Mrs. Abbott replied that they should be. Mr. Campbell stated that maybe he should be familiar with the bylaw, but he can't provide the Board with a license for the day care center before it's built.

Mrs. Ryan stated that they have chosen the floodplain district to locate a day care center in. She would think they would have looked in the criteria for the floodplain district.

Mrs. McElroy asked if the Office for Children, that is so concerned with equipment in the yard, designates certain equipment for certain age children. Mr. Campbell replied in the affirmative, and he explained the requirements.

Mrs. McElroy asked if they have ever run a day care center. Mr. Campbell replied that his wife is a certified day care provider.

Mr. Dillon asked the applicant to provide a sketch of what the building will look like.

Mr. Searles stated that the day care center will be a cape style building. He presented a sketch with elevations.

Mr. Dillon asked about handicapped access only to the first floor and stated that handicapped children will never be able to use the second floor. Mr. Campbell replied in the affirmative.

Mr. Dillon asked about the heating system and if it was isolated from the children. Mr. Campbell replied that the heating system is separate from the kitchen area where the children do not have access.

Mr. Dillon asked where the fuel is stored. Mr. Campbell replied that they will have a standard oil tank located in the utility room.

Mr. Dillon asked about a lighting plan. Mr. Searles replied they do not have a lighting plan.

## PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
## RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
## NECK STREET - SP-7

Mr. Dillon stated that he has serious concerns with dropping children off in the morning. He asked if there will be a lot of noise. Mr. Campbell replied that he expects that most of the noise will be contained within the building.

Mr. Dillon asked about a fire alarm. Mr. Fuqua replied that a type one fire alarm is required by the Fire Department.

Mr. Dillon asked if there have been any comments from Sgt. Newell of the Police Department. Mr. Fuqua replied that the Police Department has not commented yet.

Mr. Dillon stated that the area can flood at any time. He asked how they will know if flooding conditions occur. Mr. Campbell replied that they are familiar and have access to a tidal chart. There are high tides and low tides. Low tides will not have any affect on the property. If storm conditions occur, the children will not be outside playing.

Mr. Dillon asked if there will be a ramp on the outside of the building. Mr. Campbell replied that they are currently making that determination.

Mr. Dillon asked about the dumpster and if it would be anchored. Mr. Campbell replied that they expect that the dumpster will not be anchored, but located on the side of the building and enclosed.

Mr. Dillon asked about a sign for the day care center. Mr. Campbell replied that they have considered a sign. He understands there is a permit required for a sign and they have not applied for one yet.

Mr. Dillon asked what the timeframe was for building the day care center. Mr. Searles replied that he expects the center to be built in four months.

Mrs. Abbott asked due to the nature of the day care center, if they have special evacuation plans set up. Mr. Campbell replied that they have discussed that as part of the fire escape plan which he explained.

Mrs. Abbott asked if they had a copy of the standards for the Office for Children that the Board can review. Mr. Campbell replied that he has several standards. Mrs. Abbott asked that the standards be made available to the staff.

Mrs. Abbott asked about the dumpster. Mr. Campbell replied that the dumpster will be added to the plan once they determine the location.

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

.r. Dillon stated that he has serious concerns with dropping children off in the
:orning. He asked if there will be a lot of noise. Mr. Campbell replied that he
expects that most of the noise will be contained within the building.

Ir. Dillon asked about a fire alarm. Mr. Fuqua replied that a type one fire alarm is
equired by the Fire Department.

Ar. Dillon asked if there have been any comments from Sgt. Newell of the Police
Department. Mr. Fuqua replied that the Police Department has not commented
·et.

Mr. Dillon stated that the area can flood at any time. He asked how they will know
.f flooding conditions occur. Mr. Campbell replied that they are familiar and have
access to a tidal chart. There are high tides and low tides. Low tides will not have
any affect on the property. If storm conditions occur, the children will not be
outside playing.

Mr. Dillon asked if there will be a ramp on the outside of the building. Mr.
Campbell replied that they are currently making that determination.

Mr. Dillon asked about the dumpster and if it would be anchored. Mr. Campbell
replied that they expect that the dumpster will not be anchored, but located on the
side of the building and enclosed.

Mr. Dillon asked about a sign for the day care center. Mr. Campbell replied that
they have considered a sign. He understands there is a permit required for a sign
and they have not applied for one yet.

Mr. Dillon asked what the timeframe was for building the day care center. Mr.
Searles replied that he expects the center to be built in four months.

Mrs. Abbott asked due to the nature of the day care center, if they have special
evacuation plans set up. Mr. Campbell replied that they have discussed that as
part of the fire escape plan which he explained.

Mrs. Abbott asked if they had a copy of the standards for the Office for Children
that the Board can review. Mr. Campbell replied that he has several standards.
Mrs. Abbott asked that the standards be made available to the staff.

Mrs. Abbott asked about the dumpster. Mr. Campbell replied that the dumpster
will be added to the plan once they determine the location.

**PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS**
**RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT**
**NECK STREET - SP-7**

Mrs. Abbott asked about drainage calculations.

Mr. Dillon stated that the Board needs more information regarding drainage calculations, landscaping plan and signs.

Mrs. McElroy asked if the maximum number of children will be 53. Mr. Camp replied that he does not expect the rooms to be full all of the time.

Mr. Dillon stated with regards to 53 children outside on a June afternoon, he what their responsibility is to the people in the neighborhood. Mr. Campbell replied the Office for Children sets limits on the number of children playing outside. The children's outside play time will be staggered.   They also expect have field trips to the beach, bowling alley, etc.

Mr. Dillon stated that he hopes he won't see 53 children marching down Neck Street to the beach.   Mr. Campbell replied that the center will provide transportation.

Mrs. Ryan asked for a list of principles involved in the day care center.

Mrs. Ryan asked Mr. Campbell where he lives. Mr. Campbell replied that he l at 8 Davids Island Road.

Mrs. Abbott asked if they would have a bus for the field trips. Mr. Campbell r that in the case of large field trips, they expect to have a large bus.

Mrs. Abbott requested copies of the standards for the Office for Children. She asked if the Office of Children has any standards for a day care center in the floodplain and fuel on the first floor. Mr. Campbell replied that the fuel will n stored in the area where the children play.

Mr. Dillon opened the floor for questions from the public.

Mr. Philip Tilton, 6 Great Hill Drive, expressed concern over traffic on Neck with regards to number of vehicles and speed. He stated that he feels the tr must be studied.

A resident of 275 Neck Street asked how many days the center would be op Campbell replied that the center would be open Monday through Friday.

The same resident of 275 Neck Street that she lives at Salt Water Creek a can't get out now because of traffic. She expressed concern over additional

**PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS**
**RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT**
**NECK STREET - SP-7**

Mr. Campbell stated that he understands peoples concerns over traffic, but he does not expect that the increase in volume will keep this woman from getting out of her driveway.

Ms. Janet Sullivan, 376 Neck Street, stated that the traffic in the area is ridiculous, and this is a floodplain. She feels the day care center should be in an appropriate location. She feels the residents in the area will be harmed by this proposal because they bought their homes in a residential area and now a day care center is proposed.

Ms. Tammy Campbell, 8 Davids Island Road, stated that this is an appropriate location. The vans will be parked in her driveway. A nurse lives in the area and will be able to walk over to the center. Through all the rain we have had, she has been watching and the street has not been flooding. She stated that they did do a traffic survey for the area.

Mr. Chris Cazeault, 19 Davids Island Road, stated that he is a direct abutter. He is not against a day care center; he's just against the area that it's in. This is the wrong spot for a day care center. He feels that the value of his home will go down because of the day care center.

Ms. Ruth Campbell, 8 Davids Island Road, stated that she is a former school nurse. Regarding her house, there is an in-law apartment and she has all appropriate permits. Regarding the day care center and flooding, she believes the last time the area flooded was during Hurricane Bob. She does not see where a day care center is a problem. Maybe the parking must be looked at. They appreciate the Board's help and input. She sees no reason why the day care center would be a problem. The children will be well taken care of.

Ms. Sandra Gildea, 47 River Street, stated that she's sure that a school of this size will include holiday activities. Whenever there are activities at a school, there is no place to park. She feels there will be a parking problem. She stated that her main concern is traffic.

A resident of Neck Street stated that she has lived on Neck Street for about ten years and traffic is horrible. This is a heavily populated area with families. She suggested that a solution might be an alternate parking site for the staff.

Ms. Patricia Sullivan, 294 Neck Street, stated that there is a water issue. She has lived on Neck Street for four years, and she has seen the area flood many times. The entire area is wet all of the time.

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

Ms. Janet Sullivan, 371 Neck Street, stated that she has had two cars, legally parking hit on Neck Street in the last twelve months. They do not need more traff causing more problems.

Mr. Dillon stated that the Board has requested additional information and suggested that the hearing be continued.

Upon motion made by Mr. Lynch and seconded by Mrs. McElroy, it was:

UNANIMOUSLY VOTED:  to continue the public hearing to January 13, 1997 at 7:45 P.M.

Members present:
Paul M. Dillon, Chairman
Paul F. Lynch, Sr., Vice-Chairman
Paul Hurley, Clerk
Susan Abbott
Robert S. Lang
Mary S. McElroy
Mary Sue Ryan

Members absent:  none

7.  At the Planning Board meeting on January 13, 1997, the Board further discussed the special permit at the continued public hearing.

Upon motion made by Mr. Hurley and seconded by Mr. Lang, it was:

UNANIMOUSLY VOTED:  to continue the public hearing at 7:50 P.M.

Present on behalf of the application were Sonny Searles, applicant; Walter Watson, engineer; Rob Campbell, future owner of daycare, and Attorney Michael Morisi.

Mr. Dillon stated that he is disappointed in the late arrival of material by the applicant.

Mr. Morisi apologized for the later delivery. They are well aware that the late delivery would be an issue, however it was because they were trying to address all of the issues that were raised. They have provided a new footprint of the building and new parking for the proposed daycare center. The plan does represent a change in footprint and parking and has a revised date of January 13, 1997.

Mr. Dillon stated that this is a lot of material that the Board has not had a chance

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

to review. He would request that the applicant withdraw for a couple of weeks. The Board is seeing this for the first time this evening.

Mr. Morisi stated that they are aware the Board just received this information.

Mr. Clarke explained that there were two deliveries from the applicant on Friday. One package came in the morning and was included in the Board's package. The information delivered in the afternoon was not included. The revised plan was received today at noon.

Mr. Morisi stated that perhaps they should not address the new plan, but address the information contained in a letter from the Board. Mr. Morisi stated that items 2 - 6 were provided to Mr. Clarke on Friday. He asked if the Board received that information. Mr. Clarke replied that the information received before noon on Friday was distributed to the Board on Friday. The second package of information which arrived Friday afternoon was not delivered to the Board. The Board now has all the information either delivered on Friday or passed out at this meeting.

Mr. Morisi stated that with regards to item #1 drainage calculation, the information was provided and it addressed some of the issues. The new plan also addresses, in a positive way, drainage issues. The purpose of the new plan is to address parking, specifically access/egress on Neck Street. He asked Mr. Campbell to describe the changes in the new plan.

Mr. Campbell stated that the old plan had ten parking spaces along the circular pattern of the driveway. The new plan has most of the parking on the right side of the building. With the old plan the building was parallel to the street. The first change they made was to change the location of the building so that the back of the building was parallel to the side lot line, and that opened up the entire right side of the lot when looking at the lot from Neck Street.. In doing that they were able to add two parking spaces. They were also able to limit the access to each of the parking spaces by requiring cars entering the lot to fully enter the lot and then fully enter the parking space. It will not be possible for anybody entering the nine parking spaces on the right side of the lot to back out of those parking spaces onto Neck Street. The location of the dumpster is also identified on the revised plan as being adjacent to the front corner of the right side of the building. The dumpster is enclosed by a 6' stockade fence, and there will be access to the dumpster by any commercial operation that will be contracted to remove the trash without interfering with the flow of traffic on Neck Street, and also without interfering with any parking that is going on at the center. These are some of their reasons for altering the plan. Another major factor in their decision to alter the plan was that the driveway is still wide enough to have sufficient space along the inside of the driveway for several vehicles to park on a temporary basis while parents are

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

dropping off their children. The additional parking spaces in the revised plan also allow for additional vehicles to be parked or stopped on a temporary basis. This will eliminate any backlog of vehicles on Neck Street. This will allow anyone attending the center to fully enter the property, park their vehicle and bring their children into the center in a safe environment without any risk to either the children or vehicles traveling on Neck Street. These were primary concerns of the Board, and their primary motivation in altering the plan. They still have three parking spots off to the left side of the building. These three spots appeared on the original plan and will be reserved for staff. For staff members parking there, it will be the first members of the staff in attendance at the center. The three spaces will be filled first before any clients show up so those spaces will not be available for clients. It is possible for vehicles to back out onto Neck Street from the three spaces on the left side, but since they will be used by staff, the staff will be required not to back out onto Neck Street.

Mr. Lynch asked about handicapped parking, and how a handicapped child would get into the building. Mr. Campbell replied that the entire parking area will be paved, but there is a paved walkway.

Mr. Searles stated that because of the grade a handicapped ramp is not needed.

Mrs. McElroy asked what is meant by the grading is such that a handicapped ramp is not needed. Mr. Watson replied that it is a very flat area and you really don't need a dedicated ramp. Mrs. McElroy asked if it was correct that someone in a wheelchair could go right up to the door. Mr. Watson replied in the affirmative.

Mrs. McElroy asked why the handicapped parking space was put behind the dumpster. Mr. Campbell replied that the size of the handicapped space determined its location.

Mr. Lang stated that he can see they provided a lot of parking as a result of our comments from the last meeting. He asked who will park in spaces 6,7 and 8. He stated that it seems like it would be staff parking. He can't image parents parking there. Mr. Campbell replied that there may be times when clients park there. Spaces 9, 10, 11 are reserved for staff.

Mrs. Abbott asked how much they have increased the impervious surface with the new plan. Mr. Watson replied that the impervious area has been increased by approximately 600 square feet with the revised plan.

Mrs. Abbott stated that the calculations are based on the previous plan so therefore new calculations are needed. Mr. Watson replied that with the additional 600 square feet it won't change the calculations that much.

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

Mr. Dillon asked Mrs. Abbott if she wanted new drainage calculations. Mrs. Abbott replied in the affirmative.

Mrs. Abbott stated that the other plan included a playground. Mr. Campbell replied that there is a play area on the revised plan.

Mrs. Abbott asked at any given time how many children would be in the play area. Mr. Campbell replied the 3,000 square feet of play area allows for forty children at the most.

Mrs. Ryan stated that there are three spaces for staff. She asked how many spaces were increased from the old plan. Mr. Campbell replied that there are two additional parking spaces with the revised plan.

Mrs. Ryan asked where the van will be parked. Mr. Campbell replied that if the van is driven by an employee scheduled to be at the center first, then it would be parked in one of the three spaces for employees. If the van is driven by an employee that is not scheduled until 9, it would be parked in a parking space at the right of the building.

Mrs. Ryan asked about the vans. Mr. Campbell replied that they said at the last meeting they expect to have two mini vans. He couldn't say where they would be parked- it would depend on when they arrived at the center, but the vans would not be parked on the street or in front of the building.

Mrs. Ryan asked if at full capacity they would need two vans. Mr. Campbell replied in the affirmative.

Mrs. Ryan asked how much the play area decreased with the revised plan. Mr. Campbell replied that the amount of play area is not relevant as long as they have sufficient area for the children.

Mr. Dillon asked for comments from the office.

Mr. Fuqua stated that the new drainage calculations will be sent to DPW for their review.

Mr. Dillon stated that the whole revised plan should go back to departments for review. This is a new plan and there are a lot of modifications that have been made. Mr. Fuqua replied that if that is the wish of the Board the new plan will be sent to departments for their review and comment.

Page 15 of 34

## PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
## RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
## NECK STREET - SP-7

Mrs. McElroy stated that she will make the motion to send the revised plan to departments for their review and comment.

Mrs. Abbott asked if new calculations would be sent for review. Mr. Clarke replied that if there has been an increase in impervious area, new calculations are needed.

Mr. Clarke stated that a vote is not needed, we will send the plan out for comment.

Mr. Hurley stated that in the original application fill was discussed. He asked if the amount of fill will change with the revised plan. Mr. Watson replied that the amount of fill is about the same.

Mr. Hurley asked if it was correct that the outside edge of the driveway is curbed - around the parking spaces and parking area. Mr. Watson replied that it can be curbed.

Mr. Hurley asked where the water running towards the back of the lot will go. Mr. Watson replied that they will put a cut in parking space #8 to allow the water to run towards the play area.

Mrs. Abbott stated that she did review two items that she received with regards to the Office for Children. The key is to protect the health and safety of children. A day care in the floodplain she does not see how the health and safety of children is taken into account at all. The information she received talks about different types of emergencies, but she did not see any plan for evacuation. Something should be prepared in writing. Our bylaw requires us to protect the health and safety the citizens of the town. A day care center in the floodplain seems to fly in the face of health and safety.

Mr. Campbell stated that if an evacuation plan is a requirement for the license, they will have one. They have a plan for fire, but the building itself will be above the floodplain. They are proposing a first floor elevation of 18.83' which is above the floodplain which is elevation 17.83'.

Mrs. Abbott stated that it is well and good that the building is above the floodplain, but we are talking about the street that is subject to flooding.

Mr. Campbell stated that he can understand the Board's need to protect the health and safety of citizens, but he believes that's the intent of the Office for Children. Obviously if the Office for Children feels their evacuation plan is inadequate, they will not issue a license.

Mr. Campbell stated that in response to a concern raised by Mrs. Ryan, they expect

## PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
### RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
### NECK STREET - SP-7

that at maximum capacity 53 children in the center at anyone time. The Office for Children in granting a license will only grant provisional license for a period of about up to one year. They will not issue a standard license. There are limitations on the number of children under a provisional license. The Office for Children is in direct contact with the Director of the center with regards to the operation of the center almost on a weekly basis to make sure from a children's safety point of view that everything required is in place including documentation, medical records and all other requirements. Mr. Campbell stated that they are undertaking a serious project. The health and safety of the children are a primary concern and they would not endanger the children in any way.

Mrs. McElroy stated that regarding health and safety of children, under Director Health Services, a Ruth C. Campbell is listed. She asked if it was correct that Ruth C. Campbell lives in New Hampshire. Mr. Campbell replied that her primary residence is New Hampshire. Mrs. McElroy asked how she is going to watch out for the health of the children if she lives in New Hampshire. Mr. Campbell replied that she will be the Director of Health Services. She will be responsible for all the health records, health procedures, and all the administrative requirements pertaining to the children. Mrs. McElroy stated she lives in New Hampshire - when is she going to do that. Mr. Campbell replied that Ruth Campbell doesn't spend all her time in New Hampshire. Mrs. McElroy stated that her residency is New Hampshire. Mr. Campbell replied that her primary residence is New Hampshire. Mrs. McElroy stated that Francis Campbell, Director of Administration and Finance, also lives in New Hampshire. Mr. Campbell replied that is correct; their primary residence is New Hampshire, but they do spend time here. He stated that these are not full time positions. Mrs. McElroy stated that these are positions, especially the nurse, that directly affect the care of children, and they will take young children also. Mr. Campbell replied that they will not take children below two years, nine months. He stated that the requirements for the Office for Children does not say they need a nurse on site full time.

Mrs. McElroy stated that the minimum requirement for staff to child ratio is one staff per thirteen children. She asked if that means there will only be three people in the building caring for thirty-five children. Mr. Campbell asked what age group Mrs. McElroy was talking about. Mrs. McElroy replied that it did not specify age. She read from requirements of the Office for Children regarding staff to children ratio. Mr. Campbell stated that children ages six to nine requires one staff per thirteen children. Mrs. McElroy asked if it was correct that three people would be in charge of thirty-five children. Mr. Campbell replied that Mrs. McElroy is assuming there will be thirty-five six to nine year olds. Mr. Campbell stated that they will have appropriate staff levels in the center at all times, otherwise they are subject to losing their license.

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

Mr. Dillon stated that the Board should stay focused on the floodplain.

Mrs. Ryan stated that drainage calculations are most important since it is a floodplain area. She has heard many comments from people living in the area that the area is subject to flooding. We really have to look very carefully at parking spaces and whether there is enough parking. She is not convinced there will be adequate parking. This is an area that gets a lot of water and she is concerned that flooding is not made worse. She wonders if two vans are enough if they must evacuate.

Mr. Campbell stated that as he mentioned previously, they will have an evacuation plan and will provide safe shelter for the children.

Mrs. Ryan stated that one of these vans, she believes, will be parked at property across the street. Mr. Campbell replied that there is an employee that lives on the opposite side of the street, and at the end of the day, it is most likely that she will drive the vehicle home. Mrs. Ryan questions the van being parked at a residence. Mr. Campbell replied that it is an employee's residence. That van would not be parked there when the center was open. There is no regulation that says someone cannot drive a vehicle home and park it on their property.

Mrs. Ryan asked Mr. Campbell if he knew of any other day care center that was located in the floodplain. Mr. Campbell replied that he's not familiar with the elevations of other day cares so he really couldn't say.

Mr. Fuqua stated that no day care centers have been constructed in the floodplain since floodplain regulations have been in effect in Weymouth.

Mrs. Ryan stated that she would imagine that information (day cares in a floodplain) could be obtained from the Office for Children.

Mr. Dillon stated that he has two questions that were brought to his attention over the weekend. If you had a situation like last Friday and you had fifty-three people in the residence, where are you going to take the children. Where will the children go if you have to evacuate the building. Mr. Campbell replied that they have started to speak to different facilities, mostly banquet facilities, that meet the requirements of the Office for Children. This would be on a temporary basis, and if they have to provide an off site location, they are prepared to do that.

Mr. Dillon asked if it was correct that they are going to have two vans. Mr. Campbell replied that the center will have two vans under lease. Mr. Dillon asked if a situation came up where they had to get fifty-three children out of there, how are two vans going to be enough. Mr. Campbell replied that they will provide

alternate transportation. If they have to hire a bus to come in for an hour or two, they will do that.

Mr. Dillon asked if the maximum children would be fifty-three children. Mr. Campbell replied in the affirmative. Mr. Dillon stated that at 6 in the morning they could have fifty-three children there. Mr. Campbell replied that is not correct because of the schedule of the programs. Mr. Dillon asked if Mr. Campbell is saying that they will only have fifty-three children there throughout the entire twelve hours a day the center is open. Mr. Campbell replied that they expect that at any one time to have no more than fifty-three children. Mr. Dillon stated that they could very well have two hundred children there in a day as long as there are not more than fifty-three at any time. Coming and going over the entire course of the day, they could have two hundred children at the center. Mr. Campbell replied that is not true because there are programs. Different age children are not allowed to mix in the same room. They could not use a room for a before school program for a pre school program. They would not under any circumstance have two hundred children in a day. He noted that there will be a turn over of children during the day.

Mr. Lang stated that the tide we had last Friday was a very high tide. He asked if they would have had to evacuate if the center had been open. Mr. Campbell replied that they would not have had to evacuate. He lives in the area and he saw no problem.

Mr. Lang asked if it was correct that he could have a day care center in his home with fifteen children. Mr. Campbell replied that they are proposing a group center, not a family day care center. Mr. Lang asked if there is a limit on the number of children in a home day care. Mr. Campbell replied that since he's never considered a family day care, he is not familiar with the regulations.

Mr. Dillon opened the meeting for questions from the audience.

Ms. Mary Fallon, 24 Julia Road, questioned the parking and the staff to children ratio. Fifty-three children at minimum staff would be four staff members, and there will be two vans.. If there are younger children, there may be more staff members. It would leave three parking spaces for clients. Mr. Campbell replied that Ms. Fallon's numbers are correct as stated but two employees will drive the vans to the center. Ms. Fallon asked if it was correct that the van drivers will also be staff members. Mr. Campbell replied in the affirmative.

Mr. Francis Dingwell, 267 Neck Street, asked what measures are being taken to curtail heavy traffic coming through Neck Street. He has had three cats killed. He asked if there will be a fence at the day care center because children have a

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

tendency to run towards the street.  Mr. Watson replied that there is a fenced in area for the children to play in.

Ms. Dawn Whitten, 275 Neck Street, stated that she is concerned about the added burden on the sewer system. Mr. Dillon stated that the Board will get comments from the DPW on that.

Mr. Philip Tilton, 6 Great Hill Road, stated that for the record the area did flood last week.

Ms. Barbara Landman, 267 Neck Street, stated that she is concerned over the ratio of staff and children.  She asked if it will be correct that there will be three staff. Mr. Campbell explained the ratio of staff per children required.  They will have the appropriate number of staff.

Ms. Landman stated that she comes out of Neck Street when going to work. She's concerned with additional traffic and feels it will be an added burden.  Regarding flooding, she has been there ten years and there has been very bad flooding, but this past storm was the first flooding with a very high tide.

Mrs. Fallon stated that she has now heard there will be eight staff and eleven parking spaces.  That means there will only be three spaces for clients.  Mr. Campbell replied that there are be a total of twelve allotted parking spaces on the plan.  Assuming they have eight staff, there will be four long term spaces available for clients.  There will be an additional eight temporary spaces along the curb of the driveway and in the parking area.

Mrs. McElroy asked about the temporary parking spaces and if people would be parking all over the place.  Mr. Campbell replied that the driveway is wide enough for two vehicles.  There is room along inner curb of the driveway for four additional cars parked on a temporary basis.  Mrs. McElroy stated that those are not parking spaces.  Mr. Campbell replied that those spaces are temporary.

Mrs. McElroy stated that she received a letter that was left at her home.  She asked the Clerk to read it.  Mr. Hurley stated that the letter was not signed or addressed and he did not feel it should be read.

Mrs. Abbott asked about a lighting plan.  Mr. Campbell replied that on the revised plan there are lighting specifications.

Mr. Dillon asked for a copy of the actual lighting that will be put in.  Mr. Watson replied in the affirmative.

**PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS**
**RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT**
**NECK STREET - SP-7**

Mrs. Ryan asked if one handicapped space is sufficient. Mr. Clarke replied that the plan will need to be reviewed by the Inspector of Buildings for compliance with parking regulations.

Mrs. Abbott stated that she is concerned about traffic and parking. She is still concerned about an evacuation plan - she feels the Board needs more specifics on such a plan. Mr. Campbell replied that they have started working with the Weymouth Fire Department to develop a plan in case of fire. In terms of flooding, they can prepare a written plan for evacuation.

Mrs. Tammy Campbell stated that she did talk to the Deputy Chief and he will look at the plan and tell them what is expected.

Upon motion made by Mr. Lynch and seconded by Mr. Hurley, it was:

UNANIMOUSLY VOTED: to continue the public hearing to February 13, 1997 at 7:45 P.M.

It was brought to the Board's attention that February 13, 1997 was a Thursday and the Board took another vote to continue the public hearing to February 10, 1997.

Upon motion made by Mr. Lynch and seconded by Mr. Hurley, it was:

UNANIMOUSLY VOTED: to continue the public hearing to February 10, 1997 at 7:45 P.M.

Members present:
Paul M. Dillon, Chairman
Paul F. Lynch, Sr., Vice-Chairman
Paul Hurley, Clerk
Susan Abbott
Robert S. Lang
Mary S. McElroy
Mary Sue Ryan

Members absent: none

8. The Planning Board further discussed the special permit at the continued public hearing on February 10, 1997.

Upon motion made by Mr. Lang and seconded by Mr. Lynch, it was

UNANIMOUSLY VOTED: to continue the public hearing at 7:45 P.M.

**PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS**
**RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT**
**NECK STREET - SP-7**

Mr. Rob Campbell stated that he is here as a representative for the owner of the property.

Mr. Clarke stated that the Board has a copy of the letter from Searles Builders requesting a continuation of the public hearing.

Mr. Dillon asked if it was correct that Mr. Campbell is requesting that the Board continue the public hearing to February 24, 1997 at 9:00 P.M.   Mr. Campbell replied in the affirmative.

Mr. Dillon asked for comments from the Board.

Mrs. Abbott asked if the reason for the additional time was to provide comlete and comprehensive information as requested by the Planning Board.  Mr. Campbell replied in the affirmative.

Mrs. Abbott asked what items they need additional time for.  Mr. Campbell replied that they requested information from the Planning Board and they are reviewing that information in a complete and comprehensive manner.

Upon motion made by Mrs. McElroy and seconded by Mr. Lang, it was:

UNANIMOUSLY VOTED:  to grant the applicant's request for a continuation of the public hearing to February 24, 1997 at 9:00 P.M.

Mrs. Abbott asked if abutters will be notified.  Mr. Fuqua replied that the applicant will be asked to notify the abutters of the continued public hearing date.

Members present:
Paul M. Dillon, Chairman
Paul F. Lynch, Sr., Vice-Chairman
Susan Abbott
Robert S. Lang
Mary S. McElroy
Mary Sue Ryan

Members absent:  Paul Hurley, Clerk

9.  The Planning Board further discussed the special permit at the continued public hearing on February 24, 1997.

Upon motion made by Mr. Lynch and seconded by Mrs. McElroy, it was:

**PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS**
**RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT**
**NECK STREET - SP-7**

UNANIMOUSLY VOTED: to continue the public hearing at 9:00 P.M.

Present on behalf of the special permit application were Attorney Michael Morisi, Attorney Paul Bijkersma from Morisi & Associates; Sonny Searles, applicant; Walter Watson, engineer from Genesis Engineering; and Rob and Tammy Campbell, future owners of the property.

Mr. Morisi stated that this is the fourth public hearing on this matter; only the second hearing he has attended. He was not present for hearings one and two. He would like to back up for a moment and present a background overview of what he thinks is before this Board. On October 31st the application for special permit was submitted by Walter Watson from Genesis Engineering for a special permit to build a child care facility on the subject property which lies in the Weymouth floodplain, therefore they are seeking a special permit under Weymouth Zoning Bylaw 120-38.4. What is proposed is a cape style house consistent with the residential structures in the neighborhood, consisting of two floors with approximately 2,600 square feet for a maximum capacity of fifty-three children with eight staff people when the school is at full enrollment. That use is subject to licensing by the Office for Children, a State agency. Consistent with the precedence from this Planning Board on prior applications for special permits in the exact same floodplain, the proposed improvements have incorporated the following features. 1. There is no habitable or storage space within the building that is below the floodplain elevation. That is entirely consistent with the floodplain bylaw and with the prior precedent from this Board with at least four recent cases considering and granting special permits in the Weymouth floodplain. 2. The top of the foundation for the structure will be at least one foot above the floodplain elevation. Again that is highly consistent with the floodplain bylaw and the prior precedent of this Board. 3. The total fill proposed for the site is approximately 268 cubic yards. Again he would submit that is within both the floodplain bylaw and within prior precedent of this Board. There were four prior cases where this Board considered and approved special permits in the floodplain. In one case the total proposed fill was quoted to this Board to be 200 to 300 cubic yards. In the second case no fill was proposed. In the third case 225 cubic yards of fill was proposed. In the fourth case 740 cubic yards of fill was proposed. Mr. Morisi read from the record of the four cases, specifically who the applicant was, location, date submitted, date approved, and how much fill was proposed. Mr. Morisi stated that those are the only four they could find. They searched the Weymouth public records to try to get an idea of what the precedence was from this Board on prior applications for special permits regardless of the proposed use and they found those four cases. Mr. Morisi stated that he will come back to that later, but he will respectfully submit that in this particular case, because they are proposing a child care facility that the interpretation of prior enforcement by this Board of the floodplain regulation is

**PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS**
**RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT**
**NECK STREET - SP-7**

relevant to what is a reasonable interpretation and enforcement of the floodplain regulation as to this proposed use.

Mr. Morisi stated that the proposed improvements include grading and improvements that will not alter the storm water flow across the property. He does not have a copy, but he believes the Board has the letter from engineer Fontaine confirming the amount of increased discharge to the system is negligible. The Board has materials that have been submitted by engineer Watson which confirms the direction of storm water flow will not be altered by proposed improvements or by the proposed grading changes; that the storm water will flow in the same direction and it will absorb into the soil and carry into the adjacent river as presently, and that any changes will be negligible.

Mr. Morisi stated that what they are proposing is a child care facility to be operated by Tammy Campbell who is currently certified as a pre-school director and is currently the operator of a home child care center. The operation of this facility, which will be called Bear Cove Children's Center, will be subject to license by the Office for Children, and Tammy Campbell will be the proposed operator of that system. The neighborhood where the proposed improvements are located can be described as a mixed use neighborhood. In the immediate area is a school, church, a bingo hall, condominiums, houses, beach with public access boat ramp, a marina, State park, and businesses.

Mr. Morisi stated that his understanding is that this Board has requested materials relevant to the application, both at the last hearing and at the hearings before he got involved. It is his understanding that all those materials have been submitted. His understanding is that they did submit those materials timely; they did submit sufficient copies and they did submit everything the Board requested. He would ask if he's not correct in that assumption that some member of the Board bring it to his attention because it is his assumption they have now submitted all material that was requested, notwithstanding that with respect to some of those materials, it will be his contention they are not within the purview of this Planning Board for consideration of this special permit. Nevertheless they have submitted them. They came forward with all the information they think the Board has asked for; perhaps more information than asked for. There have been submitted to this Board over 100 signatures in petition form in support of the application. They have submitted the plan dated January 13, 1997, which at a prior meeting had not submitted timely so was not considered part of the record at meeting number 3. The Board has a letter on his law firm's letterhead dated February 19, 1997, which speaks to some of the issues under MGL Ch. 40A, Sec. 3. The Board now has an evacuation plan with a copy submitted to the Fire Chief. They have not received any comments either favorable or unfavorable. They have submitted lighting details in plan form that were requested at the prior hearing. They have submitted updated drainage

## PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
## RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
## NECK STREET - SP-7

calculations that were requested at the prior hearing. As stated earlier, he thinks the bottom line on the drainage calculations is that they are not increasing or changing the direction of any of the storm water runoff. He would respectfully submit that the law that is applicable to this application, at this stage, is that which is summarized in his February 19, 1997 letter to the Board, and it speaks to the property rights which are as fundamental under our constitution as any other rights of a citizen in this town, state or country. The property rights under Ch. 40A, Sec. 3 expressly provides that a child care facility is authorized to exist as of right in any zone, and not be unreasonably prohibited. The law goes on to say that reasonable regulations relating to bulk and height, yard size, lot area, setbacks, open space, building coverage requirement and the like are permissible if properly balanced against the legislatures pre-determination that child care facilities are a protected use in any zone in this town or in this state. The test that is applied by the court which mandates accommodation by this Board is a test that requires this Board to first identify a legitimate municipal concern. They will concede there is a legitimate municipal concern and that is the floodplain. The town has a bylaw; they don't quarrel with it. They stepped forward and submitted the application in October seeking a special permit from this Board. They concede that the floodplain issues are a legitimate municipal concern, and are within the purview of this Board relating to the proposed improvements. The Weymouth Zoning Bylaw, namely the floodplain bylaw must relate to the legitimate municipal concern. Mr. Morisi stated that next is where he wants to focus his attention. The application of that bylaw governing the legitimate municipal concern, namely floodplain regulations, must bear some rational relation to the legitimate municipal concern. There must be a rational relation where this Board interprets and enforces the floodplain regulation with respect to this child care facility. That is where he believes and submits those precedence are relative because in prior cases this Board has considered applications for special permits under the Weymouth Zoning Floodplain Bylaw and has granted those with enumerated conditions and based upon consideration of various factors summarized in those cases establishes the baseline of what this Board has determined reasonable with respect to those applications. In Ch. 40A, Sec. 3, it states in some cases even to hold a child care facility to the same requirements could violate the statue. In some cases accommodation of a child care facility is mandated beyond that which this Board may have considered with respect to other uses. They are not asking to go beyond what this Board may have done in other cases. They understand the precedent, they will honor it, will abide by it and should be given the same treatment and no more rigorous treatment. Legislation has determined that child care facilities are a protected use. The legislation has determined with respect to zoning, you are mandated to accommodate day care facilities. You cannot go further when considering a child care facility than you would have gone to some other use under the same bylaw. The Board has set the standard with regards to residences in the area. In this case they agree that the floodplain is a legitimate municipal concern but many of the

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

factors that have been discussed before this Board in the prior hearings are outside
the purview of what the Board has considered when the Board has considered
special permits applications in the floodplain for prior uses.

Mr. Dillon stated that Mr. Morisi has made his point very clear. We know our
jurisdiction - it is the floodplain. He would like to make one comment before Mr.
Morisi continues. Mr. Morisi has commented on special permits in the floodplain
that were granted in 1989, 1990, and 1996. He wants to bring to the applicant's
attention that the make-up of this Board has changed since then.

Mr. Morisi stated that the floodplain bylaw talks about four purposes in general.
Item A. speaks to occupants. Items B., C. and D. speak to the community. Item A.
relates to the children. Items B. through D. he respectfully submits there is no
basis to hold the child care facility to any requirements that are more restrictive
than those he enumerated. They have incorporated those features which they think
are important under the floodplain bylaw that protect the community. The Board
has the letter from engineer Fontaine which relates to their drainage calculations.
Item A. speaks to the occupants. He would submit that they have provided an
evacuation plan. They respectfully contend that the evacuation plan is consistent
with that which would be required by the Office for Children, a state agency whose
whole purpose is to protect children. Point #2, they searched for another day care
facility in the floodplain. They found none in Weymouth. They did find one in
Quincy - Virginia's Day Nursery at 368 Quincy Shore Drive that had been in
business for forty years at that location without a single floodplain incident.
Virginia's Day Nursery did state they had an evacuation plan. As the Board may
know the Wessagussett Elementary School is located in the same floodplain, and it
currently serves about 650 students plus staff.- The Wessagussett School has an
evacuation plan. Mr. Morisi stated that as he understands the school's evacuation
plan, it calls for the students and the staff to walk from the school to the nearby
parish hall. He would submit, with all respect, that they meet Part A. of the
floodplain zoning bylaw which protects the occupants with an evacuation that is at
least as extensive, and respectfully submits more extensive, than that which is
currently used by the Wessagussett Elementary School which serves more than ten
times the number of students they will be serving at their facility.-

Mr. Morisi stated that he would respectfully submit that based on those
submissions which he summarized and his contentions as to what is the
appropriate issue for this Board's consideration, that they have met those
standards, and they would respectfully request favorable action on the application
at the conclusion of tonight's public hearing.

Mr. Dillon asked Mr. Clarke if he had a copy of the evacuation plan for the
Wessagussett School. Mr. Clarke replied that he did not have a copy of that

evacuation plan.

Mr. Dillon stated that the Wessagussett School is a half mile away from the proposed location of the day care facility. Mr. Dillon stated that we will get a copy of the school's evacuation plan.

Mr. Dillon asked for comments/questions from the Board.

Mrs. Ryan stated that she does not have any questions.- With regard to Mr. Morisi's comments, she does not agree with his assessment with regards to the past approvals in the floodplain. We are talking about children and this is a very unique situation. She does agree with regards to the floodplain bylaw that it is to protect the health, safety and welfare of occupants against the hazards of flooding. Small children will be susceptible to all of the dangers associated with flooding. She does not find their evacuation plan reasonable in the sense that it will apply safely to children who are under the age of three. As a Board member who has to make a determination on an issue that concerns the floodplain, and it is strictly a matter of the health, safety and welfare of the occupants, there is nothing that has been said this evening that has convinced her that this is the correct location. The fact that it is a residential area is not the issue, but it is in the floodplain and that is why they are here for a special permit. She does not believe that the location of a child care facility that is going to provide for the safety and well being for up to fifty-three children can be properly located in this particular floodplain area with the evacuation procedures that have been submitted. As far as the child care facility on Quincy Shore Drive, she can't judge that. She is talking about the location on Neck Street. When you look at evacuation procedures, and so on with everything concerning Neck Street, and the fact that as Board members, we have to promote the health, safety and welfare of the occupants against the hazards of flooding. Her own feeling that to locate a day care facility for small children in the floodplain does not meet the criteria.

Mrs. Abbott stated that she agrees with Mrs. Ryan. The day care in Quincy is a different floodplain area. The idea that this area is subject to flooding, is a fact. The DPW on January 10 filed an incident report to the Department of Environmental Protection because of overflows in this area. The cause of the incident was extremely high tides that came up onto the street. She would agree that the amount of fill might be negligible when you are talking about the ocean but the velocity of water that would go across the site has an impact on the floodplain. With regards to the evacuation plan, she did read it quite thoroughly. She is a little scared by the words "may", "generally" and things like that. The plan seems to say it is sufficient, but she must go by the criteria which is to promote the health, safety, and welfare of occupants. There will be occupants of fifty-three children plus staff members. In this evacuation plan, it also talks about clerical staff and

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

floating clerical staff. She takes that to mean that they will have people coming more frequently and not floating on site. With regards to the properties that were mentioned as setting a precedent for a decision by the Board, she wants to state that the Board is a different making. The prior special permits in the floodplain didn't have fifty-three occupants involved. She does see a difference in the special permits that were previously approved in the floodplain - none of them had fifty-three occupants.

Mr. Lang asked Mr. Morisi if he considered the nature of the use beyond the purview of this Board. Mr. Morisi replied that the use is a child care facility - that is a given. It is not something we are debating. Mr. Lang stated that the Board approved the house next to this lot. Mr. Morisi replied that is correct. Mr. Lang asked if Mr. Morisi was saying this day care is beyond the purview of the Board. Mr. Morisi replied that he respectfully contends that the Board cannot hold a different standard for Michael Nasuti's child than the Board uses for some child who is a student at the center.

Mr. Lang asked if the same is true for parking. Mr. Morisi replied that there cannot be a different standard for this application. Ch. 40A, Sec. 3 says that if there is a reasonable rational relation between the regulation of parking to the legitimate municipal concern which is the floodplain, then the Board can regulate it, but after that rational relation, you can't. The Board cannot regulate parking the way they would in a site plan or other special permit application.

Mrs. McElroy stated that she does not know how they dare compare the single houses with one or two children that the Board approved to a home that is going to have fifty-three or maybe more plus staff with regards to evacuating them in the floodplain. She thinks they are way off base on that. The program director at the Office for Children sent a letter in response to someone's complaint saying that they had no local authority over the local zoning issues. Our local zoning and what we consider pertinent to this application, we can govern. Mr. Morisi replied that he disagreed. Ch. 40A, Sec. 3 has taken that out of the Board's hands. Mrs. McElroy stated that it does not take jurisdiction out of our hands, in our hands are the safety of the occupants.

Mrs. McElroy stated that there is no way she can vote for a day care center on Neck Street in the floodplain.

Mr. Lynch stated that he thinks the first criteria of the floodplain bylaw which is to promote the health, safety and welfare of occupants against the hazards of flooding says it all.

Mr. Hurley stated that he had no questions.

## PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
## RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
## NECK STREET - SP-7

Mr. Dillon asked for comments from the staff.

Mr. Fuqua stated that a letter was received late this afternoon from Andrew Fontaine, Town Engineer. Mr. Fontaine's comments were related to the drainage calculations that were submitted to the Planning Board dated February 5, 1997. Mr. Fuqua read the letter dated February 24, 1997 from the Town Engineer.

Mr. Dillon stated that the Board has received several letters which he asked the Clerk to read.

Mr. Hurley read a letter from the Board of Selectmen regarding correspondence they received regarding the day care center.

Mr. Hurley read a letter to the Board of Selectmen from Ruth S. Amos dated February 13, 1997 expressing concerns over the day care and enclosing copies of two petitions from residents located on or near Neck Street.

Mr. Hurley read a letter from Ruth S. Amos dated February 19, 1997 to the Board of Selectmen enclosing a copy of a letter from the North Weymouth Civic Association's Board of Directors opposing the proposed day care center on Neck Street.

Mr. Hurley read a letter to Sandy Amos dated February 14, 1997 from the North Weymouth Civic Association opposing the proposed day care center on Neck Street.

Mr. Hurley read a letter from Senator Robert L. Hedlund dated February 13, 1997 expressing concern over the proposed day care center on Neck Street.

Mr. Hurley read a letter from Nancy Graham dated February 24, 1997 in favor of the proposed day care center on Neck Street.

Mr. Dillon stated that the Board has also received petitions both for and against the day care.

Mr. Dillon opened the meeting for questions/comments from the public, but asked that people focus on the floodplain.

Mr. Frank Hawkins, 4 Colasanti Road, spoke against the proposed application. He stated that he is a Town Meeting Member and he had received calls from many people against this proposal. Their main issue was the floodplain and the fact that this area is subject to flooding. He felt the Board should deny this special permit application.

Page 29 of 34

**PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS**
**RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT**
**NECK STREET - SP-7**

Ms. Theresa Marino, 426 Neck Street, spoke against the application stating her main concern was over sewerage with regards to over taxing the system which is already over burdened.

A resident at 395 Neck Street spoke against the proposal and asked that people take a ride through that area after a rain storm.

A resident at 357 Neck Street asked what the house will look like and how it would fit into the neighborhood. He also asked how many children are in the Quincy day care center that is located in the flood zone. Mr. Searles explained that the proposed house was a cape style house with dormers.

A resident of Neck Street expressed concern over the proposal with regards to sewer and stated that the sewer overflows whenever it rains.

Ms. Barbara Johnson, Town Meeting Member, spoke with regards to the floodplain.

Ms. Mary Mundie, 267 Neck Street, spoke regarding concerns over safety with regards to traffic on Neck Street. She asked if there would be no parking signs placed on Neck Street to prevent people from parking on Neck Street, dropping their children off at the day care center and then getting on a T bus and leaving their car parked on Neck Street.

A resident of 33 Parnell Street stated that if the day care center would commit to their contribution of the runoff to the replacement of sewerage it would seem like a solution.

Ms. Barbara Landman, 267 Neck Street, stated that with regards to the applicant's claim that there is a need for day care in the area, she called other day care centers in Weymouth and everyone said they had vacancies. She asked how many children they expect in the morning. Mr. Morisi replied that the school is designed for fifty-three children.

Mr. Rob Campbell stated that between the hours of 7 A.M. and 9 A.M. there could be fifty-three children.

Ms. Landman questions how fifty-three people can park in eight spaces. She stated that she feels there is going to be a terrible, terrible problem with regards to parking and safety.

Ms. Karen Graham, 267 Neck Street, stated that with regards to other day care centers, they may have openings, but they don't have openings for children over six.

**PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7**

She has been appalled that the community has put things in the paper and that the Campbells have been threatened.

Ms. Susan Williams, 17 Athens Street, stated that she is a single parent. The day care center is there for working parents. There won't be fifty-three cars converging on the center all at one time - it will be throughout the day. Fifty-three is the maximum capacity of the center but it does not mean there will be fifty-three children there at all times.

Mr. Chris Cazeault, 19 Davids Island Road, stated that his concern is traffic.

Ms. Mary Fallon, 24 Julia Road, stated that her understanding is that the Weymouth Public Schools provide an after school day care program.

Mr. John Mulveyhill, Civil Defense Director, stated that the Wessagussett School is in the floodplain and they do have an evacuation plan that calls for the children to walk to St. Jeromes with a backup plan that calls for the children to be bussed to the Abigail Adams School which is the primary shelter for the Town of Weymouth. There is an evacuation plan in place for every special needs facility in town which includes all of the schools, and day care centers. As for this proposed facility, he has not seen an evacuation plan. As for the flooding issue, there is a major issue on Neck Street during storms at high tide. To add a special needs facility, he believes is wrong, but he has not seen their evacuation plan.

Ms. Sheilah Shea, 267 Neck Street, expressed concern over flooding and stated that on January 10th the area experienced water from a storm. She also expressed concern over increased traffic, low water pressure and sewer problems.

Ms. Karen Graham stated that she would like to respond to the statement with regards to an after school day care program at the public schools, to have your child at school all day is very difficult for the child.

A resident of 274 Neck Street stated that there are four school buses, and 2 city buses that go down Neck Street. Traffic is terrible and she is afraid someone is going to get hurt.

Ms. Tammy Campbell stated that there is one bus at 7 in the morning and one bus at 8 in the morning. The buses are not going down Neck Street one after another.

A resident of Neck Street expressed concern over flooding conditions on Neck Street and stated that she would not want to see a child have to walk through that water.

Mr. Rob Campbell stated that he thinks there is a general misconception. The A4

**PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS**
**RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT**
**NECK STREET - SP-7**

flood zone states there is no rapid water movement. The water rises slowing with plenty of notice. Puddling on the street does not present a problem for the day care since it is above the floodplain.

Ms. Dorothy O'Sullivan, 267 Neck Street, stated that she has lived here since the late 40's. She has seen how northeasters come up and this area is noted for northeasters.

Upon motion made by Mr. Lang and seconded by Mr. Hurley, it was:

UNANIMOUSLY VOTED:  to close the public hearing at 10:10 P.M.

Mr. Morisi stated that he would like to respond to the public testimony. He would like to point out, with all respect to some of the members of the community who spoke, that their testimony, he submits that it relates to sewer and not storm water. There was testimony about the smell, etc. and that is a subject for the DPW. He believes that when the engineer, Mr. Fontaine spoke about negligible amounts he was speaking to exactly what the purview of his charge was which was storm water.

A motion was made by Mr. Lang and seconded by Mr. Hurley to take the special permit application under advisement.

The Chairman called for a roll call vote.

Mary Sue Ryan - no
Susan Abbott - no
Robert S. Lang - yes
Mary S. McElroy - no
Paul F. Lynch, Sr. - no
Paul Hurley - yes

The motion fails on a 2 to 4 vote.

A motion was made by Mrs. Ryan and seconded by Mr. Lynch to deny the special permit application for a day care center in the flood zone based on the following reason. It is a floodplain district and criteria for decisions in the floodplain include health, safety and welfare of the occupants. The area is subject to flooding and a day care center for fifty-three children in the floodplain is hazardous to the well being of those children and not an appropriate location.

The Chairman called for a roll call vote.

## PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
## .ECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
### NECK STREET - SP-7

ary Sue Ryan - yes
ısan Abbott - yes
)bert S. Lang - no
ary S. McElroy - yes - her reason is the safety and welfare of the children
ıul F. Lynch, Sr. - yes
ıul Hurley - abstained

he motion carries on a 4-1-1 vote; the special permit is denied.

Iembers present:
aul M. Dillon, Chairman
aul F. Lynch, Sr., Vice-Chairman
'aul Hurley, Clerk
;usan Abbott
ʂobert S. Lang
ʃary S. McElroy
ʃary Sue Ryan

Ⅿembers absent: none

10. Following the hearing, the Board made the following specific findings regarding
ʒhe land in question and the proposed use:

None.

NOTE: Restatement of mandatory provisions and requirements are not to be taken
as findings.

11. The Board voted at its meeting on February 24, 1997, as detailed below to:

Upon motion made by Mrs. Ryan and seconded by Mr. Lynch, it was:

VOTED: 4-1-1 to deny the special permit application for a day care center in the
flood zone based on the following reason. It is a floodplain district and criteria for
decisions in the floodplain include health, safety and welfare of the occupants. The
area is subject to flooding and a day care center for fifty-three children in the
floodplain is hazardous to the well being of those children and not an appropriate
location.

NOTE: Show the vote of each member upon each question or, if absent or failing to
vote, indicate such fact, and set forth clearly the reason or reasons for its decision,
and of its other official actions.

PLANNING BOARD, TOWN OF WEYMOUTH, MASSACHUSETTS
RECORD OF PROCEEDINGS ON APPLICATION FOR A SPECIAL PERMIT
NECK STREET - SP-7

Members Vote:
Mary Sue Ryan - yes
Susan Abbott - yes
Robert S. Lang - no
Mary S. McElroy - yes
Paul F. Lynch, Sr. - yes
Paul Hurley - abstained

12.  On __March 7, 1997__ a "Notice of Decision" on the Special Permit application
was mailed to the owner and applicant (if not the owner).

THE WEYMOUTH PLANNING BOARD

_____
Paul M. Dillon, Chairman

CERTIFICATE BY THE TOWN CLERK FOR FILING OF THE DECISION IN THE
REGISTRY

This is to certify that twenty (20) days have elapsed since filing of the above
decision with this office and no appeal has been filed, or an appeal has been filed
and denied in the case.

_____
Signature and seal of the Town Clerk

# Exhibit "J"

The Commonwealth of Massachusetts William Francis Galvin - Public Browse and Search    Page 1 of 2



# The Commonwealth of Massachusetts
# William Francis Galvin

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

**NORTH WEYMOUTH CIVIC ASSOCIATION, INC.,THE Summary Screen**    ❓
Help with this form

| Request a Certificate |
|---|

**The exact name of the Nonprofit Corporation:** NORTH WEYMOUTH CIVIC ASSOCIATION, INC.,THE

**Entity Type:** Nonprofit Corporation

**Identification Number:** 042648063

**Old Federal Employer Identification Number (Old FEIN):** 000104774

**Date of Organization in Massachusetts:** 07/23/1981

**Current Fiscal Month / Day:** 06 / 30    **Previous Fiscal Month / Day:** 00 / 00

**The location of its principal office in Massachusetts:**
No. and Street:    P.O. BOX 93
72 REGATTA RD.
City or Town:    NORTH WEYMOUTH    State: MA    Zip: 02191    Country: USA

**If the business entity is organized wholly to do business outside Massachusetts, the location of that office:**
No. and Street:
City or Town:    State:    Zip:    Country:

**The name and address of the Resident Agent:**
Name:
No. and Street:
City or Town:    State:    Zip:    Country:

**The officers and all of the directors of the corporation:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration of Term |
|---|---|---|---|
| PRESIDENT | SANDRA A. GOLDEA | 47 RIVER ST., NORTH WEYMOUTH, MA 08191 USA<br>47 RIVER ST., NORTH WEYMOUTH, MA 08191 USA | |
| TREASURER | GEORGE E. MUTCH JR. | 213 NORTH ST., NORTH | |

The Commonwealth of Massachusetts William Francis Galvin - Public Browse and Search    Page 1 of 2



# The Commonwealth of Massachusetts
# William Francis Galvin

Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

---

*JUST RIGHT CHILD CARE, INC.* Summary Screen


Help with this form

---

**Request a Certificate**

---

**The exact name of the Domestic Profit Corporation:** JUST RIGHT CHILD CARE, INC.

---

**Entity Type:** Domestic Profit Corporation

---

**Identification Number:** 043285988

**Old Federal Employer Identification Number (Old FEIN):** 000511735

---

**Date of Organization in Massachusetts:** 09/08/1995

---

**Current Fiscal Month / Day:** 12 / 31          **Previous Fiscal Month / Day:** 08 / 31

---

**The location of its principal office in Massachusetts:**
No. and Street:    16 CHURCH ST.
City or Town:    WEYMOUTH        State: MA    Zip: 02189    Country: USA

---

**If the business entity is organized wholly to do business outside Massachusetts, the location of that office:**
No. and Street:
City or Town:        State:        Zip:        Country:

---

**The name and address of the Resident Agent:**
Name:
No. and Street:
City or Town:        State:        Zip:        Country:

---

**The officers and all of the directors of the corporation:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration of Term |
|---|---|---|---|
| PRESIDENT | JAN SANDRA GILDEA | 47 RIVER ST.,N.<br>WEYMOUTH, MA 02191 USA<br>47 RIVER ST.,N.<br>WEYMOUTH, MA 02191 USA | |
| TREASURER | JAN SANDRA GILDEA | 47 RIVER ST.,N.<br>WEYMOUTH, MA 02191 USA<br>47 RIVER ST.,N.<br>WEYMOUTH, MA 02191 USA | |

**The Commonwealth of Massachusetts**
**William Francis Galvin**
**Secretary of the Commonwealth**
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

**FEE: $ 125.00**

**NOTE: PLEASE TYPE OR PRINT CLEARLY!**

# MASSACHUSETTS CORPORATION ANNUAL REPORT

Federal Identification No. 04-3285988

040024376

1. The exact name of the corporation is: JUST RIGHT CHILD CARE, INC

2. Location of its principal office in Massachusetts: 16 CHURCH STREET

(number and street)

EAST WEYMOUTH          MA          02189

(city or town)          (state)          (zip)

NOTE: If corporation is organized wholly to do business outside Massachusetts, state location of that office also:

(number & street)          (city or town)          (state)          (zip)

3. Name and address of the Resident Agent, if any:

(name)

(number & street)          (city or town)          (zip)

4. Date of the end of the last fiscal year was:          DECEMBER          31          2003

(month)          (day)          (year)

5. Check here if the corporation stock is publicly traded: ☐ .

6. The capital stock of each class as of the end of its last fiscal year was:

| CLASS OF STOCK | PAR VALUE PER SHARE STATE IF NO PAR | TOTAL AUTHORIZED BY ARTICLES OF ORGANIZATION OR AMENDMENTS | | TOTAL ISSUED AND OUTSTANDING |
|---|---|---|---|---|
| | | Number of Shares | Total Par Value | Number of Shares |
| COMMON: | NO PAR | 200,000 | | 100 |
| PREFERRED: | | | | |

7. State the names and addresses of the officers specified below and of all the directors of the corporation, and the date on which the term of office of each expires:

| OFFICERS | NAME | ADDRESS Number, Street, City or Town, State, Zip Code | EXPIRATION OF TERM |
|---|---|---|---|
| PRESIDENT | JAN GILDEA | 47 RIVER ST, N WEYMOUTH, MA 02191 | * |
| TREASURER | JAN GILDEA | AS ABOVE | * |
| CLERK | MARGARET CAREY | 68 PARK AVE WEST, S WEYMOUTH, MA 021 | * |
| DIRECTORS | SAME AS ABOVE | AS ABOVE | * |

* UNTIL SUCCESSOR IS ELECTED AND DULY QUALIFIED

I, the undersigned JAN GILDEA , being the PRESIDENT of the above-named corporation, in compliance with the General Laws, Chapter 156B, hereby certify that the above information is true and correct as of the dates shown. IN WITNESS WHEREOF AND UNDER PENALTIES OF PERJURY, I hereto sign my name on this 27th day of February , 20 04 .

Signature: _____ Title: PRESIDENT / V-P.

Contact Person: JAN GILDEA / Margaret Carey     Contact Person Telephone #: 781.337.8514

156bmcar 4/3/00

The Commonwealth of Massachusetts
William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

**FEE: $ 125.00**

NOTE: PLEASE TYPE OR PRINT CLEARLY!

# MASSACHUSETTS CORPORATION ANNUAL REPORT

Federal Identification No. 04-3285988

030085504

1. The exact name of the corporation is: JUST RIGHT CHILD CARE, INC

2. Location of its principal office in Massachusetts: 16 CHURCH STREET

(number and street)

EAST WEYMOUTH (city or town)    MA (state)    02189 (zip)

NOTE: If corporation is organized wholly to do business outside Massachusetts, state location of that office also:

(number & street)    (city or town)    (state)    (zip)

3. Name and address of the Resident Agent, if any:

(name)

(number & street)    (city or town)    (zip)

4. Date of the end of the last fiscal year was: DECEMBER (month)  31 (day)  2002 (year)

5. Check here if the corporation stock is publicly traded: ☐.

6. The capital stock of each class as of the end of its last fiscal year was:

| CLASS OF STOCK | PAR VALUE PER SHARE STATE IF NO PAR | TOTAL AUTHORIZED BY ARTICLES OF ORGANIZATION OR AMENDMENTS | | TOTAL ISSUED AND OUTSTANDING |
|---|---|---|---|---|
| | | Number of Shares | Total Par Value | Number of Shares |
| COMMON: | NO PAR | 200,000 | | 100 |
| PREFERRED: | | | | |

7. State the names and addresses of the officers specified below and of all the directors of the corporation, and the date on which the term of office of each expires:

| OFFICERS | NAME | ADDRESS Number, Street, City or Town, State, Zip Code | EXPIRATION OF TERM |
|---|---|---|---|
| PRESIDENT | JAN GILDEA | 47 RIVER ST, N WEYMOUTH, MA 02191 | * |
| TREASURER | JAN GILDEA | AS ABOVE | * |
| CLERK | MARGARET CAREY | 68 PARK AVE WEST, S WEYMOUTH, MA 021 | * |
| DIRECTORS | SAME AS ABOVE | AS ABOVE | 12/31/2002 |

* UNTIL SUCCESSOR IS ELECTED AND DULY QUALIFIED

I, the undersigned JAN GILDEA , being the PRESIDENT of the above-named corporation, in compliance with the General Laws, Chapter 156B, hereby certify that the above information is true and correct as of the dates shown. IN WITNESS WHEREOF AND UNDER PENALTIES OF PERJURY, I hereto sign my name on this 15th day of March , 20 03 .

Signature: _____ Title: PRESIDENT / V up

Contact Person JAN GILDEA / Margaret Carey    Contact Person Telephone #: 781.337.8514

257481
06-21-02

156bmcar 4/5/00

# Exhibit "K"

**The following is a Request for Production of Documents related to Massachusetts Land Court Docket #280041**

**Form 24. Request for Production of Documents, etc., Under Rule 34**

Plaintiff Robert J. Campbell requests defendant James Clarke, as Director of Planning and Community Development in the Town of Weymouth, to respond within 10 days to the following requests:

(1) That defendant produce and permit plaintiff to inspect and to copy each of the following documents:
  1. Minutes of all Executive Sessions of the Planning Board of the Town of Weymouth, between September, 1996 and March, 1997; and,
  2. Executive proceedings and documentation generated by the Planning Board of the Town of Weymouth, related to any proposed amendments to Zoning Bylaws in 1997 and 1998, which were specifically initiated and sponsored by the Planning Board; and,
  3. A particular "Anonymous Letter" which was introduced and prominently displayed during a Public Hearing in February, 1997, by the then Chairman, Paul M. Dillon, as recorded and described in the transcripts of said Public Hearing.

That the Defendant shall make known to the Plaintiff when the documentation is available for inspection and copying at the office of the Planning Board at the Weymouth Town Hall 75 Middle Street, Weymouth, MA 02189.

(2) That defendant produce and permit plaintiff to inspect and to copy, test, or sample each of the following objects:
  4. Planning Board files and documentation related to the Plaintiff's Application(s) for Special Permit

(3) That defendant permit plaintiff to enter the office of the Planning Board of the Town of Weymouth, located at the Weymouth Town Hall, at the address shown above, and to inspect and to photograph, test or sample
  4. Planning Board files and documentation related to the Plaintiff's Application(s) for Special Permit

That the Defendant shall make known to the Plaintiff when the documentation is available for inspection and copying at the office of the Planning Board at the Weymouth Town Hall 75 Middle Street, Weymouth, MA 02189.

Signed:
Robert J. Campbell
*Plaintiff*
*Pro Se.*
Address: 50 Squanto Road
          N. Weymouth, MA 02191
(As amended Mar. 30, 1970, eff. July 1, 1970.)

50 Squanto Road
North Weymouth, MA 02191

June 11, 2004

Attorney George E. Lane, Jr.
Town Counsel
87 Broad St.
Weymouth, MA 02188

Attn: Mr. George E. Lane, Jr.

VIA Hand Delivery

Re: Demand for Documents Requested on Land Court Docket #280041

Dear Mr. Lane,

This letter serves as a formal demand for the defendant(s) to produce documents, transcripts, minutes and other public records previously requested verbally and in writing. Two verbal requests have been made directly to town employees in the Office of the Planning Board for an "Anonymous Letter", which was received by a member of the Planning Board and introduced and prominently displayed by the Chairman of the Planning Board during a Public Hearing in 1997.

Additional documentation on proceedings in Executive Sessions of the Planning Board was requested in writing, during our meeting in your office on May 3, 2004. A verbal request was made to Mr. Rod Fuqua on May 18, 2004 at the Office of the Planning Board, since he had no knowledge of my prior written request when asked about the status.

Since then, I have received a response from your office which fails to satisfy the request for production of documents in spirit and produced nothing more than a list of documents on file. The response from Mr. Rod Fuqua, also indicates that the "Anonymous Letter" requested was not introduced at the Public Hearing on January 13, 1997, even though the audio recording of the hearing clearly indicates that the document was present and was the topic of significant discussion. The acknowledgement of receipt of the letter and the fact that it was brought from Mrs. McElroy's home to the public hearing, presented to other members of the Planning Board and openly discussed at the hearing is prima facie evidence that this document is a public record.

As you know, a written response to a request for public records is required within ten (10) days of receipt of the request, and refusal to provide access to the information is prohibited. Please provide copies of all the documentation demanded within the next 10 days.

Thank you in advance for your continued cooperation.

Very Truly Yours,

Robert J. Campbell

# Exhibit "L"

## THE COMMONWEALTH OF MASSACHUSETTS

Executive Office of Human Services

### Office for Children

**109 Rhode Island Road, Lakeville, Massachusetts 02347**

Date: March 14, 1997

Tammy Campbell
8 Davis's Island Rd.
N. Weymouth, MA 02191

Re: Tammy Campbell
    Complaint #: 12753

Dear Tammy Campbell,

Enclosed is the report resulting from the recent investigation conducted by the Office for Children. The investigation was conducted in response to a complaint that had been filed with the Office for Children.

The investigation resulted in no non-compliances being cited at the time of the visit. As the care you are providing is exempt from family day care licensure, please complete the exemption request form that is enclosed. Please return this form with fourteen days of the date of receipt of this letter.

Thank you for your cooperation.

Sincerely yours,

*Holly Vrettas*

Holly Vrettas
Licensor

# The Commonwealth of Massachusetts

Executive Office of Health and Human Services
Office for Children
109 Rhode Island Road, Lakeville, Massachusetts 02347
Date: March 14, 1997

## INVESTIGATION REPORT

Complaint #:        12753        Facility # 510486
Name of Facility:   Tammy Campbell
Address:            8 Davis's Island Rd., N. Weymouth, MA 02191

On 2/14/97, the complainant reported that Tammy Campbell residing at 8 Davis Island Rd.
Weymouth , is currently providing care for three children from this address. The complainant
reported that this address has access to a swimming pool.

### II. Summary of Investigation Activity
The case was assigned to this Licensor on 2/18/97.

On 2/20/97, an unannounced  home visit was made. Alleged provider's daughter answered the door
and informed Licensor that her mother was not present.

On 2/20/97, Licensor returned to home. Alleged provider was not present.

On 2/20/97, written documentation was received from the Complainant and reviewed.

On 2/24/97, an unannounced home visit was made. Alleged provider's daughter informed that her
mother would return shortly.

On 2/24/97, Licensor returned to home and discussed with the alleged provider the complaint
allegation.

On 3/4/97, notification of written complaint letter mailed.

On 3/4/97, notification of findings letter mailed.

### III. Summary of Findings
On 2/24/97,  an unannounced visit was conducted. The alleged provider denied the allegation of
caring for three children from her residence.  She further explained that she does care for one child,
age seven. The child arrives to her home before school hours and after school hours, from 3:00
p.m.-5:30 p.m.  At the time of the visit, Licensor did not observe any children to be in care.  The
alleged provider explained that she has an arrangement worked out with Community Care for Kids
through a voucher. The child care arrangement described, does not appear to be a licensable
situation.

### IV. Non-compliances
There are no non-compliances found during this investigation.

**Licensor/Investigator:** Holly Vrettas

# Exhibit "M"

## BOARD OF ZONING APPEALS
## RECORD OF MINUTES AND PROCEEDINGS
### FEBRUARY 6, 2002

The Board of Zoning Appeals of the Town of Weymouth held a public hearing on
February 6, 2002, at 7 pm at the Whipple Center, Green St. Weymouth, MA, for the purpose of
passing on the applications of certain persons whose petitions were properly before the Board.
Notice of the public hearing had been given by mail to the parties in interest of the subject locus
and by publication in the Weymouth News.

| | |
|---|---|
| Present: | Richard McLeod, Chairman |
| | Edward Foley |
| | Francis O'Brien |
| | Donald Holzworth |
| | Martin Joyce |
| Staff: | Jim Clarke |
| Recording Secretary: | Janet Murray |

The Chairman called the hearing to order and explained the procedures that would be followed to
the people present. A MOTION was made by Edward Foley to open the public hearing and
waive the reading of the legal advertisement, and was seconded by Donald Holzworth and
UNANIMOUSLY VOTED.

## BZA CASE # 2598 311 Neck Street

Application of Tammy Campbell, property owner of 311 Neck Street, also shown on the
Weymouth Town Atlas as Sheet 5, Block 13, Lot 24 in an R1 Zoning District, seeking a
variance under 120-38.3. 120-70.B. and 120-74.M.(2). The applicant is also seeking a special
permit to construct a building, part of which lies within a floodplain.

Robert Campbell spoke on behalf of his wife Tammy Campbell. Mr. Campbell gave a history of
their attempts to obtain permitting for building a daycare center at 311 Neck Street. The permit
was denied, however the case was remanded back to the town by the Massachusetts Land Court.
The permit was issued in November 1998. However, this permit has since expired due in large
part, according to Mr. Campbell, to the towns misinformation regarding another parcel of land
which the Campbell's were attempting to sell.

Mr. Campbell stated that there were 4 issues at hand. The first being a flood plain special
permit. The second issue concerned minimum lot size which was changed from 15,000 sq. feet
to 25,000 sq. feet. He stated that this lot is grandfathered from this requirement until August of
2002. The third issue is the need for a variance because the lot can only accommodate 12
parking spots and town by laws require 15 parking spots for this lot usage. The fourth issue is
the need for a variance because 2 of the parking spots are within the 18 foot setback requirement
for non residential use of a circular driveway.

## BZA CASE # 2598 311 Neck Street _____ Page 2

Donald Holzworth stated that daycare centers are allowed in R-1 districts due to an exemption allowed by state law.

James Clarke stated the application was routed to various Town Departments and received the following comments. The conservation commission noted that the orders of conditions expired in 2000 and would need to be resubmitted. The tax department noted that as of 1/17/02 there was approximated $1000 due in taxes on the property, to which Mr. Campbell stated had recently been paid. The police department submitted concerns regarding width of the sidewalk, the positioning of the circular driveway, and accessibility to the property by emergency vehicles. The fire department noted that the fire system would need to meet town codes. The school department submitted a letter stating there would be no adverse affects to schools. The health department had no objections.

The Chairman asked if the public had any comments, to which there was a number of responses.

Michael Nasuti of 289 Neck Street spoke of concerns regarding safety issues. He noted that there is a public school bus stop at the corner of Neck Street and Davids Island Road. He also commented that Neck Street is a very busy street and that he is concerned about parking on the street. He also commented about the affect on property values the play area size and the care of dumpsters.

Janet Pickering Moore of Davids Island Road owns lot 4 next to 311 Neck Street. She contended that there was never an issue of whether the lot was buildable or not. She is concerned that the size of the proposed building will dwarf her smaller home.

Paul Dillon of 378 Neck Street stated he was a member of the planning board when this permit was initially submitted. He reminded the board that the town had been mandated by the state to approve the permits. He stated concern about the clustered residential nature of the neighborhood and the effect that this proposed building would have on the character of the area. He also expressed concerns about the safety evacuation plan for the facility once it is operational.

Colin McPhearson of 151 Prospect Hill Drive, Councilor for District 1, stated that he had spoken to other residents and that the overall feeling is that the building is too large for the neighborhood.

Board Member Richard McLeod questioned the arrival and departure times of the clients. Mr. Campbell stated that they would staggered over the course of the day. The hours of operation would be 7 a.m. – 6 p.m., Monday thru Friday.

Janet Weeks of 284 Neck Street noted that it can take her over 5 minutes to exit her driveway and that she is concerned that this building usage will increase that time.

Mike Gallagher of 300 Neck Street stated that his property faces the lot and he does not want to look at the asphalt parking lot.

## BZA CASE # 2598 311 Neck Street                    Page 3

Pat Sullivan of 294 Neck Street commented that the building is too big for the site and questioned if the building size could be reduced.

Mr. Nasuti spoke again asking the board to not support the request for the variance.

Mr. Campbell then spoke in response to some of the citizen comments. He noted that the plans had met all previous zoning requirements. He noted that the safety plan exists and there are four contingency plans in addition to the use of St. Jerome's church. He offered to construct a shelter for the bus stop at the corner of Neck Street and Davids Island Road. He said the building would house 4 rooms and 3 programs. The programs would be a before/after school program, a full time daycare, and a pre school program. In response to the play area concerns, he noted that only approximately 10 children would be outside at any one time. He did note that the building size could be reduced to lower the client total from 53 to 48, however this would only reduce the need for parking spots from 15 to 14, which would still require a variance for the 2 spots.

Board Member Francis O'Brien questioned the length and width of the circular drive which is 20' wide and 140' long with the interior length at 50' and the exterior length at 90-100'.

Mr. O'Brien also questioned the ages of the children to be served. Mr. Campbell replied that the youngest would be 2.9.

Ruth Campbell, mother of Robert Campbell, spoke in favor of the project and also attempted to reply to several issues which were raised by Ms. Pickering Moore.

A MOTION to close the public hearing was made by Edward Foley and seconded by Francis O'Brien, and was UNANIMOUSLY VOTED.

A MOTION was made by Donald Holzworth to approve the request for a special permit for construction within a flood plain pursuant to 120-38.3 and was seconded Richard McLeod and was VOTED UNANIMOUSLY.

A MOTION was made by Edward Foley to deny the request for a variance for parking requirements pursuant to 120-74.M.(2). Mr. Foley stated that he did not see any hardship, and was seconded by Martin Joyce.

Richard McLeod spoke in opposition to the motion to deny. Mr. McLeod thinks that there is hardship created by the shape and size of the lot that is not being imposed by the applicant and that it would impose a financial hardship for the applicant to substantially alter the plans to meet the requirements.

Francis O'Brien spoke in favor of denying the variance because the applicant could reduce the size of the building.

## BZA CASE # 2598 311 Neck Street                    Page 4

The MOTION to deny the variance was voted and passed on a 3-2 vote with Francis O'Brien, Edward Foley, and Martin Joyce voting in favor of denial, and Richard McLeod and Donald Holzworth voting against the denial.

A MOTION was made by Francis O'Brien to deny the request for a variance of 120-74.M.(2) regarding the required setback of parking spaces and was seconded by Edward Foley.

The MOTION to deny the variance was voted and passed on a 3-2 vote with Francis O'Brien, Edward Foley, and Martin Joyce voting in favor of denial, and Richard McLeod and Donald Holzworth voting against the denial.

### PETITION DENIED

DATE SIGNED/APPROVED:     3-13-02

Richard McLeod, Chairman

# Exhibit "N"

F. Campbell
8 Davids Island Rd.
Weymouth, Ma.02191

✱ DRAFT COPY

6 Feburary 1997

Attorney General's Office
1 Ashburton Place
Boston Ma. 02108

Gentlemen:

This letter is being written and forwarded on the advice of Francis
Brennan, a former Assistant DA for the State, who worked in Suffolk
and Barnstable Counties, and as a law professor at Boston University.

My son, Robert Campbell, and his wife, Tammy, have applied to the
planning board in the town of Weymouth for permission to erect a
building to be used as a day care center for children. They are
receiving opposition from a group of people who reside in the
Saltwater Creek Condominiums next to the location they have chosen.
This group has a chair person who is directing their activities
against the day care.  A copy of the Patriot Ledger article about the
opposition is attached.

On Feb.4, 1997, Miss Susan Wood, a resident of the Saltwater Creek
Condominium complex contacted my daughter-in-law and relayed the
contents of a conversation that she overheard, in the public hallway
during the evening, between a woman resident and a Weymouth police
officer, in uniform, wherein they were discussing the character of my
son Robert to determine if it could be used to get the petition
denied. The Weymouth police officer  was talking about the record my
son has because in 1989 he was drunk and caused problems and ended up
with a felony conviction. Robert joined AA and has not had a problem
since. The officer said that no one could open Robert's record as it
was against the law. He did infer, however, that if Robert was
arrested for any reason that the record could be opened to the public.
According to Miss Wood the officer appeared to be offering as much
information as he could about the characters of both Robert and Tammy.

The officer, as a private citizen, may speak of whatever he wants,
but since he is a police officer and was in uniform at the time, I am
concerned that my son may be arrested on some false charge so that his
record may become open to the public and used to prohibit the granting
of permission to open the day care center. His conviction was two
years probation and according to information I received some of the
Weymouth police officers were upset because he didn't go to jail.

Robert is an engineer and works for a company in Boston and he will
have no connection with the day care center except for being a
stockholder. He has conducted himself in an honorable manner over the
last seven years and I do not want his current reputation ruined and
the day care petition denied because of some hateful people.

Please retain this letter in your files for future reference.  Thank
you for your attention in this matter.  Our legal Representative

W. M. Morris  assoc of Quincy

Yours,

F. Campbell

cc: Morisi & Associates
    Attn: M. Morisi

# Exhibit "O"

**The following is a Request for Production of Documents related to Massachusetts Land Court Docket #280041**

**Form 24. Request for Production of Documents, etc., Under Rule 34**

Plaintiff Robert J. Campbell requests defendant Town of Weymouth, to respond within 10 days to the following requests:

(1) That defendant Town of Weymouth produce and permit plaintiff to inspect and to copy each of the following documents:
   1. Police Blotter and dispatch records from February 1, 1997 to February 7 1997; and,
   2. Police personnel assignment records and/or Duty Logs from February 1, 1997 to February 7 1997; and,
   3. All Weymouth Police records of requests for Arrest Records and Criminal History from February, 1997.
   4. Relayed radio communications and Weymouth Police Department cell phone records of Sergeant Michael Nasuti from January, February and March, 1997.

   That the Defendant shall make known to the Plaintiff when the documentation is available for inspection and copying at the office of the Town Clerk at the Weymouth Town Hall 75 Middle Street, Weymouth, MA 02189.

(2) That defendant produce and permit plaintiff to inspect and to copy, test, or sample each of the following objects:
Not Applicable

(3) That defendant permit plaintiff to enter the office of the Town Clerk of the Town of Weymouth, located at the Weymouth Town Hall, at the address shown above, and to inspect and to photograph, test or sample:
Not Applicable

Signed: _____    Date: _6/11/04_____

Robert J. Campbell
*Plaintiff*
*Pro Se.*
Dated: 11 June 2004
Address: 50 Squanto Road
          N. Weymouth, MA 02191
(As amended Mar. 30, 1970, eff. July 1, 1970.)

Weymouth Police Department
140 Winter Street
Weymouth, MA  02188

*Town of Weymouth*
*Massachusetts*

David M. Madden
Mayor

75 Middle Street
Weymouth, MA 02189

James E. Thomas
Chief of Police

Phone: (781) 335 1212
Fax: (781) 682 6136
TDD: (781) 337 5703



June 18, 2004

Mr. Robert J. Campbell
50 Squanto Road
North Weymouth, MA 02191

Dear Sir,

I am in receipt of your request for information and an opportunity to review specific documents.  Below is my item by item response.

Request # 1.  Police Blotter & dispatch records February 1, 1997 to February 7, 1997.

> This document is available (51 pages).  It will be a sanitized version so as to comply with the non-release of protected information.

Request # 2.   Personnel Assignments for February 1 through February 7, 1997

> Department assignments for the requested dates are available for inspection.

Request # 3.   Arrest records and Criminal History for February 1997.

> The custodian of these records is the Criminal History Systems Board.  That request should be To the following:

> Ms. Caroline Sawyer
> Director, CJIS Support Services
> Mass. Criminal History Systems Board
> 200 Arlington Street Suite 2200
> Chelsea, MA  02150

Request # 4.  Relayed radio communications and Cell Phone records for Sergeant Michael Nasuti.

        A.  Michael Nasuti is a patrolman not a Sergeant.

        B.  Officer Nasuti has ever been issued a department cell phone.

        C.  Radio Communications:  911 calls have a one year retention requirement dictated by law.

        D.  All radio communication between the Department and Officer Nasuti over a three month period would be most costly.  Only two employees are qualified to search our records for this information and would require hours of overtime payments the cost of which would be bared by you.

If you have any questions regarding my response, and to set up a date for the inspection of requested records, please call 781 335 1212 EXT 228.

Respectfully,

James Thomas
Chief of Police

50 Squanto Road
North Weymouth, MA 02191

August 13 , 2004

Attorney George E. Lane, Jr.
Town Counsel
87 Broad Street
Weymouth, MA 02188

Via: U.S. Mail, CMRR

Re: Request for Determination of Public Records Requested on
    Massachusetts Land Court Docket # 280041

Dear Mr. Lane,

This is a request for determination that Weymouth Police records previously requested verbally
and in writing are public records, as defined by M.G.L. Ch. 4 §7, cl. 26. This determination is
required for the relayed radio communications between Officer Michael Nasuti and the
Dispatcher, requested on June 11, 2004. Weymouth Police Chief James Thomas provided a
prompt response to the initial written request, which offered to make the information available at
a mutually agreeable time. Several attempts were made to coordinate our schedules in early July,
and we eventually met at the Weymouth Police Station on Friday, July 16, 2004.

Regarding other information requested for the week of February 1, 1997 through February 7,
1997, I was presented with a photocopy of the Police Blotter and the original Duty Logs of the
same time frame were made available for my review. Chief Thomas was truly forthcoming in
answering all of my questions related to interpreting the information on the logs, and offered to
have copies made, if necessary. I declined his initial offer, but asked if I could contact him
directly if I had additional requests. He agreed and advised he would be accommodating.

Unfortunately, my request to review the communications between Officer Michael Nasuti and
the Dispatcher was not honored and no information was provided on that portion of the request.
This contrasts the comment in the Chief's letter that it could be made available, if I paid the
overtime cost to segregate unrelated discourse. Chief Thomas expressed his opinion that I was
grasping at straws, on a Easter egg hunt, or some similar metaphor which implied that I was
looking for information without merit or validity to the request. He was not informed of the letter
sent to the Attorney General in February 1997.

On Monday, July 19, 2004, I telephoned the Chief's office and left a voicemail request for a
copy of the Duty Log and communications between Officer Nasuti and the Dispatcher on
February 4, 1997 only. The message on the Chief's answering service indicated he was on
vacation until Monday, July 26, 2004, but even after his return, he didn't respond to the July 19th
message. I called again on Monday, August 2, 2004, leaving a message with his secretary. The
Chief responded immediately, and I reiterated my verbal request. I also inquired about the
overtime rate mentioned in the Chief's written response. The Chief agreed to photocopy the Duty
Log in approximately eight (8) 8 ½" x 11" sections or suggested he could send it out to be done
professionally in full size. I advised him that eight (8) sections would be adequate.

On the communications request, Chief Thomas advised he knew what the overtime rate would be, but again related his reluctance to make the dialogue available, having the opinion that it is irrelevant in my pursuit of discovery of the facts in this case. He also mentioned he did not want to "tie up a person" for the time necessary to segregate the extraneous dialogue. This appears to be a simple delay tactic to avoid complying with the request. Since I would be paying an overtime rate, the person preparing the information would not be interrupting their usual responsibilities. This is the second expression of this sentiment towards a valid request for information from the department.

Chief Thomas mentioned he could not estimate the amount of time necessary to segregate communications in an entire twenty-four (24) hour period, to which I replied I was only interested in the eight (8) hour shift that Officer Nasuti worked on February 4, 1997. Rather than press the issue, I asked some general questions regarding typical communications and department policies pertaining to informing the Dispatcher of an officer's whereabouts during their shift and break periods. I also informed the Chief that I would let it go for now, as I refuse to debate the issue.

An unwillingness to comply with the request, simply because an individual disagrees with the reason requested or the intended use of the information does not constitute an exemption from the compliance requirement. Additionally, M.G.L. Ch. 66 §10 mandates that public records must be provided within ten (10) days, or a written response identifying the specific claim of exemption, as allowed under M.G.L. Ch. 4 §7, cl. 26 (a) through (m), must be presented in lieu of access to the information.

To this end, I expect an immediate response with a determination of the status of the records, and a claim of exemption or a written estimate of the cost and time required to prepare the subject information. Furthermore, this also serves as a formal demand that all public records requested be made available prior to the hearing scheduled in Land Court on August 19, 2004. If you have any questions or comments, I can be reached Monday through Friday at (781) 377-5497, or by cell phone at (508) 423-5785.

Coincidentally, I've noticed a significant increase in the frequency of Weymouth Police cars patrolling my neighborhood, but I don't necessarily feel more secure as a result. I remain hopeful that the concern expressed in the letter to the Attorney General is overstated, and that the department will address this current legal situation in a professional manner, with full consideration of its responsibility to uphold and enforce the law, notwithstanding personal opinions or the involvement of certain individuals. I also fully expect that there will be no repercussions or adverse actions by any member of the department resulting from these inquiries, especially where my wife and children have been directly involved and affected by this entire situation. Any intimidating comments or actions will be addressed accordingly.

Very Truly Yours,

Robert J. Campbell

True Copy Attest  RC

# Exhibit "P"



**COMMONWEALTH OF MASSACHUSETTS**

**MASSACHUSETTS SENATE**

STATE HOUSE, BOSTON 02133-1053

**SENATOR ROBERT L. HEDLUND**

PLYMOUTH AND NORFOLK
DISTRICT

ROOM 413E

TEL. (617) 722-1646
February 3, 1997

**ATTACHMENT D**

Page 6 of 39

Mr. Paul Dillon, Chairman
Weymouth Planning Board
75 Middle Street
Weymouth, MA  02189

Dear Chairman Dillon,

I am writing to express my concern over the proposed day care center for Neck Street in North Weymouth.  While I recognize that day care centers serve a very important role in our society, I question the location of this particular entity in a residential area.

The area on Neck Street where this center would be, is located in a flood plain.  The obvious environmental concerns need to be addressed before any permits are issued.  Moreover, it has been brought to my attention that the original planned number of children served in this center has been increased dramatically, which may increase traffic in the neighborhood.

The many traffic issues related to this proposal also concern me and many of the neighbors.  Neck Street, and North Weymouth in general, has had to bear the brunt of a myriad of residential and commercial development over the past few years.  This center will only add to this burden.

As you make your decision on permitting this project, I hope you take these concerns into consideration.  There are many in North Weymouth who have valid concerns, and I hope these are considered before any permit is offered.

Sincerely,

**ROBERT L. HEDLUND**
State Senator
Plymouth/Norfolk



RECEIVED

Weymouth Planning Board

RECEIVED

FEB  6

Weymouth Planning Board

NECK STREET- NORTH SIDE OF BRIDGE STREET (ROUTE 3A)NORTH
WEYMOUTH, MASSACHUSETTS.

A TWO LANE STREET HAVING SIDEWALKS AS FOLLOWS:
  EVEN NUMBER SIDE: 8 FEET WIDE   ODD NUMBER SIDE: 4 FEET WIDE

THE FOLLOWING IS A LIST OF MOTOR VEHICLES THAT FREQUENTLY TRAVEL
UPON NECK STREET:

AUTOMOBILES-VANS-PICK UP TRUCKS      OIL DELIVERY TRUCKS
FIRE ENGINES                         U-HAUL VEHICLES
POLICE CRUISERS                      NEWSPAPER DELIVERY TRUCKS
MOTORCYCLES                          SERVICE AND/OR REPAIRS
MARINE TRAILERS CARRYING:               TELEPHONE
   FISHING BOATS                        ELECTRIC
   RECREATIONAL VEHICLES                CABLE
   LARGE PLEASURE CRAFTS                GAS
TOWN OF WEYMOUTH:                    CONTRACTORS
   SNOWPLOWS                         CARPET CLEANERS
   SANDERS                          PRIVATE WATER DELIVERIES
   STREET CLEANERS                  FOOD DELIVERIES (TERN MARINE)
   SIDEWALK PLOWS                   MOVING VANS
   STREET REPAIRS                   PATRIOT LEDGER DELIVERY
   SEWER TRUCKS                     LUMBER DELIVERIES
SCHOOL BUSES/VANS                   HOME IMPROVEMENT DELIVERIES
MBTA BUSES                          FURNITURE/APPLIANCE DELIVERY
TRASH PICK UP                       PRIVATE AMBULANCE
RECYCLE PICK UP                     BREWSTER AMBULANCES
U.P.S.TRUCKS                        TOW TRUCKS
FED-EX TRUCKS                       RYDER TRUCKS
MAIL DELIVERY REGULAR               SPECIAL NEEDS VANS
MAIL DELIVERY SPECIAL AND PACKAGES  KEISSLING SCHOOL VANS


OTHER TRAFFIC USING NECK STREET:
   RUNNERS, WALKERS, JOGGERS, BICYCLES, ROLLER BLADES,SKATE
BOARDS,VISITORS TO LANE BEACH, WEBB PARK,TERN HARBOR MARINA,
WEYMOUTHPORT, EASTBAY, PUBLIC BOAT RAMP, HARBORMASTERS OFFICE AT
TERN HARBOR, FORT POINT, PROSPECT HILL, GREAT HILL, RIVER
STREET,AND MANY SIDE STREETS.

ATTACHMENT D

Page 7 of 39

# *IMPORTANT NOTICE*

## TO ALL SALTWATER CREEK OWNERS AND RESIDENTS

THE WEYMOUTH PLANNING BOARD IS HOLDING IT'S FINAL HEARING ON THE SEARLES BUILDERS, INC. PROJECT. THE PROPOSED STRUCTURE IS A DAY CARE CENTER. THE NAME OF THIS "SCHOOL" IS THE BARE COVE DAY CARE CENTER. THE FACILITY WILL PROVIDE DAY CARE TO 53 CHILDREN WITH VARIOUS PROGRAMS THROUGH OUT THE DAY. THE HOURS OF OPERATION ARE 7:00AM-7:00PM MONDAY THROUGH FRIDAY.

WE RESIDE IN A FLOODPLAIN WHICH REQUIRES A SPECIAL PERMIT BEFORE ANY BUILDING COMMENCES. THE CONSERVATION COMMITTEE APPROVED THE FIRST BUILDING PLAN. HOWEVER, A NEW PLAN WAS SUBMITTED AT THE LAST MEETING. I BELIEVE THAT A PROJECT OF THIS MAGNITUDE WILL IMPACT OUR COMMUNITY SEVERELY. THIS WILL ADD A GREAT DEAL OF BURDEN TO AN ALREADY DIFFICULT WATER PROBLEM. THE TRAFFIC WILL MORE THAN DOUBLE WHAT IT IS NOW. THE PLAN DOESN'T ALLOW FOR SUFFICIENT PARKING AND WILL USE NECK STREET FOR ITS PARKING PURPOSES. THE MOST IMPORTANT CONSIDERATION IS THE SAFETY OF VERY YOUNG CHILDREN.

MAKE YOUR CONCERNS KNOWN TO THE PLANNING BOARD, VOICE YOUR OPINION REGARDING CHILD SAFETY, WATER AND PARKING.

PLEASE HELP SUPPORT YOUR COMMUNITY AND ATTEND THIS VERY IMPORTANT MEETING AT THE:

WEYMOUTH TOWN HALL
75 MIDDLE STREET
WEYMOUTH, MA. 02190
MONDAY
FEBRUARY 10, 1997
7:45PM
617-335-2000

# ARE YOU AWARE THAT:

## THE WEYMOUTH PLANNING BOARD IS HOLDING A PUBLIC MEETING ON :

# MONDAY, JANUARY 13TH 1997
# AT 7:45 PM
# AT WEYMOUTH TOWN HALL
# 75 MIDDLE ST. WEYMOUTH

**TO DECIDE IF A DAY CARE CENTER SHALL BE BUILT AT THE CORNER OF NECK STREET AND DAVID'S ISLAND ROAD. (A FLOOD PLAIN LOT)**
**THE DAY CARE CENTER PLANS TO CARE FOR @ FIFTY CHILDREN.  THE AREA IS ZONED RESIDENTIAL.**
**THE NUMBER OF CARS BRINGING AND PICKING UP CHILDREN, PLUS TRUCKS WITH DELIVERIES OF SUPPLIES, CARE GIVERS COMING, GOING AND PARKING, VANS COMING AND GOING ON DAY TRIPS COULD HAVE A DEFINITE IMPACT ON THE TRAFFIC ON  AN ALREADY BUSY STREET.**

**PLEASE CALL BEFORE MONDAY VOICING YOUR OPINION TO PLANNING BOARD MEMBERS.**

**PAUL DILLON      337-4946**
**MARY McELROY   UNLISTED**
**PAUL HURLEY     UNLISTED**
**SUSAN ABBOTT   337-7526**
**MARY SUE RYAN  331-7083**
**ROBERT LANG     335-8669**
**PAUL LYNCH SR.  337-3883**

ATTACHMENT D

Page 8 of 39

## CONCERNED CITIZENS
## NECK STREET
## NORTH WEYMOUTH, MA. 02191

Weymouth Town Hall
Planning Board
75 Middle Street
Weymouth, Ma.



**Weymouth Planning Board**

To whom it may concern:

The residents of the Neck Street and surrounding side streets, are presenting the Planning
Board with signed petitions regarding the Bare Cove Day Care Center.  These petitions
include 83 signatures of residents located within the proposed locale of this center.
Many of these are citizens concerned with the conservation and preservation of the
wetlands.

We, the residents of Neck Street are trying to work together concerning the safety of the
children, the additional traffic problems and the negative impact of additional water
displacement from the sewers and the Back River, which, already in the past, have
caused considerable problems.

Thank you for your consideration regarding this matter.


*CONCERNED CITIZENS*



RECEIVED

Weymouth Planning Board

## *PETITION*

We are the residents of Neck Street located behind the UHAUL Rental Center.  The purpose of this petition is related to the proposed building of a day care center on Neck Street.  The Bare Cove Day Care Center is located between 275 Neck Street and David's Island Road.  The proposed building is within a flood plain.  This is a dangerous street with high traffic and the constant risk of flooding.  We believe this is unsafe for the children using the facility and it's abutting residents because of water run off.  Please sign this petition in support of the Neck Street residents.

| *NAME* | *ADDRESS* |
|--------|-----------|
| SHILPA SHAH | 264 NECK STREET |
| Barbara Landman | 267 Neck St. |
| Patricia A/ Sullivan | 294 Neck St. |
| Eleanor Hassang | 290 Neck St. |
| Carol Bennett | 300 Neck St |
| John Bennett | 300 Neck St |
| Susan Burg | 6 Great Hill Dr |
| Curtis J. Nishino | 15 Great Hill Dr |
| Thomas McCann | 9 Great Hill Dr |
| Frank W. Pagliuca Jr | 27 Regatta Rd. |
| Agnes M. Cardosi | 27 Regatta Rd |
| Eugene Lauria | 381 Neck St |
| Lou Lauria | 381 Neck St |
| Joe Mullen | 389 Neck St |
| Agnes M. Mullen | 389 Neck St |
| George W. Pupilo | 395 Neck St |
| Margaret E. Pupilo | 395 Neck St. |
| Kevin Sullivan | 357 Neck St |
| Anthony Berardinelli | 358 Neck St. |
| Josephine Berardinelli | 358 Neck St. |
| Mary F. Sullivan | 371 Neck St |
| Kathleen Sullivan | 371 Neck St |
| Marjorie C. Snow | 51 Great Hill Dr. |
| Charles W. Snow | 51 Great Hill Drive |
| Catherine A. Zonstih | 363 Neck Street |
| Jean Joyce | 364 Neck St. |

## *PETITION*



RECEIVED
FEB 6
Weymouth Planning Board

We are the residents of Neck Street located behind the UHAUL Rental Center. The purpose of this petition is related to the proposed building of a day care center on Neck Street. The Bare Cove Day Care Center is located between 275 Neck Street and David's Island Road. The proposed building is within a flood plain. This is a dangerous street with high traffic and the constant risk of flooding. We believe this is unsafe for the children using the facility and it's abutting residents because of water run off. Please sign this petition in support of the Neck Street residents.

| *NAME* | *ADDRESS* |
|--------|-----------|
| Thomas E. Lope | 364 Neck St. N. Weymo |
| Mark Shuc | 274 Neck St. N. Wey- |
| Anna M. Doherty | 383 Neck St N. Wey |
| Mrs. Alexandria Balkiski | 411 Neck Street |
| Helen E. Tilton | 6 Great Hill Dr |
| Dorothy R. Tilton | 6 Great Hill Dr. |
| Robert Clarke | 284 Neck St Nolwey, Ma |
| Janet Nyhs | 284. Neck St. No. Wey, ma |
| Bryan Vrop | 357 Neck St N. Woy ma |

ATTACHMENT D

Page 10 of 39

## *PETITION*



R E C E I V E D
FEB 6
**Weymouth Planning Board**

We are the residents of Neck Street located behind the UHAUL Rental Center. The purpose of this petition is related to the proposed building of a day care center on Neck Street. The Bare Cove Day Care Center is located between 275 Neck Street and David's Island Road. The proposed building is within a flood plain. This is a dangerous street with high traffic and the constant risk of flooding. We believe this is unsafe for the children using the facility and it's abutting residents because of water run off. Please sign this petition in support of the Neck Street residents.

| *NAME* | *ADDRESS* |
| --- | --- |
| Susan Wencel | 370 Neck Street |
| Joan Massa | 1º Colonial Road |
| Beata | 16 Eme Line Rd |
| Lisa Mae Neill | 26 Back River Road |
| Janice Pearson | 2 Albert Rd E Weymouth Ma 02189 |
| Glenna Shim | 274 Neck N Weymouth |
| Carmen | 4 Doris Dr. Wey |
| M. Nee | 194 Fuller Road N Wey. |
| Am Massa | 4 Colonial Rd |
| Westhaver | 26 Back River Rd. |
| Joan MacNeil | 26 Back River Rd. |
| James Billig | 194 Fuller Rd Weymouth |
| Le Wencel | 370 Neck St. |
| Robert Math | 63 Great Hill Dr. wey. |
| Mary Lou King | 63 Great Hill Dr. Wey |

ATTACHMENT D

Page 11 of 39



## *PETITION*

We are the residents of Neck Street located behind the UHAUL Rental Center. The purpose of this petition is related to the proposed building of a day care center on Neck Street. The Bare Cove Day Care Center is located between 275 Neck Street and David's Island Road. The proposed building is within a flood plain. This is a dangerous street with high traffic and the constant risk of flooding. We believe this is unsafe for the children using the facility and it's abutting residents because of water run off. Please sign this petition in support of the Neck Street residents.

| NAME | ADDRESS |
|---|---|
| *John S. Arias* | 275 Neck St |
| Sarah A. Tremblay | 275 Neck St B-4 |
| Mary V. (Sanfear) | 275 Neck St B-6 |
| Ron Civalli | 267A Neck St. #6 |
| Marilyn | 267A " " -6 |
| | 267A " " #6 |
| Thomas L. Malver Jr | 267A " " 5 |
| Kym Huggins | 267 Neck St A-7 |
| | 267 Neck St A-7 |
| Mary Dickson | 267A Neck St A-12 |
| Maureen Kam | 267A Neck St #10 |
| Susan Heyward | 267 Neck St #3 |
| Theresa Kelly | 267 Neck St B-7 |
| Mary J. Mundie | 267 Neck St, B-9 |
| Charles T. Donny | 267 Neck St #B-9 |
| Dorothy T. M'Giflern | 267 Neck St - B-12 No way |
| Gary Gommes | 267 Neck St C-12 + No Way |
| Sheilah Shea | 267 Neck St. B-10 |
| Mary Connell | 267 Neck St B-4 |
| Mary Fallon | 24 Julia Rd |
| Linda M. Reardon | 267 Neck St C-9 |
| Lena Turner | 267 Neck St 3" |
| Richard Sheehy | 275 Neck St |
| Kellie Holcomb | 20 Rosemont Rd |
| Mary Jacoby | 20 Rosemont Rd |

## *PETITION*



RECEIVED
FEB 6
Weymouth Planning Board

We are the residents of Neck Street located behind the UHAUL Rental Center. The purpose of this petition is related to the proposed building of a day care center on Neck Street. The Bare Cove Day Care Center is located between 275 Neck Street and David's Island Road. The proposed building is within a flood plain. This is a dangerous street with high traffic and the constant risk of flooding. We believe this is unsafe for the children using the facility and it's abutting residents because of water run off. Please sign this petition in support of the Neck Street residents.

| *NAME* | *ADDRESS* |
|--------|-----------|
| Chris Careault | 19 Sauns Is Cans Lo |
| Ralph B. Soper | 65 David's Island Rd |
| Ruth J. Soper | 65 David's Island Rd. |

**ATTACHMENT D**

**Page 13 of 39**

## *PETITION*



R E C E I V E D

FEB 6

**Weymouth Planning Board**

We are the residents of Neck Street located behind the UHAUL Rental Center. The purpose of this petition is related to the proposed building of a day care center on Neck Street. The Bare Cove Day Care Center is located between 275 Neck Street and David's Island Road. The proposed building is within a flood plain. This is a dangerous street with high traffic and the constant risk of flooding. We believe this is unsafe for the children using the facility and it's abutting residents because of water run off. Please sign this petition in support of the Neck Street residents.

| *NAME* | *ADDRESS* | *Date* |
|---|---|---|
| Dawn White | 275 Neck Street #-4 Weymouth, Ma. | 2/1/97 |
| Lynne Owen | 275 Neck St. A-2 Weymouth MA | 2/1/97 |
| Cindy Forrey | 275 Neck St A5 Weymouth | 2/1/97 |
| Thomas P. Greene | 275 Neck St C-1 No. Weymouth, Ma | 2/2/97 |

**ATTACHMENT D**

**Page 14 of 39**

ATTACHMENT D

Page 27 of 39

**CONCERNED CITIZENS**
**NECK STREET**
**NORTH WEYMOUTH, MA. 02191**



February 11, 1997

Weymouth Town Hall
Planning Board
75 Middle Street
Weymouth, Ma.

To whom it may concern:

The residents of the Neck Street and surrounding side streets, are presenting the Planning Board with signed petitions and photographs regarding the Bare Cove Day Care Center. These petitions include 25 signatures of residents located within the proposed locale of this center. Many of these are citizens concerned with the conservation and preservation of the wetlands.

We, the residents of Neck Street are trying to work together concerning the safety of the children, the additional traffic problems and the negative impact of additional water displacement from the sewers and the Back River, which, already in the past, have caused considerable problems.

Thank you for your consideration regarding this matter.

*CONCERNED CITIZENS/*
*RUTH S. AMOS*

*Ruth S Amos*

January 30, 1997

## PETITION



We are residents of the area of Neck Street, River Street and Fort Point, generally. The purpose of this Petition is related to the proposed building of a day-care center on Neck Street. The Bare Cove Day Care Center will be located between 275 Neck Street and David's Island Road. The proposed building is on a dangerous street with heavy traffic, within a floodplain, ~ ~~tont risk of flooding in the area. We believe these factors pose ur children using the facility as well as its abutting reside also be affected by water runoff problems created by de environmental changes.

**ATTACHMENT D**

Page 28 of 39

| SIGNATURE NAME | ADDRESS |
|---|---|
| _[illegible signature]_ | 587 _[illegible]_ St. No. Wey |
| Mary _[illegible]_ | 48 Frank _[illegible]_ |
| Mary _[illegible]_ | 73 Broad Reach _[illegible]_ |
| Christine Burke | 73 Broad Reach, N. Wey |
| Virginia Sullivan | 88 Chard St. S. Wey MA |
| Rosamond Abbott | 181 Abigail Adams Cir. No. Weymouth |
| Kathleen Riley | 11 Fallen Farm E. Weymouth MA 02189 |
| Patrick Burke | 71 Broad Reach, North Weymouth |
| _[illegible]_ Burke | 61 Broad Reach, No. Wey. MA |
| Gilbert Abbott | 181 Abigail Adams Circle, Weymouth, MA |
| _[illegible]_ Ryan | Rosemont St. _[illegible]_ Weymouth MA |
| Christopher Ryan | Rosemont St. _[illegible]_ MA |
| _[illegible]_ | Commercial St. _[illegible]_ MA |
| _[illegible]_ | 88 Chard St. S. Weymouth MA 02189 |
| _[illegible]_ Sullivan | 88 Chard St. S. Wey MA |

## *PETITION*



We are the residents of Neck Street located behind the UHAUL Rental Center. The purpose of this petition is related to the proposed building of a day care center on Neck Street. The Bare Cove Day Care Center is located between 275 Neck Street and David's Island Road. The proposed building is within a flood plain. This is a dangerous street with high traffic and the constant risk of flooding. We believe this is unsafe for the children using the facility and it's abutting residents because of water run off. Please sign this petition in support of the Neck Street residents.

| *NAME* | *ADDRESS* |
|--------|-----------|
| Robert Selogan | 267 Neck St. C-10 |
| Novita Clapton | 267 Neck St. C-4 |
| Eugene Wizengki | 267 Neck St. C-8 |
| Morris Landman | 267 Neck St. C-7 |
| Teri McCann | 267 Neck St C-5 |
| Jean Cosmus | 267 Neck St C-12 |

ATTACHMENT D

Page 29 of 39



January 30, 1997

## PETITION

We are residents of the area of Neck Street, River Street and Weymouth, Planning Board generally. The purpose of this Petition is related to the proposed building of a day-care center on Neck Street. The Bare Cove Day Care Center will be located between 275 Neck Street and David's Island Road. The proposed building is on a dangerous street with heavy traffic, within a floodplain, and there is a constant risk of flooding in the area. We believe these factors pose unsafe conditions for the children using the facility as well as its abutting residents. Abutting residents will also be affected by water runoff problems created by developmental and environmental changes.

| NAME | ADDRESS |
|------|---------|
| Mary T. Squire | 51 Broad Reach N. Weymouth |
| | |
| Ames H. McLaurin | " |
| Lauren A. Connely MTIA | " " |

ATTACHMENT D

Page 30 of 39

### North Weymouth Civic Association
### P.O. Box 93
### North Weymouth, Ma. 02191

14 February 1997

Ms. Sandra Amos
275 Neck Street Unit B1
No. Weymouth, Ma 02191

Dear Ms. Amos,

Please be advised that the North Weymouth Civic Association's Board
of Directors, at their regularly scheduled meeting of 13 February,
voted unanimously to oppose the proposed Day Care Center for over
fifty (50) children at the intersection of Neck Street and David's
Island Road. Please feel free to mention our opposition where
appropriate.

Yours truly,

Bradley H. Annis
Treasurer (filling in for
Corresponding Secretary)

ATTACHMENT D

Page 31 of 39

**RUTH S. AMOS/**
**CONCERNED CITIZENS**
**NECK STREET**
**NORTH WEYMOUTH, MA. 02191**

February 19, 1997                          ATTACHMENT D

                                              Page 34 of 39

Weymouth Town Hall
Planning Baord
Weymouth Town Hall
75 Middle Street
Weymouth, Ma  02189

To whom it may concern:

We are enclosing copy of a letter from the North Weymouth Civic Association's Board
of Directors.  This letter unanimously opposes the proposed Bare Cove Day Care Center
at the corner of David's Island Road and Neck St.

Thank you for your attention to this matter.


Ruth S. Amos/        *Ruth S Amos*
Concerned Citizens

enc.:



RECEIVE

FEB 18 1997

OF WEYMOUTH
BOARD OF SELECTMEN

## RUTH S. AMOS/
## CONCERNED CITIZENS
## NECK STREET
## NORTH WEYMOUTH, MA. 02191

February 13, 1997

David Chandler, Chairman
Board of Selectmen                              **ATTACHMENT D**
Weymouth Town Hall
75 Middle Street                                **Page 35 of 39**
Weymouth, Ma 02191

Dear Mr. Chandler,

We are enclosing copies of two petitions from residents located on or near Neck Street, the Planning Board has the originals. Also, please find copies of articles printed in both the Patriot Ledger and Weymouth News on February 12th. The proposed day care center is located on a floodplain, which the builders intent to fill.

We are concerned with the safety of the children, traffic and the burden of additional water which a business of 53 children generates. We ask that a traffic study be performed on Neck Street which considers the influx of an additional 100 or more automobiles. Currently, the center intends offering morning and afternoon programs which will results in the 100 additional mentioned above. The current proposal allows for 12 parking spaces, one space is dedicated to handi-capped parking, eight for staff and two for vans, resulting in one parking space for 53 vehicles. Sgt. Newell, Traffic Officer, of the Weymouth Police states that parking on Neck Street "won't present any problems since the street is very wide". We do not agree with this.

The next planning board meeting is scheduled for February 24th at 9:00PM, and your support will be appreciated. If you require further information, please call me 335-3093.

Ruth S. Amos/          *Ruth S Amos*
Concerned Citizens

enc: Letter only
Gregory P. Hargadon, Vice-Chrm.
Susan M. Kay, Clerk
William B. Barry, Jr.
Joseph Piper

# North Weymouth Civic Association
## P.O. Box 93
## North Weymouth, Ma. 02191

ATTACHMENT D

Page 36 of 39

14 February 1997

Ms. Sandra Amos
275 Neck Street Unit B1
No. Weymouth, Ma 02191

Dear Ms. Amos,

Please be advised that the North Weymouth Civic Association's Board
of Directors, at their regularly scheduled meeting of 13 February,
voted unanimously to oppose the proposed Day Care Center for over
fifty (50) children at the intersection of Neck Street and David's
Island Road. Please feel free to mention our opposition where
appropriate.

Yours truly,

Bradley H. Annis
Treasurer (filling in for
Corresponding Secretary)



RECEIVE

FEB 2 0 1997

OF WEYMOUTH

**RUTH S. AMOS/
CONCERNED CITIZENS
NECK STREET
NORTH WEYMOUTH, MA. 02191**

February 19, 1997

**ATTACHMENT D**

**Page 37 of 39**

David Chandler, Chairman
Board of Selectmen
Weymouth Town Hall
75 Middle Street
Weymouth, Ma  02189

Dear Mr. Chandler,

We are enclosing copy of a letter from the North Weymouth Civic Association's Board
of Directors.  This letter unanimously opposes the proposed Bare Cove Day Care Center
at the corner of David's Island Road and Neck St.  As you are aware, the current proposal
is for 53 children from the ages of 2 ½ to 14 years.

Thank you for your attention to this matter.

Ruth S. Amos/
Concerned Citizens

enc.:

# Exhibit "Q"

Company, Inc. All Rights Reserved.

**New England:** *Investors want in Systems to offer up its online or its IPO. Page NE2.*

# NEW ENGLAN

## KING NEW ENGLAND     5/12/99



Unemployment
Number of people in New England who are unemployed (in thousands)

State
...nge from year-earlier period in the number of people unemployed



b. '98 – Feb. '99        Mar. '98 – Mar. '99

Conn.   Maine   Mass.   New Hamp.   Rhode Island   Vermont

*View Publishing Corp*

## FOCUS

## or Hartford Complex
## ly Gets an Audience

**DONNELL ANAND**
*E WALL STREET JOURNAL*
With city and state ...ed for months on luring Patriots and building a sports complex called ng, a smaller home development is stuck in

project. In fact, the idea is that the city wins because it would also get its first big new hotel and office building in years, which will generate jobs and contribute to the city's revival.

Some critics, however, view TIFs as just another form of corporate welfare, arguing that developers would build these projects anyway. There's also the

---

## Limits Sought On Locations For Day Care

### By CAROL GENTRY
*Staff Reporter of THE WALL STREET JOURNAL*

The not-in-my-backyard syndrome is aiming at an unlikely target: children.

A bill before the Massachusetts Legislature would give towns and cities some control over the location of day-care centers, making it harder for operators to open such facilities in residential areas.

Supporters say the bill will protect neighborhoods against encroachment by commercial child-care operations, which can add unwanted traffic volume and noise to an area and hurt property values.

But opponents say the bill, which is scheduled to be heard by a legislative committee today, will make it more time-consuming and expensive to find a site for child care, which is already scarce.

### Supply Crunch

"We have an incredible supply crunch," says Christine Johnson-Staub, director of policy and research at Associated Day Care Services of Metropolitan Boston Inc., a nonprofit care provider and referral agency. If the bill passes, she says, "cities will start making you jump through hoops to set up day care."

The legislation, sponsored by Sen. Robert L. Hedlund, a Weymouth Republican, would give communities greater leeway to restrict day-care centers through special permitting rules and other means. His bill would restore zoning rights that communities lost with a state law in 1991, enacted because of the day-care shortage.

Sen. Hedlund says his bill is aimed at businesses that care for a score of children or more, not family day-care homes, which can take in up to 12 children. "It's not snob zoning that's driving us to do this," he says, but the need for local control.

"Who knows what's best for a municipality?" Sen. Hedlund asks. "The locally elected officials or a bureaucrat in Boston?"

### Couple's Plan

The bill was prompted when a couple purchased two adjacent lots on Neck Street in Weymouth, planning to build their home on one and a day-care center that could ac-

---



## Kelly May
## To Preserv

### By GEETA O'DONNELL ANAND
*Staff Reporter of THE WALL STREET JOU*

For years, Jimmy Kelly has foug keep South Boston pretty much as he ways known it: blue collar and Irish.

In the mid-1970s, he made a nam himself by leading protests against s busing—a battle that got him arr eight times. In the '80s, he tried unsuc fully to let South Boston residents cho live in public-housing projects in thei neighborhood rather than be assigned where in the city.

But now Mr. Kelly faces his most f dable opponent ever: the market. A l ing economy and tight housing mark sweeping young urban professional South Boston's row houses and triple ers. Rents are soaring, and housing jumped 55% from 1995 to 1998.

Mr. Kelly—a former sheet-worker and current City Council dent—has emerged as the leader of fort to stem the inflow. He's pushin council to limit new housing and re the accouterments of yuppie living decks atop apartments and floor-to-c doors that turn restaurants and bar outdoor cafes. And he's looking to c

RNAL/NEW ENGLAND

## fits of Logan Expansion

wsuits Could
Plans") is
s.
that the fig-
assport are
tance, when
lelayed by a
iport counts
rt. Evidence
actually de-
contrary to

elays at Lo-
ccording to
ould reduce
What will
?
Massport's
pposed run-
und-Aid ap-
ready satu-
excuse for
is built and
ll only be a
is reached
d are real,

position to
attributed
nino's posi-
mayor and
ut respond
their con-

By consistently presenting the opposi-
tion to airport expansion in negative
terms (as a "hurdle" to overcome), you
imply that economic growth should be
pursued at any cost—in this case the cost
of quality of life for Boston residents, who
are already seriously abused by air traf-
fic. Your pro-business slant is no excuse
to make light of the fact that a city that
has become unlivable can no longer
thrive economically.

JACQUES WEISSGERBER
Boston

### What's So Funny About Vermont?

At first it was my thought to take no
notice of your April 7 piece on Maine and
Vermont humor—"You Know You Can't
Get There From Here, but Where Are
You?" After all, in the words of Calvin
Coolidge: "The things I do not say never
hurt me."

However, I am an actor who has
played Coolidge off and on for 25 years.
My solo performance, "Calvin Coolidge:
More Than Two Words," has been my
major occupation since 1985. It has taken
me all over the country—yes, even into
the state of Maine.

First, let me deal with Maine hu-
morist and storyteller Clyde Folsom's
mangling of the Coolidge story from
which I draw the title of my performance.
The story, in fact, is drawn not from the
Coolidge presidency, but from Cal's vice-
presidential years. The lady seated next
to Coolidge says: "I've made a $5 bet that
I can make you say more than two
words." Mr. Folsom correctly renders the
vice president's response: "You lose."

he Charts:
linics" re-
of medical
dical Asso-
this was a

n conjunc-
ritz Health
ny, has op-
nent since
nstitutions
edia than
esses, and
are leaded
es or their
it it is the
y engaged
nd in this

Earlier in your article, yet another
Maine humorist, Mark Easton, asserts,
"I can't think of any Vermont jokes—not
that you'd want to print in the paper."
What calumny! I cannot believe that
Coolidge would wish me to remain silent
when Vermont—the state he so loved—is
slandered!

Maine humorists are small potatoes
compared to America's main humorist,
Will Rogers, who once said: "Calvin
Coolidge has more subtle humor than any
other public man I ever met. I have often
said I would have liked to have hidden in
his desk somewhere and just heard the
little sly 'digs' that he pulled on various
people that never got them at all. I bet he
wasted more humor on folks than almost
anybody."

lUROWITZ

So, in my Coolidge persona, I chal-
lenge any two Maine humorists or story-
tellers to a duel. I will trade them quip for
quip, story for story. We shall see who
still stands at the end of an hour."

JIM COOKE
Dorchester, Mass.

ts—by
Letters
mith,
ven
Suite 718
er is
7:.



# Massachusetts Bill Would Restrict Location of Child-Care Facilities

Continued From Page NE1
cerns about increased traffic and safety of
pedestrians. Because the property was in a
flood plain, the town insisted the project
get the planning board's approval.

Tammy and Robert Campbell, the cou-
ple who wanted to build the center,



■ Gap between demand and supply:
40,000

"jumped through every hoop," but still
were turned down after a year and a half of
meetings, Mrs. Campbell says. After pro-
ceeding with legal challenges, the Camp-
bells won when a judge ruled the town
couldn't stop the construction. But over the
two years it took for the center to get the
go-ahead, the Campbells lost their original
financing and construction costs soared to
$80,000. They hope to build Bear Cove
Children's Center in time to open in Sep-
tember, Mrs. Campbell says.

Sen. Hedlund's bill received unanimous
support from the Local Affairs Committee
two weeks ago, and is to be heard today by
the Human Services and Elderly Affairs

ponent showed up, Sen. Hedlund says.

The state Office of Child Care Services,
which regulates day care, says it objects to
the bill. "We feel the current regulations
strike an adequate balance between the
community's right to control what happens
within its borders and the need for child
care," a spokesman says. The spokesman
says he doesn't know why the agency didn't
come to the last hearing.

Children's advocacy groups have been
working on legislation to boost the child-
care tax credit, which passed last week,
and say they haven't focused yet on Sen.
Hedlund's bill. But they don't like it, ei-
ther. Neither do day-care developers.

### 'Antichild' Bill

"It's antichild legislation," says
Michael Burkin, a Waltham, Mass., attor-
ney who works with Mulberry Child Care
Centers of Dedham, Mass.

The measure comes as many parents
continue to struggle to find day care. A 1997
survey by Associated Day Care Services, a
project called the Early Education Quality
Improvement Project, found Boston had
long day-care waiting lists citywide. The
greatest shortage was for facilities serving
preschoolers ages three to five, with an av-
erage of 33 children waiting per center. For
toddlers, the waiting list was 18; for infants,
15.

Statewide, figures on waiting lists are
difficult to come by except for lower-in-
come families who are eligible for sub-
sidized child care. Even though the state
increased funding for such families this
year, officials say the number of eligible
children without care is 15,000.

Doug Baird of Associated
Day Care Services says if Dedham or
other communities that buy his
restrictions may eventually restrict his
community can zone out child-care cen-
ters, it's going to inevitably be in trouble.

# Exhibit "R"




**BOARD OF SELECTMEN**

SUSAN M. KAY
Chairman

DAVID W. CHANDLER
Vice Chair

WILLIAM E. RYAN
Clerk

GREGORY P. HARGADON

PEG GOUDY

**(781) 335-2000**
**TTY (781) 331-5124**
**FAX (781) 335-3283**

*75 Middle Street*
*East Weymouth, Mass. 02189*

PAMELA T. NOLAN
Executive Administrator

# THE TOWN OF WEYMOUTH

The Town of Weymouth has been certified by the Criminal History Systems Board for access to conviction and pending criminal case data. As a license applicant, it is understood that a criminal record check will be conducted for conviction and pending criminal case information only as to applicant and/or its officers, stockholders and directors. The information below is correct to the best of my knowledge.

Applicant by

_____

Duly Authorized

**APPLICANT INFORMATION**
(Please Print)

_____    _____    _____

LAST NAME    FIRST NAME    MIDDLE NAME

_____

MAIDEN NAME OR ALIAS (IF APPLICABLE)

_____    _____

DATE OF BIRTH    SOCIAL SECURITY NUMBER

HOME ADDRESS _____

_____

REQUESTED BY _____
CORI AUTHORIZED EMPLOYEE/S

# Exhibit "S"

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
ROBERT J. CAMPBELL, AND THE CAMPBELL FAMILY INVESTMENT TRUST

Norfolk County

## DEFENDANTS
TOWN OF WEYMOUTH, ET AL.

FILED
CLERKS OFFICE
2005 MAR 14    Norfolk County

(b) County of Residence of First Listed Plaintiff **Norfolk County**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Robert J. Campbell,
Plaintiff Pro Se
50 Squanto Road
North Weymouth, MA 02191

Attorneys (If Known)
George E. Lane, Jr.
Town Counsel
87 Broad Street
Weymouth, MA 02188

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— | [ ] 620 Other Food & Drug | | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product | Med. Malpractice | [ ] 625 Drug Related Seizure | [ ] 423 Withdrawal | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | Liability | [ ] 365 Personal Injury — | of Property 21 USC 881 | 28 USC 157 | [ ] 450 Commerce/ICC Rates/etc. |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel & | Product Liability | [ ] 630 Liquor Laws | | [ ] 460 Deportation |
| & Enforcement of Judgment | Slander | [ ] 368 Asbestos Personal | [ ] 640 R.R. & Truck | **PROPERTY RIGHTS** | [ ] 470 Racketeer Influenced and |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' | Injury Product | [ ] 650 Airline Regs. | [ ] 820 Copyrights | Corrupt Organizations |
| [ ] 152 Recovery of Defaulted | Liability | Liability | [ ] 660 Occupational | [ ] 830 Patent | [ ] 810 Selective Service |
| Student Loans | [ ] 340 Marine | **PERSONAL PROPERTY** | Safety/Health | [ ] 840 Trademark | [ ] 850 Securities/Commodities/ |
| (Excl. Veterans) | [ ] 345 Marine Product | [ ] 370 Other Fraud | [ ] 690 Other | | Exchange |
| [ ] 153 Recovery of Overpayment | Liability | [ ] 371 Truth in Lending | | | [ ] 875 Customer Challenge |
| of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle | Property Damage | [ ] 710 Fair Labor Standards | [ ] 861 HIA (1395ff) | [ ] 891 Agricultural Acts |
| [ ] 190 Other Contract | Product Liability | [ ] 385 Property Damage | Act | [ ] 862 Black Lung (923) | [ ] 892 Economic Stabilization Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal Injury | Product Liability | [ ] 720 Labor/Mgmt. Relations | [ ] 863 DIWC/DIWW (405(g)) | [ ] 893 Environmental Matters |
| | | | [ ] 730 Labor/Mgmt. Reporting | [ ] 864 SSID Title XVI | [ ] 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate | [ ] 740 Railway Labor Act | **FEDERAL TAX SUITS** | [ ] 900 Appeal of Fee Determination |
| [ ] 220 Foreclosure | [X] 442 Employment | Sentence | | [ ] 870 Taxes (U.S. Plaintiff | Under Equal Access to |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ | Habeas Corpus: | [ ] 790 Other Labor Litigation | or Defendant) | Justice |
| [ ] 240 Torts to Land | Accommodations | [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 950 Constitutionality of |
| [ ] 245 Tort Product Liability | [ ] 444 Welfare | [ ] 535 Death Penalty | [ ] 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| [ ] 290 All Other Real Property | [X] 440 Other Civil Rights | [ ] 540 Mandamus & Other | Security Act | | [ ] 890 Other Statutory Actions |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- [ ] 1 Original Proceeding
- [X] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Violations of Title 42 USC Sections 1983, 1985 and 1986, via official misconduct, intentional torts, ethics violations and deliberate deceit

## VII. REQUESTED IN COMPLAINT:
[ ] CHECK IF THIS IS A CLASS ACTION DEMAND UNDER F.R.C.P. 23

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [X] No

## VIII. RELATED CASE(S) IF ANY
(See instructions):

JUDGE _____    DOCKET NUMBER _____

DATE **March 14, 2005**    SIGNATURE OF ATTORNEY OF RECORD    Robert J. Campbell    PLAINTIFF PRO SE

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) _CAMPBELL_ FILED WN OF WEYMOUTH
CLERKS OFFICE

2005 MAR 14 P 4:09

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER
SHEET. (SEE LOCAL RULE 40.1(A)(1)).

U.S. DISTRICT COURT
DISTRICT OF MASS.

_____ I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

440 II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740,
          790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.     * Also complete AO 120 or AO 121
                                                                        for patent, trademark or copyright cases

_____ III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
           315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
           380, 385, 450, 891.

_____ IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
           690, 810, 861-865, 870, 871, 875, 900.

_____ V.    150, 152, 153.

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E)). _N/A_____

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?
                                                          YES ☐    NO ☒

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC
   INTEREST?   (SEE 28 USC 2403)                          YES ☐    NO ☒
   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                          YES ☐    NO ☐

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC
   2284?                                                  YES ☐    NO ☒

7. DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL DIVISION OF THE DISTRICT OF MASSACHUSETTS (WORCESTER
   COUNTY) - (SEE LOCAL RULE 40.1(C)).                    YES ☐    NO ☒
   OR IN THE WESTERN DIVISION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES)?(SEE LOCAL RULE 40.1(D)).
                                                          YES ☐    NO ☒

8. DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN DIVISIONS OF THE DISTRICT?
                                                          YES ☐    NO ☒

   (a)    IF YES, IN WHICH DIVISION DOES THE PLAINTIFF RESIDE?_____

9. IN WHICH DIVISION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE?  _EASTERN_____

10. IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL AGENCY OF
    THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE
    CENTRAL DIVISION; YES ☐ NO ☒        OR WESTERN DIVISION;  YES ☐   NO ☒

11. ALTERNATIVE DISPUTE RESOLUTION - IS THIS CASE SUITABLE FOR ADR? IF SO, BY WHICH ADR?

    EARLY NEUTRAL EVALUATION ☐      MEDIATION ☒      SUMMARY JURY/BENCH TRIAL ☐

    MINI-TRIAL ☐                    OTHER ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME  _ROBERT J. CAMPBELL  PLAINTIFF PRO SE_
ADDRESS _50 SQUANTO ROAD, NORTH WEYMOUTH, MA 02191_
TELEPHONE NO. _(781) 335-4362_

(Category Form.wpd - 3/28/2000)