UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2006 MAR 13 P 4:58

U.S. DISTRICT COURT
DISTRICT OF MASS.

Robert J. Campbell,

     *Plaintiff,*

V.

Town of Weymouth, et al
     *Defendants*

CIVIL ACTION

DOCKET 05-10620-WGY

## PLAINTIFF'S OPPOSITION TO DEFENDANTS TOWN OF WEYMOUTH, DILLON, {M.S.} RYAN, ABBOTT, LYNCH, CLARKE, COATES, MCELROY, O'BRIEN, FOLEY, JOYCE, ELKERTON, NASUTI and {Wm} RYAN'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

Now comes the Plaintiff, Robert J. Campbell, ["Campbell"] with the following statement

in opposition to the Defendants Town Of Weymouth ["Town"], Paul Dillon, Mary Sue

Ryan, Susan Abbott, Paul Lynch, James Clarke, Jeffrey Coates, Mary McElroy, Francis

O'Brien, Edward Foley, Martin Joyce, Stanley Elkerton, Michael Nasuti and William

Ryan's Motion to Dismiss Second Amended Complaint ["Complaint"], dated February

26, 2006.

To prevent confusion and provide clarification for the following Discussion, the

Defendants Paul Dillon, Mary Sue Ryan, Susan Abbott, Paul Lynch, and Mary McElroy,

will be collectively referred to as ["the Planning Board"], James Clarke as ["Planning

Director"], Jeffrey Coates as ["Building Inspector"], Francis O'Brien, Edward Foley,

Martin Joyce and Stanley Elkerton collectively, as ["the BZA"][1]. For further distinction,

---

[1] Defendant McElroy was also a member of the Board of Zoning Appeals when the Plaintiff requested the variance, but was absent for the Public Hearing when the BZA voted on the proposed project.

     United States District Court
     Docket #05-10620-WGY

the remaining Defendants will be referred to as follows: Michael Nasuti ["Nasuti"] and

William Ryan ["Wm. Ryan"] to distinguish from Mary Sue Ryan, ["M.S. Ryan"].

On February 26, 2006, through Counsel, the Defendants filed a Motion To Dismiss,

suggesting that Campbell's Second Amended Complaint is defective for the following

reasons;

1. {The Complaint} failed to state a claim upon which relief can be granted.
   Fed.R.Civ.P., Rule 12(b)(6); and,

2. {The Complaint} alleged conduct of the Defendants {which} occurred more than
   three (3) years before the Complaint was filed on March 14, 2005, and that the
   claims are "untimely, time barred and subject to dismissal"; and,

3. the claims under 42 U.S.C. §1983 must be dismissed for failure to state a claim
   upon which relief can be granted; and,

4. "has not alleged a cognizable deprivation or due process because {the Plaintiff}
   has not alleged nor can he prove that he has a federally protected property or
   liberty interest" in the relief sought: and,

5. "has not alleged a compensable deprivation of procedural due process because
   {the Plaintiff} has not alleged nor can he prove the absence of an adequate post
   deprivation remedy under state law"; and,

6. {the Plaintiff's} "…allegations do not amount to a colorable deprivation of
   substantive due process"; and,

7. {The Complaint} "…does not state a claim against Nasuti under §1983 upon
   which relief can be granted…"; and,

8. "the Plaintiff's purported claims under 42 U.S.C. §§1985 and 1986 {should be
   dismissed} because neither states a claim upon which relief can be granted."

Finally, the Defendants note, "Even provided with an opportunity to amend its Complaint to plead a viable claim....in response to this Court's show cause order, the Plaintiff failed or declined...to state a comprehensible and viable claim."

As in the previous opposition statement[2], Campbell recognizes specific deficiencies in the {Second Amended} Complaint and reiterates his insistence that the claims against each of the Defendants are factual and meritorious, and that substantial evidence exists to support them. Notwithstanding the pending Motion to Amend with supporting Documents Affidavit, the Plaintiff contends there are additional facts with material evidence that have not yet been mentioned or presented in pleadings either in this action or the Massachusetts Land Court {"L.C. Docket #280041"}.

The long history associated with this action has produced volumes of public records from the Town's proceedings and other documents related to the Plaintiff's diligent efforts to develop the locus. The Plaintiff will clarify the claims, cause and relevant facts through this opposition statement and in subsequent pleadings.

## Discussion of Relevant Background

This action originated from the Plaintiff's appeal of the BZA's denial of a variance request [Complaint- paras. 140-144, 155] on L.C. Docket #280041. Based on specific facts and substantial evidence revealed through Plaintiff's Discovery efforts in that case [Complaint- paras. 82-84], the true cause of action on the federal questions was realized [Complaint- para. 86]. With this new information, the Plaintiff attempted to remove the

case from the state court under 28 U.S.C. §1441 to address the federal and constitutional violations.

Lacking additional details from L.C. Docket #280041, the Defendants have misconstrued the {federal} cause of action to be the single act of the BZA denying the variance alone, and not the Defendants' prior actions which led to the need for a variance in the first place. Without a full appreciation for (or refusal to acknowledge) the underlying cause, the Defendants have also misinterpreted the appropriate time frame applicable to the three year statute of limitations.

It is incumbent upon the Plaintiff now to "put the pieces of the puzzle together," and identify those essential elements of his claims as they apply to the acts of the Defendants as individuals and respective Boards. A brief recapitulation of certain events is appropriate for perspective.

Campbell was denied a Special Permit in March 1997 [Complaint- para. 67], but prevailed on appeal on Massachusetts Land Court Docket #237269 {"L.C. Docket #237269"} [Complaint- paras. 68, 93]. In that action, the Defendant Planning Board[3] and Building Inspector assented to Plaintiff's Motion to Amend and Substitute Plaintiffs, Robert J. And Tammy A. Campbell in lieu of Searles Builders, Inc. (see attached Documents Affidavit Exhibit "A"). The special permit was issued on a Remand Order in November 1998 [Complaint- para. 94] (see attached Documents Affidavit Exhibit "B").

---

[2] Plaintiff's Opposition to Defendant Amos' Motion to Dismiss, filed February 6. 2006.

Then as now, the Plaintiffs[4] did not own locus but still have a constitutionally protected property interest in both the lot and the permits. (see Plaintiffs response to Show Cause Order, pgs 4-6). Since the Defendants assented to and the Land Court acknowledged Campbell's standing in L.C. Docket #237269, any challenge on the issue now is mooted by *Res Ipsa Loquitur*.

Clearly the Planning Board sought to prevent Campbell's plans to build a daycare center from the start, stating explicitly in their decision [Complaint- para. 67] that locus is not an appropriate location for the proposed use. This position and subsequent actions underscores the greater truth that the Planning Board and the Town itself resent the fact that the exemption afforded to daycare centers by M.G.L. c.40A, §3, ¶3 (the Dover Amendment) limits their authority to decide on this issue.

M.G.L. c.40A, §3, ¶3 provides;

> No zoning ordinance or bylaw in any city or town shall prohibit, or require a special permit for, the use of land or structures, or the expansion of existing structures, for the primary, accessory or incidental purpose of operating a child care facility; provided, however, that such land or structures may be subject to reasonable regulations concerning the bulk and height of structures and determining yard sizes, lot area, setbacks, open space, parking and building coverage requirements. As used in this paragraph, the term ""child care facility" shall mean a day care center or a school age child care program, as those terms are defined in section nine of chapter twenty-eight A.

The purpose of this legislation (noted in the landmark decision, <u>Petrucci v. Board of Appeals of Westwood</u>, Land Court Misc. Case No. 219424) was to facilitate the

---

[3] The full membership of the (1997) Weymouth Planning Board were named as Defendants. Two individuals that voted affirmatively for the project are excluded from the instant action.

[4] Searles Builders Inc. also did not own locus when the appeal was initiated on L.C. Docket #237269.

establishment of childcare facilities and advance social policy. The House version of the

legislation (House No. 5772 of 1990) stated:

> "... a serious emergency exists with respect to the shortage of quality affordable
> child care in Massachusetts... It is that factors inhibiting the supply and
> availability of child care facilities will be mitigated without corrective measures
> of the type hereinafter set forth."

In deciding Petrucci, Judge Lombardi noted "My reading of this section (§3 of M.G.L.

c.40A) is that the Legislature was trying to state in explicit terms that a child care facility

merits special protection. *Lawmakers clearly did not want such uses to be frustrated by*

*local zoning requirements.*" {emphasis added}


In deciding cases on M.G.L.A. c. 40A, §3, the limitations placed on local zoning control

have been clearly defined. "...[C]hild care facilities may not be prohibited, nor made

subject to a special permit requirement, but may be subject to reasonable dimensional

regulations." Brad Cartwright v. Town of Braintree, Land Court Misc. case No. 236228

at 5 and 6. The Appeals Court further found that, "the town may not, through the guise of

regulating bulk and dimensional requirements under the enabling statute, proceed to

'nullify' the use exemption permitted to an educational institution." Bible Speaks v.

Town of Lenox, 8 Mass. App. Ct 19, 31 (1979) (siting Sisters of the Holy Cross v.

Brookline, 347 Mass. App. Ct. 486, 494 (1964).


In deciding the Plaintiff's appeal on the special permit (L.C. Docket #237269), Judge

Green found that, "...the board's application of the by-law's special permit requirement to

the plaintiff's application operated to nullify the protections afforded child care facilities

under the Dover Amendment, and did not "reasonably regulate" the proposed use." (*Id* at

pg 10). Similarly in this situation, by proposing and enacting further restrictions on

daycare facilities [Complaint- paras. 79-81] {"1998 Amendments"}, the Planning Board

sought to circumvent the protections afforded {child care facilities} by M.G.L.A. c. 40A,

§3. This, therefore, became the foundation of the Plaintiff's claims on appeal of the

BZA's variance denial {on L.C. Docket #280041}.

To determine the validity or constitutionality of the 1998 Amendments, precedent support

rests in Trustees of Tufts College v. Medford, 33 Mass. App. 580, 602 N.E.2d 1105

(1992). There, the Appeals Court found that "ALM GL c.40A, §3 invalidates two types

of zoning provisions: (1) those that are facially discriminate against the use of land for

educational purposes whether by way of prohibition, site plan requirements, or special

permit requirements; and (2) those that, although cast in form of non-discriminatory

dimensional or parking space requirements, have the practical effect of nullifying use

exemption permitted to [an] educational institution."

Although the 1998 Amendments are facially indiscriminate, any constitutional review on

a procedural or substantive due process basis must consider the surrounding facts and

circumstances and the {unlawful} procedures employed by the Planning Board to

implement them:

  1. The 1997 Amendments which first imposed restrictions on daycare development

     projects took effect only four (4) months prior to the 1998 proposal (from August

     1997 to January 1998).

  2. In that brief period, the Planning Board received no new applications for daycare

     centers, and not even the Plaintiff's project was subjected to the restrictions

     {although Campbell *voluntarily* modified his proposal to comply with them}

     [Complaint- para. 45] {emphasis added}

3. The 1997 Amendments were never implemented, tested or otherwise proven to be inadequate, thereby precluding any immediate need to increase the minimum requirements.

4. Where both 1997 and 1998 versions were developed and proposed by the Planning Board comprised of the same members, it is unlikely that their initial efforts were so deficient as to warrant such inordinate attention in a four month period.

5. The discussion by the Planning Board on the 1998 Amendments (see attached Documents Affidavit Exhibit "C") reveals the arbitrary and capricious nature of the changes, based solely on the whim of Dillon, Abbott and M.S. Ryan.

Notably absent from the discussion was any commentary related to the need for the change, which was later professed to be resulting from "new applications for daycare centers, especially in single family districts" (see Documents Affidavit in support of Plaintiffs Motion to Amend, Exhibit "C").

6. Abbott represented the Planning Board at the Town Meeting and introduced the 1998 Amendments as follows: "Article 42. State Law allowing day care centers in any zoning district has created many problems for planning boards..." {without elaborating on the nature of the problems} {emphasis added} (see Documents Affidavit in support of Plaintiffs Motion to Amend, Exhibit "D").

Campbell insists that the Planning Board and Clarke, acting under the color of law, willfully and intentionally deceived other Town departments, Town Meeting and the {Massachusetts} Attorney General, in offering the 1998 Amendments as "reasonable regulation" to conceal their true purpose: repudiate the Dover Amendment at all costs {emphasis added}.

The Plaintiff now contends that the 1998 Amendments are unconstitutional and have deprived him the right to the use of locus for purposes protected by statutory regulations thereby violating the Due Process Clauses of the 5th and 14th Amendments in violation of 42 U.S.C. §1983. In Parrat v Taylor, 451 U.S. 527 (1981), the Supreme Court addressed issues related to a negligent deprivation of property, finding "(a) In any 1983 action the initial inquiry must focus on whether the two essential elements to a 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Id.* Pp. 531-535. Plaintiff contends both conditions have been satisfied by the facts presented.

Unlike Parrat, Hudson v. Palmer, 468 U.S. 517 (1984) confronts intentional deprivation issues and equates them with negligent deprivation, finding that "...an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable post deprivation remedy." *Id.* at 14 [468 U.S. 517, 534].

Although this also amounts to a violation of the Takings Clause of the 5th Amendment by inverse condemnation, the Plaintiff further insists that the remedy and relief available under M.G.L. c.79, §10 is inadequate to completely rectify the injuries caused by the

Defendants' actions. Full remedy and relief is unavailable to the Plaintiff at the state level on several grounds, "Individual municipal employees were immune from personal liability on a claim under {Massachusetts} G.L. c.258, the Massachusetts Tort Claims Act, arising out of alleged gross negligence, where such a claim qualified as a "negligent or wrongful act or omission" under c.258, §2." Monahan v. Methuen, 408 Mass. 381, at 392 (1990) The Massachusetts Tort Claims Act, M.G.L. c.258, provides in part,

> "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances..." c.258, §2

Where the public employer is a municipality, relief would be further denied to the Plaintiff on a state civil rights claim, since "...a municipality is not a "person" covered by the Massachusetts Civil Rights Act, (MCRA), G.L. c.12.§§ 11H, 11I" Howcroft v. City Of Peabody, Mass. App. Case No. 98-P-2151 (2001), at 22.

The Appeals Court went on in Howcroft to compare the MCRA to §1983: "In Batchelder v. Allied Stores Corp., 393 Mass. 819, 821 (1985), the court compared the provisions of §1983 with those of the MCRA; the MCRA, unlike §1983, is available "whether or not [the person or persons are] acting under color of law" (emphasis supplied). G. L. c. 12, §11H, inserted by St. 1979, c. 801, §1. Those observations regarding the absence of the need to show State action under the MCRA, however, did not dispose of the question whether a municipality is a "person" under the MCRA. That issue was expressly left open in Swanset Dev. Corp. v. Taunton, 423 Mass. 390, 391 (1996). As stated in note 15, supra, a municipality may be liable as a "person" under §1983, see Monell v. Department of Social Servs. of New York, 436 U.S. 658, 688, 694 (1978)", Id. at 23.

United States District Court
                                                              Docket #05-10620-WGY

From <u>Howcroft</u> footnote [15]:

> "The individual defendants in their official capacities are not "persons"
> under § 1983. See <u>Laubinger</u> v. <u>Department of Rev.</u>, 41 Mass. App. Ct.
> 598, 602 (1996) ("the law treats the action as [one] against the official's
> office and hence against the State"), quoting from <u>O'Malley</u> v. <u>Sheriff of
> Worcester County</u>, 415 Mass. 132, 141 n.13 (1993). A municipality may
> be liable under §1983, see <u>Monell</u> v. <u>Department of Social Servs. of New
> York</u>, 436 U.S. 658, 688, 694 (1978), but only if the injury is caused by
> "officials whose acts may fairly be said to be those of the municipality," or
> if there is a municipal policy or custom that caused the injury. <u>County
> Commrs. of Bryan County</u> v. <u>Brown</u>, 520 U.S. 397, 403-404 (1997)."

Additionally, the Supreme Court found in <u>D'Amico v. California</u>, 389 U.S. 416 (1967)

[citing <u>McNeese v. Board of Education</u>, 373 U.S. 668 ], "that one of the purposes

underlying the Civil Rights Act was "to provide a remedy in the federal courts

supplementary to any remedy any State might have," id., at 672, we held that "relief

under the Civil Rights Act may not be defeated because relief was not first sought under

state law which provided [an administrative] remedy," id., at 671. See <u>Monroe v. Pape</u>,

365 U.S. 167, 180 -183"

<u>Monell</u> [436 U.S. 658], defines a "person" as a body politic or corporate, and further

found that, "[L]ocal governing bodies (and local officials sued in their official capacities)

can, therefore, be sued directly under 1983 for monetary, declaratory, and injunctive

relief in those situations where, as here, the action that is alleged to be unconstitutional

implements or executes a policy statement, ordinance, regulation, or decision officially

adopted or promulgated by those whose edicts or acts may fairly be said to represent

official policy." Pp. 690-691

Where the Town's form of government up until 2000 was by Town Meeting, the Planning Board through the Planning Director, was the sole authority responsible for developing and instituting the Town zoning policies. The Plaintiff offers proof that the Town instituted a "municipal" policy or custom of avoiding compliance with and exemption from the provisions of M.G.L. c.40A, §3, as a direct result of Campbell's proposed project, which is still in effect today. Of course, Campbell contends, this policy cannot be touted as an "official" policy, given its' invidious nature.

Prima facie evidence of the existence of this policy is contained in the Documents Affidavit Exhibit "D", <u>Reuse Plan for Naval Air Station South Weymouth</u> {Draft Dated 3/7/05}, and <u>Zoning and Land Use By-Laws for NAS South Weymouth</u> {Draft Dated 3/8/05}. As explained in the Overview of the Reuse Plan, the United States Department of Defense ("DoD), closed the former South Weymouth Naval Air Station as a result of the 1995 Base Realignment And Closure ("BRAC") process. Accordingly, the Governor of Massachusetts established the Naval Air Station Planning Committee ("NASPC") by Executive Order 378 of 1995. The Board of Selectman appointed Dillon and McElroy to represent the Town, and Clarke served as an advisor to the NASPC. McElroy was subsequently elected Chairperson of the NASPC.

Particular interest should be paid to the true intentions of those involved in developing the <u>Zoning and Land Use By-Laws for NAS South Weymouth</u> ("NAS Zoning Plan"), which is plainly described in the Reuse Plan Overview, para. 3, bullet 3, which states, "Adoption of proposed Zoning By-Laws which would *ensure local control* of development while addressing the need to create a unified permitting process…" {emphasis added}.

United States District Court
                                                                    Docket #05-10620-WGY

Fresh from the proceedings on the Plaintiff's application for Special Permit, McElroy,

Dillon and Clarke proceeded to develop the first Draft Proposal of the NAS Zoning Plan,

which was adopted by the NASPC in January, 1998. The 1998 version is identical in

content to the attached Draft Dated 3/8/05, since it was also presented to and approved by

the three (3) towns[5]. Of particular concern to This Court is the fact that the NAS Zoning

Plan was also submitted to the United States Navy for review and approval in the same

time frame.


Note the following clauses from the NAS Zoning Plan as evidence of the Town's policy:

1.  Page 2, Section 1.4,  Legal Relation Among The Reuse Plan, The By-Laws And
    The Regulations, para. (B), which reads in part, "These By-Laws are adopted
    pursuant to the Authority set forth in the Enabling Legislation, and are to be
    interpreted in accordance with the provisions of M.G.L. c.40A, except to the
    extent the provisions of Chapter 40A are inconsistent with the provisions of these
    By-Laws" {assuming a superior position to M.G.L. c.40A}

2.  Page 9, Section 2.4, Administrative and Enforcement Powers within the Central
    Redevelopment Area, para. (C)(5), which reads in part, *"...provided that the
    provisions of M.G.L. c.40A, §3 shall not apply to these By-Laws."* {emphasis
    added}

3.  Note that the South Shore Tri-Town Development Corporation ("Corporation"),
    created by the Enabling Legislation, "...shall have full and exclusive zoning
    licensing and permitting authority,..." in the Central Redevelopment Area as
    provided by Section 2.4 (A).

United States District Court
                                                              Docket #05-10620-WGY

4. Page 10, Section 2.5, <u>Enforcement Powers within the Perimeter Area</u>, para. (D)(5), which reads in part, *"...provided that the provisions of M.G.L. c.40A, §3 shall not apply to these By-Laws."* {emphasis added}

5. Note that the Applicable Town Boards (as defined in Section 2.5(C)), "...shall have full and exclusive zoning licensing and permitting authority,..." in the Perimeter Areas as provided by Section 2.4 (A).

6. Further note that "daycare centers" are not a permitted use in the Perimeter Areas, precluding any need to exempt the "Applicable Town Board" from the provisions of M.G.L. c.40A, §3.

The exemptions included in this proposal are directly attributable to the experience that McElroy, Dillon and Clarke had with the Plaintiff's proposal to develop locus. This is obvious, since the Defendants had no prior experience with permit applications relying on M.G.L. c.40A, §3 protection, and no other contemporary encounters {from 1997 to 1998} other than the Plaintiff's. To alleviate any immediate concerns This Court may have, the Corporation retained the services of an independent zoning expert who found and purged these clauses from the Final Version of NAS Zoning Plan, prior to it's approval in May, 2005. For comparison, the Approved Version dated May 5, 2005 and Minutes of the Town Council's Public Hearing dated June 16, 2005, are provided in Documents Affidavit Exhibit "E".

At the Public Hearing on June 16, 2005, the Plaintiff questioned whether a Zoning Plan containing an exemption to M.G.L. c.40A, §3 could withstand judicial scrutiny. Paraphrasing the Corporation's Zoning Expert puzzled response, "We couldn't figure out

why that was in there, but we removed it from the Final Version." The Plaintiff offers
This Court one viable suggestion as to "Why"; *the Defendants will go to extraordinary
lengths to retain local control over zoning issues.* {emphasis added}

The Defendants obviously seek to retain total control on zoning use and have deliberately
and continuously refused to comply with the provisions of M.G.L. c.40A, §3. It is
precisely that totalitarian aspiration and the obvious extent to which they were willing to
go which forms the foundation for the Plaintiff's federal cause of action. The indisputable
evidence of this unconstitutional demeanor proves that the Defendants acted willfully,
wantonly and maliciously toward the Plaintiff and similarly situated individuals not
named herein.

The level of defiance shown by the Planning Board after the Land Court remanded the
special permit case {from L.C. Docket #237269} is a true indication of their attitude
toward the Plaintiff and determination to stop his plans. At the Public Hearing where they
were force to grant the permit [Complaint- para.94], Dillon vehemently opposed, stating
"I will never vote to approve this project" and M.S. Ryan quipped, "We can just change
the law."

This comment undoubtedly led to Senator Hedlund's subsequent bill {introduced several
months after the hearing} which was a proposal to remove the zoning exemption
provided by M.G.L. c.40A, §3. The bill is described in the Wall Street Journal article of
May 12, 1999 (See Documents Affidavit in Support of Plaintiff's Motion to Amend,
Exhibit "Q"). It is no coincidence that paras. 7 & 8 of the article quotes Hedlund as
saying "'It's not snob zoning that's driving us to do this', but the need for local

control...'Who knows what's best for a municipality?'...'The locally elected officials or a bureaucrat in Boston?'"

As locally elected officials and municipal employees, the Defendants are entrusted with limited statutory authority specific to their positions, to serve as administrators and custodians of the Constitution and the laws of the Commonwealth. When individuals ignore their duties and deliberately act beyond the scope of their authority, defiantly refusing to abide by the limitations imposed on them, our society as a whole is diminished. The Plaintiff contends that all such acts are unconstitutional on their face, but it is the intentions behind those acts which are most often hidden from plain view.

In their response, the Defendants state (pg 8, ¶1) that, "A section 1983 cause of action accrues when the plaintiff knows or has reason to know, of the injury which is the basis of the action; when facts supportive of a civil rights action are obvious, or should be obvious to a reasonably prudent person similarly situated." {emphasis added} Edwards v Sotomayor, 557 F. Supp. 209, 213 (D.P.R. 1983). Campbell was aware of the injuries caused by specific actions, but the individual events mostly appeared grossly unfair and only marginally actionable {in state courts}, if at all. Campbell maintains that the appropriate tolling for his constitutional claims is the point at which he became aware of the Defendants invidious purposes, and the methods used to attain their goals.

"A reasonably prudent person" would expect that local government officials and municipal employees would abide by the obligations and limitations of their respective offices and conduct their affairs accordingly. The appropriate questions to consider the issues in this perspective then become who, when, how, and why they didn't. The

Complaint describes the facts in summary form only, due to the protracted length of this

project and the numerous opportunities the Defendants were given to consider the

Plaintiffs situation objectively. Flaunting their authority, they defiantly and repeatedly

refused to do so, in violation of a multitude of state and federal statutes along the way.

Campbell alleges the Defendant's motives behind this driving obsession can be found in

the information contained in a certain "Anonymous Letter" received by McElroy

[Complaint- para. 57, 190-195]. Campbell further contends that the conversation he had

in his initial meeting with Nasuti [Complaint- paras. 32-38] led to the unlawful disclosure

of detailed information on his criminal background to Wm. Ryan, Amos, Gildea, the

North Weymouth Civic Association and the Planning Board {and other unnamed

parties}.

By discussing the issue outside of the Public Hearing, a quorum of the Planning Board

violated the Open Meeting Law in M.G.L. c.39, §23B, and in failing to address their

concerns about Campbell's character and reputation directly, through the method

available in the Executive Session provisions of M.G.L. c.39, §23B(1), have further

violated Campbell's constitutional rights to freedom from <u>oppression</u>. {emphasis added}

M.G.L. c.39, §23B(1) states in pertinent part:

> (1) To discuss the reputation, character, physical condition or mental
> health rather than the professional competence of an individual, provided
> that the individual involved in such executive session has been notified in
> writing by the governmental body, at least forty-eight hours prior to the
> proposed executive session. Notification may be waived upon agreement
> of the parties. A governmental body shall hold an open meeting if the
> individual involved requests that the meeting be open.

Instead, the Defendants deliberately chose a subversive approach to deny the Plaintiff his

rights given by the statute:

> If an executive session is held, such individual shall have the following
> rights:
>
> (a) to be present at such executive session during discussions or
> considerations which involve that individual.
>
> (b) to have counsel or a representative of his own choosing present and
> attending for the purpose of advising said individual and not for the
> purpose of active participation in said executive session.
>
> (c) to speak in his own behalf.

Campbell insists he should have been allowed to address concerns on his character and

reputation, since there is substantial evidence in his support, resulting from an

investigation conducted by the United States Department of Defense from 1990 to 1991.

This investigation was initiated immediately following his conviction in 1989, due to the

fact that Campbell held a SECRET security clearance for access to classified information

since 1983. After a hearing on the results of the investigation, all of the issues presented

by the DoD were adjudicated in Campbell's favor, on all counts. At this time, Campbell

declines to present copies of the DoD files since the majority of the information

contained therein is covered by the Privacy Act of 1974 {Title 5 U.S.C. 552a}. Campbell

insists it contains contradictory statements to the reports on file in the Weymouth Police

Department {the only information accessible to Nasuti}.

Campbell further contends his allegations are not merely conclusory, but a product of

'logic and reason.' This is the only scenario that fully explains the association between

the Planning Board's animus toward the Plaintiff and the Board of Selectman's actions to

change the CORI requirements {as a pre-emptive measure to deny the project}. In fact, the 1998 {Bylaw} Amendments could also be perceived as a pre-emptive measure to deny the project in the event Campbell did not succeed in the special permit appeal, since the 1998 Amendments took effect prior to the decision on the special permit appeal {L.C. Docket #237269}.

The Plaintiff insists that the Planning Board through its working and familial relations with the Board of Selectmen {through Wm. Ryan} unlawfully discussed and disseminated information on Campbell's criminal history, resulting in the temporally proximate change in CORI requirements. In so doing, Wm. Ryan has violated the Plaintiff's constitutional rights to freedom from oppression in violation of his civil rights under violation of 42 U.S.C. §§1983 and 1985(2). Campbell further insists that the Town, Clarke and the Planning Board conspired to act in retaliation for his expression of his First Amendment rights to redress {his appeal of the Special Permit denial} in violation of 42 U.S.C. §1985(2).

Furthermore, Plaintiff adamantly insists that the Town, Clarke, Coates and the BZA had knowledge of or should have known of these unconstitutional actions and failed or refused to act to prevent them from harming the Plaintiff in violation of 42 U.S.C. §1986. Additionally, while debating the Plaintiff's variance request, the BZA refused to recognize the hardship presented by the Plaintiff in relation to the geometry of locus and only addressed the minimum parking requirements. The BZA completely ignored the Plaintiff's portion of the request related to non-residential use of the minimum setback. If properly considered, a dimensional analysis shows that no alternate configuration or reduction in building size would make the plan conform to the 1998 requirements.

Notwithstanding the fact that the BZA's prior approval of similar variances on minimum

parking in other locations is a direct violation of the Uniformity Clause of M.G.L. c.40A,

§4, which reads,

> Section 4. Any zoning ordinance or by-law which divides cities and towns
> into districts shall be uniform within the district for each class or kind of
> structures or uses permitted.
>
> Districts shall be shown on a zoning map in a manner sufficient for
> identification. Such maps shall be part of zoning ordinances or by-laws.
> Assessors' or property plans may be used as the basis for zoning maps. If
> more than four sheets or plates are used for a zoning map, an index map
> showing districts in outline shall be part of the zoning map and of the
> zoning ordinance or by-law.

In other words, if a variance is granted to others in similar circumstances, the approval of

a variance is obligatory for a daycare application.


A brief discussion on the effect of the 1998 Amendments on Campbell's project will

further confirm this to be the true the cause of the federal action:

1. If the Planning Board did not act arbitrarily to adopt the 1998 Amendments,

   the Plaintiff could have re-applied for a special permit as soon as it expired in

   2001, since his plan was fully compliant with all previous zoning requirements;

   or

2. If the Building Inspector was not negligent by allowing his Department to

   provide inaccurate information to prospective buyers of Campbell's house lot,

   the sale could have been made before the special permit expired, preventing the

   need for a variance; or

3. If the BZA correctly deliberated and approved the variance, as they were

   obliged to do; or

4. If the Planning Board had not deliberately lied to implement the 1998
   Amendments,

Campbell could have proceeded as planned, without hinderance, and the constitutional

violations would not have occurred, {emphasis added} under the 'no harm, no foul'

concept.

Furthermore, if the Building Inspector was not personally motivated in opposition to the

Plaintiff {or M.G.L. c.40A, §3}, he could have granted the extension to the special permit

that Campbell requested, thereby eliminating the need for a variance. This attitude is best

related through a conversation which occurred between Campbell and Coates by chance

meeting in the elevator at the Town Hall, during the Summer of 2002. Campbell was at

the Town Hall actively engaged in Discovery efforts on L.C. Docket #280041, and

Coates was in the last few days before his {forced, early} retirement from the Building

Inspector position. The exchange occurred approximately as follows:

Campbell: Mr. Coates?

Coates:    Yes?

Campbell: You know, in spite of all that's happened with this project, I'd like to
          say that it's always been a pleasure in dealing with you. You've
          always acted in a professional manner.

Coates:    Well, it's hard to be professional when you're being sued.

Campbell: It's not a personal issue.

{the conversation ended with the elevator ride}

A brief discussion on {some of} Campbell's injuries directly resulting from the 1998

Amendments further confirms the validity of the cause of action, in that;

1. If the 1998 Amendments did not exist, Campbell could have proceeded on the project as soon as the house lot was sold in September 2001, six (6) months prior to the BZA hearing, and before Campbell's credit was irreparably damaged. The pre-conditions imposed by the bank financing the project would have required Campbell to refinance his current home and prevented the pending foreclosure, the repossession of his vehicle and need to file for Chapter 13 Bankruptcy {first filed 10 weeks after the BZA denied the variance} (See attached Documents Affidavit, Exhibit "F")

2. If Campbell's request to extend the special permit was granted, the project would have proceeded in September 2001, as in (1) above. Since the request was denied, funds paid to re-apply for the permit and variance {in December 2001} were not available to prevent either the repossession of his leased vehicle in January 2002 or the pending foreclosure, thereby mandating the first Chapter 13 Bankruptcy filing; or

3. If the BZA had approved the variance, the financing described in (1) above, could have been obtained in February 2002, allowing adequate time to prevent the first Chapter 13 Bankruptcy filing {although some damage to Campbell's credit would still have occurred, there was an opportunity to reverse the vehicle repossession}; or

4. If the Planning Board had not lied to implement the 1998 Amendments, the requirement for a variance never would have existed.

Regardless of which circumstances are considered, the only logical conclusion is that the variance never should have been required, and Campbell never should have been to subjected to the disparate treatment he received.

The Defendants' actions indisputably forced Campbell {and his family} to sell their home in 1999, causing them to be temporarily homeless; drained him of all available funds by forcing him to repeatedly and continuously recover from tortious acts; forced him into bankruptcy; irreparably damaged his reputation and credit which continues to affect his ability to earn a living; and a myriad of other consequential injuries to his health.

With regards to the involvement of Officer Nasuti, the Plaintiff wishes, first, to express his sincere gratitude to the Officer's dedication and commitment to ensuring the safety and security of the citizens of Weymouth. Many people and their property have been protected by his efforts and many dangerous persons have been apprehended through his usual professionalism. In light of these accomplishments, it is most disappointing to the Plaintiff that those attributes did not extend to the Campbell household, and most offensive that Campbell's family has also been injured by Nasuti's deliberate acts. That being said, I intend to momentarily break from the typical flowery rhetoric and third person narrative to speak plainly on this issue, so there is no misunderstanding about the extent of the damage caused by his betrayal of my trust and confidence.

I am adamant in the belief that my encounter with the Defendant Nasuti in 1996 is the primary reason that the Town has acted as alleged. Whatever reason or justification the Defendant Nasuti attempts to offer for his unlawful and unethical involvement cannot even begin to rectify the havoc he's wreaked or assuage the damage done to my wife and children. I am helpless to defend them from the detrimental effects of his actions. As a reminder to This Honorable Court and everyone else involved, I confided in Michael about a troublesome past and asked only for an opportunity to make amends, completely trusting that he would be willing to help.

United States District Court
                                                                    Docket #05-10620-WGY

Therefore, I must insist that further evidence exists to support the claims against him. There are other participants in and witnesses to the Town's proceedings, who are not named in this action, who are or may be willing to confirm some or all of these allegations, or may be compelled to do so, with This Court's approval.

Accordingly, Campbell contends that Nasuti abused his authority as a Weymouth Police Officer, by violating the Massachusetts Conflict of Interest Laws, M.G.L. c.268A, §23(c)(2). Nasuti has also violated the Plaintiff's constitutional rights to due process under the 14th Amendment through an abuse of process to obtain information on Campbell's criminal history.

M.G.L. c.268A, §23(c)(2) states:

> (c) No current or former officer or employee of a state, county or municipal agency shall knowingly or with reason to know:
>
> > (2) improperly disclose material or data within the exemptions to the definition of public records as defined by section seven of chapter four, and were aquired by him in the course of his official duties nor use such information to further his personal interest.

Campbell contends that Nasuti has continuously and repeatedly interjected himself into these proceedings at the most advantageous times for his personal interests and the most critical occasions for the Plaintiff. With each appearance, the extent of his actions has been increasingly detrimental to the Plaintiff's plans and increasingly questionable behavior for a Police Officer. Beginning with a breech of trust at their first meeting and increasing to a violation of multiple ethics laws at the subsequent meeting with Amos.

Further offensive to the Plaintiff was his direct {and unlawful} participation in the Public Hearing on the variance application before the BZA, at which he suggested that Campbell intended to ignore any restrictions or conditions the BZA might impose on a variance approval.

Pertaining to Nasuti's recent appearances in the Plaintiff's neighborhood:
Campbell has resided at the same address since November 2000. In diligent {and authorized} pursuit of his Discovery efforts on L.C. Docket #280041 in June 2004, the Plaintiff requested information from the Weymouth Police Department (WPD) regarding Nasuti. In July 2004, Campbell met with Chief Thomas of the Weymouth Police Department to review some of the documents and information requested, but other materials were not available. Chief Thomas plainly stated his disagreement with Campbell's reasons for requesting the information and refused to fully comply with {several} valid Discovery Requests. (See Documents Affidavit in Support of Plaintiff's Motion to Amend, Exhibit "O")

In August 2004, Campbell made a written demand for the materials to the Town Solicitor, which also expressed concerns about the obvious increase in WPD patrols on his street. For the four years prior to the Discovery requests & demand, Nasuti was nowhere to be seen in the immediate area, but once the complaint was made, he appeared right on cue, as he has in the past. Campbell also has knowledge of at least one written complaint and a witness to an incident where Nasuti has used his authority to retaliate against a person who filed a complaint about him with the WPD. The Plaintiff has genuine and continuing concerns about Nasuti's potential reaction to this action, giving weight to the injunctive relief requested. From October 2004 to February2005, Campbell

made approximately three (3) verbal complaints to the Town Solicitor about Nasuti's presence in the area, including one incident involving Nasuti's discussion with a neighbor at approximately 12:30 AM, while in his WPD cruiser.

In February 2005, the Plaintiff engaged in a brief verbal exchange with Nasuti in front the Plaintiff's house, {Campbell was photographing Nasuti as he drove by}. Apparently offended by the Plaintiff's actions Nasuti backed his car up to the Plaintiff's house and demanded to know if Campbell had a problem with him being on this street. Campbell replied he was just protecting his interests {from his front doorstep}. Obviously more annoyed with the lack of details, Nasuti demanded "From what?!" and asked Campbell if this was about the daycare project that "died eight years ago". In turn Campbell questioned Nasuti's participation at the BZA Public Hearing only three years before {that exchange}. Nasuti replied that "he was asked to attend," but didn't say by whom, or why he deliberately chose to accept the invitation. When another car approached, the exchange ended, but not before Campbell invited Nasuti to "come over and talk about it."

For the reasons stated above and the additional authorities listed below the Plaintiff humbly requests that This Court allows an appropriate equitable tolling of the Plaintiff's claims, based on: The five (5) 'Kale' factors traditionally used by courts to determine if tolling is applicable are: (1) Lack of actual notice of the filing requirement; (2) Lack of constructive knowledge of the filing requirement; (3) Diligence in pursuing one's rights; (4) Absence of prejudice to the Defendant(s); and, (5) Plaintiff's reasonableness in remaining ignorant of the requirement, from Kale v Combined Insurance Co., 861 F.2d 746, 752 (1st Cir. 1988), citing Andrews v Orr, 851 F.2d 146, 151 (6th Cir. 1988).

Page 26 of 28                                          United States District Court
                                                       Docket #05-10620-WGY

Disparate Treatment exhibited by the Defendants, "[D]epartures from the normal procedural sequences also might afford evidence that improper purposes are playing a role…" <u>Village of Arlington Heights v Metro Housing Development Corp</u>, 429 U.S. 252, 267 (1977); and, "…evidence that Defendants acted…disparately from which they acted toward others may serve as circumstantial evidence of retaliation…" <u>Housing Works Inc v City of New York</u>, 72 F.Supp.2d 402, 424 (SDNY 1999); and, a {continuous} Pattern of Antagonism exhibited by the Defendants, "…circumstantial evidence of a Pattern of Antagonism following protected conduct can give rise to the inference{s}…" <u>Kachmar v. Sunguard</u>, 109 F.3rd 173, 177 (3rd Cir. 1997); and a Suspicion of Mendacity exhibited by the Defendants, "[D]ishonesty about a material fact as affirmative evidence of guilt…" <u>Reeves v Sanderson Plumbing</u>, 530 U.S. 133 (2000), quoting <u>Wright v West</u>, 505 U.S. 277, 296 (1992)

Wherefore, the Plaintiff humbly prays that This Honorable Court deny the Defendants Town Of Weymouth, Paul Dillon, Mary Sue Ryan, Susan Abbott, Paul Lynch, James Clarke, Jeffrey Coates, Mary McElroy, Francis O'Brien, Edward Foley, Martin Joyce, Stanley Elkerton, Michael Nasuti and William Ryan's Motion to Dismiss and grant the Plaintiff's Motion To Amend Complaint.

Respectfully submitted,

Robert J. Campbell
Plaintiff, Pro Se
50 Squanto Road
North Weymouth, MA 02191
Telephone (781) 335-4362

Dated March 13, 2006

United States District Court
Docket #05-10620-WGY

Pc: William P. Breen, Jr., Esq.                  Gregory F. Galvin, Esq.
    Murphy, Hesse, Toomey & Lehane, LLP          775 Pleasant St., Unit 16
    300 Crown Colony Dr., Ste 410                E. Weymouth, MA 02189
    Quincy, MA 02169

    George E. Lane, Jr., Esq.                    Stephen C. Warneck, Esq.
    87 Broad St.                                 350 Lincoln St., Ste 2400
    Weymouth, MA 02188                           Hingham, MA 02043

## CERTIFICATE OF SERVICE

I hereby certify on this day that a true copy of the enclosed document was served upon
the Defendant(s) by U.S. Mail-First Class/Hand Delivery

Date: 3/13/06

Robert J. Campbell,
Plaintiff, Pro Se
50 Squanto Road
North Weymouth, MA 02191
(781)335-4362

United States District Court
Docket #05-10620-WGY